**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | <u>CLASS ACTION</u> |
| FISERV, INC., FRANK J. BISIGNANO, MICHAEL P. LYONS, ROBERT W. HAU, and KENNETH F. BEST, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**<u>OF THE FEDERAL SECURITIES LAWS</u>**

Plaintiff City of Hollywood Police Officers' Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of Fiserv, Inc. ("Fiserv" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action on behalf of all persons and entities that purchased or otherwise acquired Fiserv common stock between July 24, 2024 and July 22, 2025, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' (defined herein) violations of the federal securities laws under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    This case is about how Fiserv misled investors by artificially inflating its growth numbers through compelled migration of legacy customers using Payeezy, the Company's older point-of-sale ("POS") platform, to Clover, its expensive and feature-heavy POS platform.  As this forced migration increased Fiserv's headline growth numbers, Defendants falsely claimed that this growth was being driven by new customers organically signing up for Clover.  The market learned that this growth was unsustainable when a substantial portion of these migrated customers abandoned Fiserv altogether in favor of less-expensive competing products like Square and Toast.

3.    Fiserv is a global provider of transaction processing software for banks and retail merchants.  Fiserv's flagship product and most important growth driver is Clover, which provides

merchants with a payment "gateway" to facilitate the secure processing of credit, debit, and mobile payment transactions on behalf of financial institutions and their customers. Clover revenue is primarily generated from transaction fees paid by merchants, which are computed as a percentage of the dollar value for goods and services charged through Clover. Fiserv positioned Clover as a comprehensive "operating system for small businesses" that also generates revenue from POS hardware sales and expensive subscription-based value-added services ("VAS") like payroll administration software, merchant financing, and cash flow management solutions.

4.    Fiserv investors have been focused on growth trends in Clover's gross payment volume ("GPV"), which represents the total monetary value of transactions processed through the Clover platform. Accelerating GPV growth rates indicate an expanding number of new merchants on Clover, which translate into sustainable revenue growth. On the other hand, decelerating GPV growth rates signal a slower uptake of new merchants or the loss of existing merchants on the Clover platform (i.e., attrition). During the Class Period, the Company claimed that it closely tracked GPV trends and merchant attrition. For instance, Fiserv's then-CEO, Frank Bisignano ("Defendant Bisignano"), stated that "we have the benefit of looking at attrition rates from everything."

5.    At a November 2023 investor conference, Defendant Bisignano presented strategies to accelerate Clover's revenue growth, including expansion of its direct sales force and increasing VAS revenue through product innovation. At the conference, Fiserv reiterated key financial targets, including Clover revenue of $3.5 billion in 2025 and $4.5 billion in 2026. According to Defendants, Fiserv would primarily achieve these targets by signing up new Fiserv merchants onto Clover, instead of moving existing Fiserv merchants on other platforms (its so-called "back book") to Clover. Specifically, Defendants told investors that 90% of Clover revenue

2

growth was, and would continue to be, generated from new Fiserv merchants, while only 10% would come from back book merchants who proactively switched to Clover. In fact, Defendants acknowledged that the higher-priced Clover platform was impractical for many smaller merchants within its back book who did not require Clover's VAS functions. These representations were important to investors because Fiserv's ability to effectively sign-up new merchants to the Clover platform was indicative of the sustainability of Cover's revenue growth.

6.       During 2023, Fiserv began to phase out Payeezy, its older payment gateway for small business merchants. Payeezy was cheaper for small business merchants and provided them with basic e-commerce functions. Notwithstanding its "very moderate assumptions for back book conversions," Fiserv forcibly migrated as many as 200,000 merchant locations on Payeezy to Clover from late 2023 through the first half of 2024. This back book conversion provided a rapid boost to Clover revenue and GPV. Specifically, the Company reported Clover revenue of $2.7 billion on GPV of $310 billion for 2024, accounting for half of Fiserv's year-over-year revenue growth. Unbeknownst to investors, Clover's 2024 Revenue and GPV growth were boosted by these forced migrations. Furthermore, the legacy Payeezy merchants were leaving Clover en masse for competitors like Square and Toast because Clover was much more expensive than Payeezy and provided functions they did not need or want.

7.       The Class Period begins on July 24, 2024, when Defendant Bisignano assured investors that Clover's growth was being fueled by new merchant business (not its back book) and that Clover was not facing significant merchant attrition. As the Class Period progressed, Defendants continued to tout Clover's growth prospects while failing to disclose that Clover GPV growth was decelerating due to attrition from former Payeezy customers that had been forcibly moved to Clover. Fiserv executives later admitted that this attrition began relatively quickly and

was largely driven by price-sensitive Payeezy merchants seeking lower-cost alternatives such as Square, Toast, and Shopify, as they were not utilizing Clover's expensive hardware and VAS solutions. In addition, poor customer service and other operational issues further drove merchant attrition on Clover.

8.      This complaint alleges that, throughout the Class Period, Defendants misled investors by failing to disclose that: (a) due to cost issues and other problems with its Payeezy platform, Fiserv forced Payeezy merchants to migrate to its Clover platform; (b) Clover's revenue growth and GPV growth were temporarily and unsustainably boosted by these forced conversions, which concealed a slowdown in new merchant business; (c) shortly after these conversions, a significant portion of former Payeezy merchants switched to competing solutions due to Clover's high pricing, inadequate customer service, and other issues; (d) as a result of these merchant losses, Clover's GPV growth was significantly slowing, and its revenue growth was unsustainable; and (e) based on the foregoing, Fiserv's positive Class Period statements about Clover's growth strategies, competition, attrition, GPV growth, and business prospects were materially false and misleading.

9.      The market began to learn the truth about Defendants' fraud on April 24, 2025. On that date, Fiserv shocked investors by reporting Clover GPV growth of only 8% for the first quarter of 2025, a material stepdown from 2024 GPV rates of between 14% and 17%. The Company attributed this slowing growth to lower 2025 transaction volumes from Payeezy merchants who had converted to Clover. Despite this steep drop-off in GPV growth, Clover's first quarter 2025 revenue growth remained relatively steady at 27%. Defendants attributed the spread between Clover revenue growth (27%) and GPV growth (8%) to strong Clover hardware sales and VAS penetration from existing merchants. However, Defendants continued to defraud investors by

failing to disclose that this spread was largely due to the loss of transaction volumes from former Payeezy merchants who left Clover for competing solutions. Analysts at J.P.Morgan noted that this was "the widest spread between revenue and volume in our model's history, raising concerns about sustainability of premium growth." On this news, Fiserv stock dropped 18.5 percent.

10.    Then, on May 15, 2025, Fiserv disappointed investors by disclosing that GPV growth deceleration would continue throughout 2025. Analysts were surprised at this trend, with Bernstein Research highlighting the "intensifying competitive dynamics" and Goldman Sachs noting the "very significant churn" of Clover customers from back book conversions. On this news, Fiserv stock dropped an additional 16.2 percent, closing at $159.13 on May 15, 2025.

11.    Finally, on July 23, 2025, Fiserv lowered the top end of its full-year organic growth guidance range and confirmed that its quarterly organic revenue in the Merchant segment had decelerated to 9 percent year-over-year from 11 percent in the previous quarter. The slowing organic growth rates led analysts to question the credibility of Fiserv management. For example, analysts at Wolfe research stated that "we recognize a need for the dust to settle, **with stability/credibility in metrics and guidance reestablished** before some investors add materially to shares." Analysts at Keefe Bruyette & Woods stated that "FI missed Merchant segment organic growth expectations (again) and lowered its FY25 organic growth revenue outlook to the lower end of the prior range, implying **the steep ramp in Merchant segment growth that was previously anticipated is unachievable**." On this news, Fiserv stock dropped an additional 13.9 percent, closing at $143.00 on July 23, 2025.

12.    As a result of Defendants' wrongful acts and omissions, and the significant declines in the market value of the Company's common stock pursuant to the revelations of the fraud, Plaintiff and other members of the Class (defined herein) have suffered significant damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's stock trades on the New York Stock Exchange ("NYSE") located in this Judicial District.  Defendants conduct business in this Judicial District, Fiserv maintains executive offices located at 1 Broadway in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## PARTIES

**A.     Plaintiff**

17.     Plaintiff purchased or otherwise acquired Fiserv common stock during the Class Period and was damaged as a result of the Defendants' wrongdoing alleged in this complaint.

**B.     Defendants**

18.     Defendant Fiserv is headquartered in Milwaukee, Wisconsin and its common stock trades on the NYSE under the ticker symbol "FI."

19.     Defendant Frank J. Bisignano ("Bisignano") served as Fiserv's Chief Executive Officer (since 2020) and Chairman of Fiserv's Board of Directors (since 2022) until his resignation

from both positions on May 6, 2025.  Defendant Bisignano also served as Fiserv's President from 2019 until January 27, 2025.

20.    Defendant Robert W. Hau ("Hau") was at all relevant times Fiserv's Chief Financial Officer.

21.    Defendant Michael P. Lyons ("Lyons") served as Fiserv's President since January 27, 2025 and assumed the role of Chief Executive Officer on May 6, 2025.

22.    Defendant Kenneth F. Best ("Best") was at all relevant times Fiserv's Chief Accounting Officer.

23.    Defendants Bisignano, Hau, Lyons, and Best are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Fiserv's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations which were being made were then materially false or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

24.    Fiserv is a Milwaukee, Wisconsin-based global payments and financial technology provider with "executive offices" in New York City.  The Company operates through two main segments: (1) Merchant Solutions, including the Clover platform; and (2) Financial Solutions, under which the Company provides account processing, digital banking solutions, card issuer processing, and network services to banks and other financial institutions.  In the Merchant Solutions segment, revenue is generated through payment processing fees, hardware sales, and subscription-based VAS such as fraud prevention, loyalty programs, and data analytics on behalf of a wide range of merchants, from small businesses to large enterprises.  In the Financial Solutions segment, the Company earns revenue through contracts with banks, credit unions, and other financial institutions for account processing, digital banking platforms, and card issuer services.

25.    In December 2012, mobile payments startup Clover Network, Inc. was acquired by payments processing giant First Data Corporation ("First Data").  First Data was then acquired by Fiserv in July 2019 through an all-stock transaction valued at $22 billion, with Defendant Bisignano, who previously led First Data, becoming the post-merger CEO at Fiserv.  Fiserv touted the acquisition as a value-accretive move to strengthen its position in the payments industry, combining its core banking expertise with the merchant capabilities of Clover.

26.    Clover, Fiserv's flagship product and the Company's most important growth driver, is a cloud-based POS platform that facilitates the secure processing of credit, debit, and mobile payment transactions.  Clover primarily generates revenue by charging a percentage of each merchant transaction.  Clover revenue is also generated from hardware sales and VAS subscriptions.

27.    Clover's GPV provides a snapshot of transaction volume and scale of payments handled on the platform.  Growing GPV rates signal support for Clover as a foundation for sustainable recurring revenue.  Conversely, when Clover acquires fewer new merchants and loses existing merchants through attrition to competitors, GPV rates decelerate.  Because Clover GPV rates and merchant attrition are so important to the sustainability of the Company's revenue growth, they are closely monitored by both Fiserv executives and investors.  Prior to the Class Period, in mid-2023, the Company began to retire its Payeezy system and started to convert its Payeezy merchants at up to 200,000 locations, to Clover.

28.    During an investor conference in November 2023, Defendant Bisignano presented strategies to accelerate Clover's long-term revenue growth, including expanding its direct sales force and increasing VAS revenue through product innovation.  During the conference, Fiserv also provided a $10 billion 2025 revenue target for its Merchant Solutions segment, including at least $3.5 billion in Clover revenue that "did not include back book conversion at any degree of scale." The Company also issued a $4.5 billion Clover revenue target for 2026.  Since then, investors have increasingly focused on Fiserv's ability to maintain growth rates of Clover's GPV, an indication of a growing customer base that translates into sustainable long-term revenue growth.

29.    In April 2024, Fiserv reported 30 percent Clover revenue growth and 19 percent Clover GPV growth for the first quarter of 2024 (compared to the same quarter in the previous year), which was well received by investors.  Defendants explained that the spread between these growth rates "reflects a higher penetration of value-added solutions [to existing clients], continued channel mix shift and some pricing."  Remarkably, Defendants did not attribute any of this spread to the loss of former Payeezy merchants who were immediately dissatisfied with Clover's higher costs and unnecessary functions for its business.  Throughout the Class Period, Fiserv executives

consistently stated that only 10 percent of Clover's revenue growth was, and would continue to be, driven by back book conversions, with the remaining 90 percent from new client acquisitions.

**B.    Materially False and Misleading Statements Issued During the Class Period**

30.    The Class Period begins on July 24, 2024, when Fiserv issued a press release announcing its results for the second quarter ended June 30, 2024 (the "Q2 2024 Earnings Release").  In the Q2 2024 Earnings Release, Fiserv touted its 28 percent revenue growth in the Merchant Solutions segment.  In an investor presentation accompanying the Q2 2024 Earnings Press Release, Fiserv also highlighted "$313 billion Clover annualized GPV, up 17%."

31.    On the same day that the Q2 2024 Earnings Release was issued, the Company hosted an earnings call (the "Q2 2024 Call").  During the Q2 2024 Call, Defendant Bisignano stated that:

> ***Clover revenue grew 28% in the second quarter on an annualized payment volume growth of 17%. The spread between revenue and volume growth continues to reflect a higher penetration of value-added solutions, continued channel mix shift, and value-based pricing.*** VAS penetration stayed constant sequentially at 20% in Q2, an improvement from prior years where we typically see a seasonal decline from Q1 to Q2. VAS penetration was driven by growth in Clover Capital and the Clover SaaS package and should expand with several new offerings coming in the second half. ***Overall, we remain on pace to meet our 2026 targets***.

32.    During the Q2 2024 Call, Defendant Bisignano was asked about Fiserv's back-book conversions:

> James E. Faucette (Morgan Stanley analyst):  I want to go back to Clover and Clover growth. And one of the questions we get a lot is – you talked at your analyst meeting back in November – about using Clover and how the back book could contribute a little bit more going forward to that growth. But I'm wondering if you can talk through a little bit the sales cycle there and where your existing customers see value on Clover, and how you're feeling about that from a – and maintaining those customers from a competitive standpoint if they are reevaluating solutions, et cetera. Thanks a lot.

> Defendant Bisignano: Thank you. Thanks, Jim. Good to hear from you. Hey. I mean, like, we've been really, really feeling good about the Clover strategy and

10

continuing to refine it. Obviously, we know there will be a day where we're going to come back and say we've hit it directly into the back book, but we see so much front-book activity opportunity. Between our international, between our ISV, between how we're thinking about the verticals like services, like restaurants that we're continuing to build that product set, that VAS. Obviously, it's an outperformer in attrition across the total book. And we have the benefit of looking at attrition rates from everything. We look at them from what our ISO portfolios are attriting versus our ISV portfolios attriting versus our agent versus our direct book. And *we feel really, really good about how it's performed. We're continuing to ramp up our investment in value-added services and vertical expertise there. So, we've made a set of commitments, 3.5 and then 4.5 and pen rates and we think about the Merchant business being $10 billion and $12 billion and all of that feels really, really tight and on track*.

Obviously, I always have to say, we started Clover with seven engineers and three patents, and now we've got a global franchise. So, it's straight in our sights. Obviously, we have lots of other great things in our portfolio, but it also is the key to why we have 900 financial institutions. And I would expect over a period of time on this journey that if you ask me, we haven't ever made a commitment or guided how many financial institutions, but *you should expect us to continue to grow that at a double-digit number every year.*

33.    The following day, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendant Hau and Defendant Best and included as exhibits certifications signed by Defendant Bisignano and Defendant Hau pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "SOX Act"). In the Q2 2024 10-Q, the Company stated that "Additional information about market risks to which we are exposed is included within Item 7A of our Annual Report on Form 10-K for the year ended December 31, 2023" (the "2023 10-K"). The Q2 2024 10-Q further stated that "[t]here were no significant changes to our quantitative and qualitative analyses about market risk during the six months ended June 30, 2024." The 2023 10-K contained the following risk factor concerning the competitive and technological challenges that could impact Fiserv's payment solutions, including Clover, and the ability of Fiserv to remain competitive:

***We operate in a competitive business environment and may not be able to compete effectively.***

The markets for our products and services are highly competitive from new and existing competitors. Our principal competitors include other vendors and providers of financial services technology and payment systems, data processing affiliates of large companies, processing centers owned or operated as user cooperatives, financial institutions, independent sales organizations ("ISOs"), independent software vendors, payments companies and payment network operators. Our competitors vary in size and in the scope and breadth of the services they offer. Many of our larger existing and potential clients have historically developed their key applications in-house. As a result, we may compete against our existing or potential clients' in-house capabilities. In addition, we expect that the markets in which we compete will continue to attract new technologies and well-funded competitors, including large technology, telecommunication, media and other companies not historically in the financial services and payments industries, start-ups and international providers of products and services similar to ours. … We cannot provide any assurance that we will be able to compete successfully against current or future competitors or that competitive pressures faced by us in the markets in which we operate will not materially and adversely affect our business, results of operations and financial condition.

***If we fail to keep pace with technological change, we could lose clients or have trouble attracting new clients, and our ability to grow may be limited.***

The markets for our products and services are characterized by constant and rapid technological change, evolving industry standards, frequent introduction of new products and services, and increasing client expectations. Our ability to respond timely to these changes, including by enhancing our current products and services and developing and introducing new products and services, will significantly affect our future success. In addition, the success of certain of our products and services rely, in part, on financial institutions, business partners and other third parties promoting the use of or distributing our products and services. If we are unsuccessful in developing, marketing and selling products or services that gain market acceptance, or if third parties insufficiently promote or distribute our products and services, it would likely have a material adverse effect on our ability to retain existing clients, to attract new ones and to grow profitably.

34.    The 2023 10-K also contained the following risk factor concerning the loss of

Fiserv's customers:

***If we are unable to renew contracts on favorable terms or if contracts are terminated prematurely, we could lose clients and our results of operations and financial condition may be adversely affected.***

Failure to achieve favorable renewals of client contracts could negatively impact

our business. At the end of the contract term, clients have the opportunity to renegotiate their contracts with us or to consider whether to engage one or more of our competitors to provide products and services or to perform the services in-house. Some of our competitors may offer more attractive prices, features or other services that we do not offer, and some clients may desire to perform the services themselves. Larger clients may be able to seek lower prices from us when they renew or extend a contract or the client's business has significant volume changes. In addition, larger clients may reduce the services we provide if they decide to move services in-house. Further, our small merchant business clients may seek reduced fees due to pricing competition, their own financial condition or pressure from their customers.

We also have contracts with U.S. federal, state and local governments. The contracts with these clients may contain terms that are not typical for non-government clients, such as the right to terminate for convenience, the right to unilaterally modify or reduce work to be provided under the contract, significant or unlimited indemnification obligations and being subject to appropriation of funds for the government contract program. In addition, if any of our government contracts were to be terminated for default, we could be suspended or debarred from contracting with that entity in the future, which could also provide other government clients the right to terminate.

These factors could result in lower revenue from a client than we had anticipated based on our agreement with that client. If we are not successful in achieving high contract renewal rates and favorable contract terms, if contracts are terminated, or if we are prevented from performing work for these clients in the future, our results of operations and financial condition may be materially and adversely affected.

35. On October 22, 2024, Fiserv issued a press release announcing its results for the third quarter ended September 30, 2024 (the "Q3 2024 Earnings Release"). In the Q3 2024 Earnings Release, Fiserv touted its 24 percent organic revenue growth in the Merchant Solutions segment. In an investor presentation accompanying the Q3 2024 Earnings Release, Fiserv also highlighted "***$311 billion Clover annualized GPV, up 15%***."

36. On the same day as the Q3 2024 Earnings Release was issued, the Company hosted an earnings call (the "Q3 2024 Call"). In introductory remarks during the Q3 2024 Call, Defendant Bisignano stated that:

Let me share some of the many highlights of the quarter. ***It was another strong quarter of growth in the Merchant Solutions segment, with organic revenue up***

*24%. At Clover, revenue grew 28%* and value-added services penetration reached 21%, up 1 percentage point from Q2.

[…]

As I look across all the new initiatives we are rolling out, I am pleased with how the vision and investment *we put into motion five years ago has brought Fiserv to a strong position* today, one that's clearly hard to replicate. The results show that we are executing on mandates for each of our two ecosystem, merchants and financial institutions. ***This will continue in many ways, as we add to our Clover portfolio, extend services to enterprise merchants, expand issuing to new verticals and geographies, enable more real-time payments, modernize core banking systems, add partners, grow internationally, and continue to use distribution data, and more***.

37.     In prepared remarks during the Q3 2024 Earnings Call, Defendant Hau stated that:

***Clover revenue grew 28% in the third quarter on an annualized payment volume growth of 15%***. VAS penetration increased sequentially by 1 point to 21% in Q3, driven by growth in Clover Capital and the Clover SaaS package.

[…]

In Q4, we will be rolling out new vertical software plans for retail and services. With this progress, ***we remain on track to achieve our 2026 Clover targets of $4.5 billion in revenue*** and VAS penetration of 27%.

38.     In the question-and-answer portion of the Q3 2024 Call, Defendant Hau was asked

about the Company's expectations for Clover revenue and payment volume:

Jason Kupferberg (Bank of America Merrill Lynch analyst): Good morning, guys. Just a couple of questions on Clover. I know revenue growth was steady here. Volume growth ticked down a little bit. Just any thoughts on Q4 expectations for those metrics? I think the volume comps get a little bit harder, revenue also next quarter. So, just wanted to get a sense of how we should be thinking about near-term trajectory there. I know you've got some new country launches, product launches to support it.

Defendant Hau: Yeah, Jason, good morning. So, yes, ***we continue to see good overall revenue and volume growth out of our Clover solution***. As you know, we've got a target to be $4.5 billion by 2026. That gets us – we needed about a 28% compound growth rate to achieve that, exactly where we were for the quarter, it's where we are on a year-to-date basis. A key part of that is continuing to add value-added services.  That ticked up 1 point to 21% of revenue.

Overall, ***volume remains good***. It obviously isn't as strong as it was last year. Some of that is very strong last year. So a little bit of a "difficult comp," but also the

consumer, while still strong, still spending, has certainly eased a bit. We saw that last quarter. We saw that continue again this quarter, but *we feel good about where that spending is right now and what we see going into the future*.

39. In the question-and-answer portion of the Q3 2024 Call, Defendant Bisignano was asked about the Company's expectations for its $4.5 billion Clover target:

> James E. Faucette (Morgan Stanley analyst): Thank you so much. I wanted to follow up on the SMB bundle, and this ties a little bit into Dan's question, but it seems like there's a lot of capability expansion that's happening within the Clover ecosystem and then looking at new ways to go to market. How should we be thinking about – I know you gave some targets for back book and some of those things to get to the $4.5 billion target. But how should we be thinking about, like, the roles that those will play and if there's been any change in your thinking in terms of mix or type of customers and sets within that Clover target? Thank you.

> Defendant Bisignano: Yeah. I know there's only one question allowed, but that felt like five. Good job, James. Let me try it. Like, first of all, in some ways, they're not really inside this company that there's a ton of new thoughts. We always have a lot of R&D going on that historically, and the IR team don't always love me for it, but they are more apt to talk to you about when we're getting to market than what's in the R&D shop.

> So *this idea about us bringing more capability to the SMB space has always been there*. I think if you go back to our acquisition of Ondot and us embedding it in mobility, and then it became – let's think about XD and a new product. But then you start saying to yourself, we could deliver this way beyond Clover and XD. We can integrate it all. We can put our SpendLabs acquisition in there. Oh, boy, we can end up helping our FIs grow and other channel partners and future partners to be signed up. That's why we are ultimately a partner of choice for people who want to partner in the SMB space because of our capability.

> So I think you got to think about it that, yes, *there may be more back book swept up in there because there's a reason beyond switching out your FD150 for a Clover Station, now you have a much broader capability*. None of this back book, if it happened, would ever, more than our natural kind of rate, which we talked about of merchant churn, going from an older device to a newer. But I think you're seeing the size of the opportunity to actually impact Clover more than we might have because of the full capability set. Thank you. I think you're on the right track there.

40. The following day, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendant Hau and Defendant Best and included as exhibits certifications signed

15

by Defendant Bisignano and Defendant Hau pursuant to Sections 302 and 906 of the SOX Act.  In

the Q3 2024 10-Q, the Company stated that "Additional information about market risks to which

we are exposed is included within Item 7A of our [2023 10-K]."  The Q3 2024 10-Q further stated

that "[t]here were no significant changes to our quantitative and qualitative analyses about market

risk during the nine months ended September 30, 2024."  The 2023 10-K risk disclosures are

discussed in ¶¶ 33-34, *supra*.

41.     On December 4, 2024, Defendant Hau participated in the UBS Global Technology

& AI Conference (the "2024 UBS Investor Call").  During the 2024 UBS Investor Call, Defendant

Hau was asked about Fiserv's non-Clover business:

> Timothy E. Chiodo (UBS analyst): We're going to move on to non-Clover SMB.
> So in the model, it's roughly $3.7 billion or so of revenue last year. We understand
> about two-thirds of that or so is in the US. We generally think about that as a fast
> growing international business for the roughly one-third of it and then a slower
> growth or possibly the next growth, US non-Clover SMB. But that's okay. Right.
> There is a plan to address that via back book conversion. That's more of a 2026
> event. Could you just talk to us a little bit about what is the makeup of the US non-
> Clover SMB business?
>
> Defendant Hau: Yeah. So, this is a great business for us. As you say, it's about $3.7
> billion out of our almost call it $5.8 billion of revenue, almost $6 billion of small
> business overall revenue. ***Clover obviously growing very rapidly***. ***We expect that
> non-Clover business to generally grow mid-single digits globally and we continue
> to sell it. We continue to see growth in existing clients using – as our small
> businesses grow, so does our revenue and we continue to sell it***. Obviously, we
> believe Clover is a great solution, but it isn't necessarily the solution for our small
> businesses. Not every small business needs to have a full blown operating system.
> Some just like running their small business. The example I love to give is I'm
> running a pizzeria because I love making pies. I got five tabletops. I don't need a
> fancy full blown operating system. Having a terminal on my car is more than fine,
> and we're happy to sell that service to those clients.

42.     During the 2024 UBS Investor Call, Defendant Hau was asked about Fiserv's

$4.5 billion Clover revenue target by 2026:

> Timothy E. Chiodo (UBS analyst): We're going to move to the Clover $4.5 billion
> target by 2026. A question that we often get from investors is the CAGR implied
> to get there is sort of in the high-20s or so on the revenue growth. And you've had

a large gap between the volume growth and the revenue growth because of the strength of the value-added services. So, the question we often get is implied in reaching that target from here, call it the mid-teens volume growth for Clover, is there an expectation of a mild acceleration in the volume growth to help support that target?

Defendant Hau: Yes. There's a number of drivers that get us from the roughly just over $2 billion last year to $4.5 billion. If you do the math that requires about a 28% CAGR. It doesn't mean we're going to grow 28% every day, every month, every quarter, every year. But broadly, *we're looking at a 28% growth to get there. By the way, first half – we've seen the first nine months of the year, we're about a 28% growth*. And that's a combination of continued volume, most definitely, not a massive change in volume. We're not counting on a big improvement in the macro economy to get us there. But the economy continues to operate kind of where it is right now.

We'll get a lift in volume as we expand internationally. So, that's part of the growth – or *the growth algorithm is additional volume as we expand internationally, but also selling more value-added services internationally*.

[…]

The value-added services, the new capabilities that I talked about in the first question, we continue to invest in bringing new capabilities, but also see further penetration of the existing capability. Part of the growth algorithm to get to that $4.5 billion is to see our value-added service penetration to go from 19% to 20%, 21%. By 2026, we'll be a 27% value-added service. So, *you'll actually see that spread between volume and revenue growth continue to widen as we see that value-added service penetration continue to grow*. And so, that's bringing new capabilities not only to those three verticals that I talked about, restaurant, retail and services, but also horizontal capability.

43.    On December 10, 2024, Defendant Bisignano participated in a Raymond James TMT and Consumer Conference (the "2024 Raymond James Investor Call"). During the 2024 Raymond James Investor Call, Defendant Bisignano was asked about Fiserv's back book conversion rate:

John Davis (Raymond James analyst): And just to go back to the merchant business here, so you laid out 12% to 15% organic growth at the Investor Day. Obviously, Clover is a big piece of that, clearly taking share. The industry is probably growing high single-digit. So, if we just double click on Clover, it's still growing close to 30%. You've laid out a target for $4.5 billion of revenue in 2026, which implies kind of high-20s growth from here, mid-teens to high-teens volume growth. So, just talk a little bit about the sustainability of that growth. What gives you confidence?

You mentioned Brazil and Mexico international rollout. You still haven't done much with the back book, but just help talk a little bit about the success at Clover. What's driving that sustained high level of growth into 2025 and 2026?

Defendant Bisignano: Yeah. Yeah. I have a smile on my face because I have an objective here to change our vernacular a little bit. Back book was never my term. It's my client base, right? What am I going to do with my client base? And generally, I'm in my client base, trying to sell more product and innovate with them. And so, here's the way I think about it, because really we were asking, it looks like you could get from here to there, but tell us how are you going to get from here to there. We have this fabulous distribution systems. And acquiring – we're in this world of acquiring new merchants and selling more products.

I don't have really fancy strategies, get more clients and bring in more product. And **we've been very successful at that**. So you closing pen rate going up. And if you think about, call it, circa approximately a 1,000 financial institutions, and then you see us do something like ADP, right? That's a great partnership. I love Maria Black, the CEO there. I always said, we should be able to do something together and put our teams together. And we came out with us distributing their product and them distributing our product. And so, it's very logical, I think. So, you could think about those type of partnerships. Then, you think about plus or minus 1,000 financial institutions. And I think in all of those, our pen rate in that installed base that they have can go up. Said differently, if I look at a lot of partnerships, I think we could double the amount of clients in those partnerships that we have. Then secondarily, I think **we're going to continue to create more partnerships because the reality is, Clover's darn good**. Clover, financial institution and partners like Clover and our ability to put more software. You'll hear us putting CashFlow Central on Clover. You'll look at us having Payroll through ADP on Clover. Those are all additive in a big way. And then you go outside the US, and you also bring it to your other distribution partners.

44.    During the 2024 Raymond James Investor Call, Defendant Bisignano was asked about Fiserv's non-Clover revenue growth:

John Davis (Raymond James analyst): And maybe just to touch for a minute on the ex-Clover merchant business. Can you talk a little bit about the success you're having in enterprise, kind of other initiatives that are driving pretty healthy growth outside of Clover?

Defendant Bisignano: Yeah, well, I mean, I think look at, ultimately, we built Commerce Hub and we have an orchestration layer and you see us winning now in the enterprise and we'll call it omni-commerce, because a lot of our clients have it going both ways. But we got a solution that we believe can serve omni-commerce better than anybody else in the industry, because we're fabulous in store, but we're also fabulous at now the ability given an orchestration layer, deliver more VAS into that, too, and be able to help them grow. So I'd say that there.

18

I would also say, we have an unbelievable ISV business. That was the byproduct of two acquisitions. One, we got a couple of dollars back in the day and BluePay and CardConnect, which one was an e-comm, one was – had an ISV. We brought it together. We use the technology of that to grow our agent business in a different way. And many of those are not necessarily Clover, but there are these technical integrations. Now, we do see a world where Clover shows up there, too. But right now, that would sit in a non – as you describe it, non-Clover business.

So, I think **our product set is strong. I think our technical integrations are good. I think, we look at everybody we compete with and feel like, yeah, there's people ahead of us and things, but our ability to invest and our ability to have technical expertise and our client base's desire for us to win, all put together make us a long-term winner**, I believe.

45.    On February 5, 2025, Fiserv issued a press release announcing its results for the fourth quarter and full year ended December 31, 2024 (the "2024 Earnings Release").  In the 2024 Earnings Release, Fiserv touted its 11 percent revenue growth in the Merchant Solutions segment. In an investor presentation accompanying the 2024 Earnings Release, Fiserv also highlighted "**$310 billion Clover annualized GPV, up 14%**."

46.    On the same day as the 2024 Earnings Release was issued, the Company hosted an earnings call (the "Q4 2024 Call").  In introductory remarks during the Q4 2024 Call, Defendant Bisignano stated that:

> **We added large enterprise clients, both traditional and e-commerce merchants, on the strength of our unified offering, modern gateway and growing value-added solutions portfolio. At Clover, we laid the foundation for continuing our strong growth** as we released new software, services and hardware offerings and added three new countries.
>
> **We extended merchant acquiring services to more financial institutions focused on winning small business clients**. We built solutions to help SMBs navigate the complexity of running their businesses. Managing cash flow, in particular, is one of the biggest challenges. It's ineffective, time consuming, and expensive.

47.    In introductory remarks during the Q4 2024 Call, Defendant Hau stated that:

> Small business organic and adjusted revenue growth in the quarter was 24% and 12%, respectively, on payments volume growth of 4%. Clover revenue reached $2.7 billion in 2024 with nearly 90% in our small business line reporting. Clover revenue grew 29% in both the quarter and full year on Q4 annualized payment

volume growth of 14%. ***This spread reflects growth in value-added solutions, some targeted value-based pricing actions and strong hardware sales.***

48.    In introductory remarks during the Q4 2024 Call, Defendant Hau stated that:

Drilling down by segment, for Merchant Solutions, ***we see organic revenue growth of 12% to 15% in 2025, driven mostly by strong growth in Clover***, as we reach our $3.5 billion revenue target, including an increase in VAS penetration to the 25% outlook. Our ability to achieve these goals is supported by opportunities we advanced in 2024 with five new hardware rollouts; new features and functionality for our three focused verticals of restaurant, services and retail; and three new geographies; Brazil, Mexico and Australia.

***We expect the small business line to grow above segment average driven by Clover***. Enterprise should be slightly below the segment average to more normal levels following the end of transitory benefits in Argentina, and some one-time revenues associated with the large PayFac win….

While we don't give quarterly guidance, I think it's instructive to consider the quarterly cadence this year. Overall, ***we expect growth to be weighted towards the second half of the year***. Several reasons for this. First, we've had multiple new product rollouts in late 2024 that we expect will gain traction over time in the market from Clover vertical software to CashFlow Central and the SMB suite.

Second, we had several important new wins that will take time to implement and generate revenue, including Target expected to go live in late March and Verizon in September. Third, we entered three new countries with pilots in the fourth quarter and full-scale go-to-market efforts just getting underway this year.

49.    On February 20, 2025, the Company filed with the SEC a Form 10-K reporting the Company's financial results for the fourth quarter and full year ended December 31, 2024 (the "2024 10-K").   The 2024 10-K was signed by Defendant Bisignano, Defendant Hau, and Defendant Best, as well as other members of the Fiserv Board of Directors, and included as exhibits certifications signed by Defendant Bisignano and Defendant Hau pursuant to Sections 302 and 906 of the SOX Act.  Although the 2024 10-K contained substantially the same risk disclosures as the 2023 10-K, discussed in ¶¶ 33-34 *supra*., the 2024 10-K included new disclosures related to artificial intelligence technology as well as additional paragraph quoted below:

In addition, participants in the financial services, payments and technology industries may merge, create joint ventures or engage in other business

combinations, alliances and consolidations that may strengthen their existing products and services or create new products and services that compete with ours.

50.    On March 11, 2025, Defendant Hau participated in the Wolfe Research FinTech Forum (the "2025 Wolfe Research Investor Call"). During the 2025 Wolfe Research Investor Call, Defendant Hau was asked about Fiserv's growth prospects:

> From a Fiserv standpoint, obviously, macro matters, but *we see good growth*. When we gave the guide for the year, we guided organic growth for the company at 10% to 12%. But we also did upfront, and this is not a macro environment per se, this was an original guidance back in early February with our fourth quarter, that *we expected growth to ramp into the second half of the year, and we continue to see that. And that's really driven by things like CashFlow Central coming into market, the new partnerships we have with ADP where we're cross-selling each other products, payroll through the Clover solutions, selling payroll, them selling Clover*. Things like some of the new products and new software that got rolled out last year continue to accelerate.

51.    During the 2025 Wolfe Research Investor Call, Defendant Hau was also asked about Clover's growth prospects:

> Darrin Peller (Wolfe Research analyst): And just – and Clover again, I mean in terms of the trajectory you expect for the year, how – it's just – look, it's coming off of a really strong year. So thinking about comps and just thinking about trajectory going forward.
>
> Defendant Hau: Yeah. So in March of 2022, we laid out our goal for Clover revenue in 2025. So March of 2022, we said we expect to be $3.5 billion of revenue at the end of 2025. And that was about a 28% to 30% compound annual growth rate to achieve that.
>
> Darrin Peller (Wolfe Research analyst): Yeah. Yeah.
>
> Defendant Hau: Some of you in this room might have thought we were a little bit crazy in laying that goal out. But if fast forward now, the last couple of years, we've seen 28%, 29% growth. We closed out last year 2024 at $2.7 billion. And to achieve that $3.5 billion, we need to continue that 29% growth. And that is the outcome or the benefit of that international expansion, that new products, both in terms of hardware and software, continuing to build out our distribution channel. *We have good visibility into the Clover growth confidence in that international channel*.

52. During the 2025 Wolfe Research Investor Call, Defendant Hau was also asked about Clover's growth prospects:

> Darrin Peller (Wolfe Research analyst): Okay. And then just one question we get a lot is the back book, right, whether or not you're actually really benefiting from Clover's growth from just converting business over from your existing business. Where are you on that in terms of whether it's a percent number or anything else you can give us?

> Defendant Hau: Yeah. So that dialogue has shifted over the last several years. ***Four or five years ago, we got the question around the back book from the standpoint of, well, yeah, great, you're growing Clover, but it's all back book conversion. So it's not real. And back then, the answer was no. Actually, that Clover revenue was actually driven by new clients to Fiserv. And about 10% of the Clover growth back then was from back book conversion. So, yes, we do have merchant clients who are not using Clover convert to Clover and it provides about a 10% lift.***

> Fast forward today, the question is more of, geez, when are you going to go attack that back book and provide even more growth? Today, ***we're about 10% of our growth comes from back book***.

> Darrin Peller (Wolfe Research analyst): Still.

> Defendant Hau: And that's a combination of merchants deciding to move from a "simple dumb terminal" on their counter to wanting a full-blown operating system and seeing the value, the benefit of having all of those value-added solutions embedded in the extra data and information they can get by running Clover and increase the efficiency of their operation, so deciding to convert. It's also some sales activity. But for the most part, ***our effort is around bringing on new clients and continuing to expand the number of merchants, small businesses that are using our solutions and growing that way***.

53. On March 18, 2025, Defendant Hau participated in the Bank of America Electronic Payments Symposium (the "2025 Bank of America Investor Call"). During the 2025 Bank of America Investor Call, Defendant Hau was asked about Fiserv's "back book" volume:

> Jason Kupferberg (Bank of America analyst): So, the back book also comes up sometimes as a Clover driver. And I think originally at the Investor Day, you guys had said, oh, back book maybe contributes 10%.

> Defendant Hau: Right.

Jason Kupferberg (Bank of America analyst): And I think that's more or less been your experience since the time of the Investor Day. As we look out at your 2026 target, does that 10% get a little bit bigger?

Defendant Hau: Yeah. ***So, the 10% you were referring to is a number actually we've been seeing for several years.***

Jason Kupferberg (Bank of America analyst): Right.

Defendant Hau: I can tell you for the last five years that I've been associated with the merchant side of our business, that's been the case. And what that is is ***roughly 10% of the Clover growth is driven by back book conversion. Or said another way, 90% of new Clover revenue growth is from clients that are new to Fiserv from a merchant acquiring standpoint, and that's been very consistent for the last five years.*** I would expect that to kind of hang in there. ***For this year, that's what we're seeing right now and I expect to see the balance of this year. What we said during Investor Day back in November is as we hit 2026, 2027, 2028, we'd expect that to modify a little bit.*** It's not something that we don't need that to go to 50% to get to the $4.5 billion. But at some point in time, it would make sense to more proactively address that back book and November of 2023 – 2026 look like a time that we'd probably want to do that.

54.    The statements in ¶¶ 30-53 were materially false and misleading when made because they failed to disclose that: (a) due to cost issues and other problems with its Payeezy platform, Fiserv forced Payeezy merchants to convert to its Clover platform; (b) Clover's revenue growth and GPV growth were temporarily boosted by these conversions, which concealed a slowdown in new merchant business; (c) shortly after these conversions, a significant portion of former Payeezy merchants switched to competing solutions due to Clover's high pricing, inadequate customer service, and other issues; (d) as a result of these merchant losses, Clover's GPV growth was significantly slowing, and its revenue growth was unsustainable; and (e) based on the foregoing, Fiserv's positive Class Period statements about Clover growth strategies, competition, attrition, GPV growth, and business prospects were materially false and misleading.

**C.    The Truth Begins to Emerge While Fiserv Continues to Mislead Investors**

55.    Investors began to learn the truth about this fraud on April 24, 2025, when Fiserv hosted an earnings call in connection with its financial results for the first quarter of 2025 (the "Q1

2025 Call"). During the Q1 2025 Call, Fiserv shocked investors by reporting a material decline from 2024 GPV growth rates of between 14% and 17%, down to 8% for the first quarter of 2025, despite Clover's revenue growth remaining relatively flat for the quarter. Defendant Hau attributed this spread between Clover revenue growth and GPV growth to strong one-time Clover hardware sales and VAS penetration within existing merchants, among other things:

> Clover revenue growth was a solid 27% against the highest growth quarter last year. There are several reasons for the spread between revenue and volume growth including a two-point gain sequentially in the penetration rate of Clover value-added services to 24%. Roughly one-third of the spread came from strong Clover hardware sales. As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market. Such sales bode well for our Processing and VAS revenue going forward.

> Another nearly one-third came from growth in anticipation and Clover capital. As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VASS as well.

56.     In reaction, analysts at J.P. Morgan flagged "the widest spread between revenue and volume in our model's history, **raising concerns about sustainability of premium growth**." Morningstar noted that the outpacing of revenue growth over volume growth even as the business matures suggested an overreliance on VAS and hardware. Cowen Research cautioned that reliance on hardware sales, with two consecutive quarters of outsized hardware contributions, raises questions about the sustainability of Fiserv's revenue and the viability of Clover among competitors.

57.     On this news, Fiserv's stock price dropped $40.20 per share, or 18.5 percent, from a closing price of $217.10 on April 23, 2025, to a closing price of $176.90 on April 24, 2025.

58.     While this news partially revealed Defendants' fraud, Defendants continued to defraud investors by failing to disclose that this spread was largely due to the loss of transaction volumes from a substantial number of former Payeezy merchants who cancelled their Clover

contracts.  During the Q1 2025 Call, Defendant Lyons made the following statements about Clover

revenue and GPV growth:

> Let's shift to our performance at the segment level. Merchant Solutions posted 8% organic revenue growth with a 10 basis point rise in adjusted operating margin to 34.2%. Bob will discuss the details, so I'd like to highlight our progress in the quarter on three key near-term initiatives.
>
> First is ***driving Clover growth through new products, new markets, new partners and new geographies***. Second is signing more financial institutions as merchant referral partners. And the third is adding new and existing enterprise merchant clients to our Commerce Hub platform and driving VAS penetration.

59.     On the Q1 2025 Call, Defendant Hau made the following statement about Clover's

decelerating GPV growth:

> For Clover, revenue grew 27% in the first quarter and annualized payment volume growth of 8%. ***The softer volume growth largely reflects three factors: first, leap year and Easter, as I just mentioned. Second, a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 2024. And third, a slowdown in spending in Canada, particularly on travel.*** Canada is currently the largest international market for Clover. Excluding these specific factors, Clover volume grew at a healthy double-digit pace.
>
> Clover revenue growth was a solid 27% against the highest growth quarter last year. ***There are several reasons for the spread between revenue and volume growth including a two-point gain sequentially in the penetration rate of Clover value-added services to 24%. Roughly one-third of the spread came from strong Clover hardware sales.*** As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market. Such sales bode well for our Processing and VAS revenue going forward.
>
> Another nearly one-third came from growth in anticipation and Clover capital. As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VASS as well.

60.     The next day, the Company filed with the SEC a Form 10-Q reporting the

Company's financial and operational results for the first quarter of 2025 (the "Q1 2025 10-Q").

The Q1 2025 10-Q stated that "Additional information about market risks to which we are exposed

is included within Item 7A of our [2024 10-K]."  The Q1 2025 10-Q further stated that "There

were no significant changes to our quantitative and qualitative analyses about market risk during the three months ended March 31, 2025." The 2024 10-K contained the risk disclosures discussed in ¶¶ 33-34 and ¶ 49, *supra*.

61.    Defendants' fraud was further revealed on May 15, 2025, when Fiserv disappointed investors by disclosing that Clover's GPV growth deceleration would continue throughout 2025. During the J.P. Morgan Global Technology, Media and Communications Conference, Defendant Hau was asked about investors' "hard stock reaction" to the Company's reports of decelerating volume growth:

> TienTsin Huang (J.P. Morgan analyst): But I figured we just start, just given the hard stock reaction to the first quarter, give you an opportunity to address that. What might be understood. What's been the learning from that in terms of the questions you've been receiving?

> Defendant Hau: So, maybe obvious, but I'll state the obvious, certainly disappointed with the reaction, unexpected. And what we have learned through this is **there is an intense focus on Clover volume**. So over and over and over again, as we've talked to investors since that earnings call, it comes back to what's going on with Clover volume. They get the revenue, they get the rest of the company, but what's happening there. And so lots of conversations about kind of all the puts and takes in that number. And specifically, as I suspect most of you know, **we reported an 8% Clover volume growth, which was slower than what we reported last year. Lots of conversation about the sequential move of that**. Fourth quarter of last year, we reported 14%. And so, when you look at it, sequentially, it looks like a 6-point drop.

> And there were a couple of things that we talked about on the earnings call and extensively since, and two very specific things. One is last year, particularly in the first quarter of last year, we had a gateway conversion. So we had a gateway that was non-Clover clients that we converted over to the Clover Gateway. And so **we saw a pickup of volume from that last year that doesn't repeat this year**. And so that was about 2 points of headwind against the growth rate. So 8% kind of becomes 10%.

> The other item we talked about is, obviously, Q1 last year, we had leap year, 1 day out of 91 days last year, 90 days this year. It's a little more than 1 point of growth. So 8% becomes 10% becomes 11%. And then we had a couple of other items we talked about, the timing of Easter was Q1 of last year, Q2 of this year, March to April. We did see some slowing of Canada, which is our largest international market in the first quarter.

Fast forward to today, right now, and I don't give quarterly guidance period, let alone on one key performance indicator around Clover. But **given the lots of discussion and questions around it, we expect second quarter to be generally similar to first quarter in terms of the reported growth rate from a volume standpoint. We do see that gateway headwind actually increasing a bit in the second quarter.** . . . And that's a dynamic of during the first quarter, we've been converting that gateway for about a year. It's probably about two quarters heading into first quarter, got a big chunk in the first quarter and then a little bit more in second and third quarter, but **it was ramping through the first quarter. So Q2 is when you have the full quarter impact of what was going on in Q1. And then we expect that to subside going forward, Q2 – excuse me, Q3 and Q4.**

62.    Analysts were shocked by the news.  For example, analysts at Goldman Sachs reacted with surprise:

The bottom line of this note, however, is that we believe **the main driver of the decel in Clover was a gateway conversion in the prior year that saw very significant churn subsequent to the conversion**. Thus, Fiserv is currently growing over the volume from the prior year **that churned in the second half**. . . .

Fiserv migrated volumes from another platform (i.e. a back book conversion) to Clover in the first half of 2024, which the company noted was roughly a 2 point headwind to 1Q25 volumes, and mgmt noted is likely to be a slightly larger impact to volumes in 2Q25. Our understanding from our research and from speaking with the company is that **these volumes were primarily e-comm merchants with limited use case for a POS platform like Clover, and thus the company experienced significant churn following the migration of these customers, as they migrated to other payment gateways that are native to their e-commerce storefronts**.

We note several anecdotal examples in various online payment forums that highlight operational issues with the migration, beginning in late 2023 and into 2024, and that are consistent with our understanding of the post migration churn dynamics. Note that we highlighted this churn dynamic in our note earlier this week after attending a Fiserv mgmt dinner. **We believe that overlap of the Payeezy gateway with various website builder platforms such as Shopify and WooCommerce made it particularly easy to migrate to native payment offerings after experiencing frictions with the migration**. The bottom line here is we believe that this explains why FI is saying that the headwinds from the gateway conversion will abate in 2H25, because the migrated volumes experienced very high churn and did not contribute as much in 2H24.

63.     Analysts at Morgan Stanley stated that "Importantly, the gateway conversion lapping headwind in 1H is expected to step down in 3Q and be muted in 4Q primarily due to **high churn within that customer base, which began in 2H24**."

64.     Analysts at Wolfe Research took note of the higher Clover attrition rate:

**The primary drag on Clover's growth in Q1 and Q2 has been the migration of Payeezy gateway merchants onto Clover throughout FY24.** While this initiative boosted volumes in the 1H'24, it was partially offset by higher attrition in the second half. Q1 2025 Clover volume growth decelerated by roughly 200bps and is expected to have a ~300bps impact in Q2, as the Y/Y benefit laps (the migration process peaked with the discontinuation of Payeezy onboarding on March 25, 2024), coupled with attrition of the Payeezy conversion base.

Management noted that attrition from these migrated merchants **began relatively quickly, driven largely by price-sensitive clients seeking lower-cost alternatives (as these merchants weren't typically utilizing FI's VAS offerings)**. This attrition partially offset some volume growth in Q3 and Q4 2024, but sets up easier Y/Y comparisons in the back half of 2025.

65.     On this news, Fiserv's stock price dropped $30.73 per share, or 16.2 percent, from a closing price of $189.86 on May 14, 2025 to a closing price of $159.13 on May 15, 2025.

66.     Then, on May 20, 2025, Defendant Hau participated in the Barclays Emerging Payments and FinTech Forum (the "2025 Barclays Investor Call").  During the 2025 Barclays Investor Call, Defendant Hau admitted that Fiserv had "significant" price and operational impact with its legacy Payeezy gateway:

I certainly recognize that the reported GPV for the first quarter and our outlook for the second quarter, 8%, was a surprise or a disappointment, but particularly if you factor in the impact of the gateway that we've talked about extensively in the last three weeks, right in line with our expectations as we entered this year, right in line with where we believe the year is going. We've talked a lot about at – gateway, low double digits in the first quarter and in the second quarter. That's our expect-ation to deliver that $3.5 billion, and we feel good about our ability to do that.

Just a little bit of background on that gateway, because I think there's been some misunderstanding about what that is and why we did it. This is a third-party gateway that we resold over the last several years, and we found ourselves, a couple of years ago, being a very large part of a third party from a rep standpoint, and **we started to see some significant price impact and operational impact**. So, we made the

decision a couple of years ago or so, to exit that gateway and when you make that decision, you want to move all of those merchants to a new gateway. And obviously, the right choice for us is our go-forward gateway, Clover.

So, we went through that process. It wasn't about driving additional volume or revenue to Clover. It was about operational efficiency, cost savings and getting folks to the appropriate gateway. We did that. We started it late 2023, really accelerated the peak amount of movement was in first quarter of 2024. So you see that impact now as that business kind of laps itself, so to speak.

67.     On June 4, 2025, Defendant Hau participated in the William Blair Growth Stock Conference (the "2025 William Blair Investor Call").  During the 2025 William Blair Investor Call, Defendant Hau further admitted that Fiserv's legacy Payeezy gateway had become "quite costly and a bit problematic":

And we've talked extensively about the gateway conversion that we did in 2024, late '23, early '24, that caused about a 2 point headwind on that 8 points. So that 8%, if you adjust for the gateway, low-double-digits, consistent with what we saw last year. And that gateway conversion really didn't bring much revenue. It was a strategy to eliminate. **One gateway that we had in the company was a third-party gateway that we were white labeling that became quite costly and a bit problematic**. And so we made the decision to move away from that gateway. And once you make that decision to leave a gateway, you've got to figure out where you're going to move those clients. Obviously, Clover is our go-forward gateway. And so we move clients to the Clover. That drove some volume last year that ebbed in the first quarter of this year. So again, if you adjust, we're at low-double-digits, right in line with what we expected and right in line with what we need to deliver the $3.5 billion for this year.

68.     During the 2025 William Blair Investor Call, Defendant Hau was asked about the Company's outlook for organic revenue growth:

Andrew W. Jeffrey (William Blair analyst): So, we just have a couple more minutes. Maybe if you could just offer a high-level, medium-term outlook for organic revenue growth, EBIT margin expansion, EPS growth, mentioning that should be the 40th consecutive year of double-digit EPS growth, which is no small feat.

Defendant Hau: Yeah.

Andrew W. Jeffrey (William Blair analyst): I guess you get credit for about a quarter of that.

Defendant Hau: That's right.

Andrew W. Jeffrey (William Blair analyst): And maybe capital allocation.

Defendant Hau: Yeah. So, we talked a little bit – *we expect the total company to grow 10% to 12% this year. This will be the fourth year in a row of 11% or better growth, if we hit the midpoint of that. So, we've been in double digits for the last several years. For the company, that's quite an acceleration*.

69.     The statements in ¶¶ 58-60 and ¶ 68 were materially false and misleading when made because they failed to disclose that: (a) due to cost issues and other problems with its Payeezy platform, Fiserv forced Payeezy merchants to convert to its Clover platform; (b) Clover's revenue growth and GPV growth were temporarily boosted by these conversions, which concealed a slowdown in new merchant business; (c) shortly after these conversions, a significant portion of former Payeezy merchants switched to competing solutions due to Clover's high pricing, inadequate customer service, and other issues; (d) as a result of these merchant losses, Clover's GPV growth was significantly slowing, and its revenue growth was unsustainable; and (e) based on the foregoing, Fiserv's positive Class Period statements about Clover growth strategies, competition, attrition, GPV growth, and business prospects were materially false and misleading.

**D.    The Truth Is Fully Revealed**

70.     Defendants' fraud was fully revealed on July 23, 2025, when Fiserv released its results for the second quarter of 2025.  Specifically, Fiserv lowered the top end of its full-year organic growth guidance range and reported that its quarterly organic revenue in the Merchant segment had decelerated to 9 percent year-over-year from 11 percent in the previous quarter. During the conference call to discuss second quarter of 2025 results, Defendant Lyons stated, "just on the overall organic growth rate for the company.  We obviously refined to approximately 10%, from 10% to 12%."

71.    In reaction, analysts questioned the credibility of Fiserv's previous growth metrics. For example, analysts at Wolfe research stated that "we recognize a need for the dust to settle, **with stability/credibility in metrics and guidance reestablished** before some investors add materially to shares."  Additionally, analysts at Keefe Bruyette & Woods stated that "FI missed Merchant segment organic growth expectations (again) and lowered its FY25 organic growth revenue outlook to the lower end of the prior range, implying **the steep ramp in Merchant segment growth that was previously anticipated is unachievable**."

72.    On this news, Fiserv stock dropped an additional 13.9 percent, closing at $143.00 on July 23, 2025.

73.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

74.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

75.    The Individual Defendants permitted Fiserv to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

76.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fiserv, their control over, receipt, or modification of Fiserv's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning Fiserv, participated in the fraudulent scheme alleged herein.

77.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Fiserv common stock by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding Fiserv's business, operations, and management and the intrinsic value of Fiserv stock and caused Plaintiff and members of the Class to purchase Fiserv stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

78.     During the Class Period, as detailed herein, Fiserv and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Fiserv stock and operated as a fraud or deceit on Class Period purchasers of Fiserv stock by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Fiserv stock declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of Fiserv stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

**A.**     **Applicability of Presumption of Reliance: Fraud on the Market**

79.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased Fiserv stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

80.    At all relevant times, the markets for Fiserv stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, Fiserv filed periodic public reports with the SEC;

(b)    Fiserv regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    Fiserv was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    Fiserv stock was actively traded in an efficient market, including its common stock that was traded on the NYSE under the ticker symbol "FI."

81.     As a result of the foregoing, the market for Fiserv stock promptly digested current information regarding Fiserv from publicly available sources and reflected such information in Fiserv's stock prices.  Under these circumstances, all purchasers of Fiserv stock during the Class Period suffered similar injury through their purchase of Fiserv stock at artificially inflated prices and the presumption of reliance applies.

82.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**B.     No Safe Harbor**

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Fiserv who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

(a)     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fiserv common stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

84.     The members of the Class are so numerous that joinder is impracticable.  Fiserv common stock is actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

85.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

87.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fiserv;

(c)    whether the Individual Defendants caused Fiserv to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Fiserv common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Fiserv and the Individual Defendants**

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     During the Class Period, the Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Fiserv stock during the Class Period.

92.     Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fiserv stock.  Plaintiff and Class members would not have purchased Fiserv stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

93.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Fiserv stock during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

94.     Plaintiff repeats and realleges the allegations contained in ¶¶ 1-88 as if fully set forth herein.

95.     The Individual Defendants acted as controlling persons of Fiserv within the meaning of Section 20(a) of the Exchange Act by virtue of their positions and their power to control the actions of Fiserv and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

(A)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(B)     Awarding Plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D)    Granting such other, further, and/or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 24, 2025

**LABATON KELLER SUCHAROW LLP**

/s/ Francis P. McConville
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff*

## <u>CERTIFICATION</u>

I, David Strauss, as Chairman of City of Hollywood Police Officers' Retirement System ("Hollywood Police"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Hollywood Police.  I have reviewed a complaint prepared against Fiserv, Inc. ("Fiserv") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Hollywood Police did not purchase securities of Fiserv at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Hollywood Police is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Hollywood Police fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Hollywood Police's transactions in Fiserv securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Hollywood Police sought to serve and was appointed as a lead plaintiff or representative party on behalf of a class in the following class actions under the federal securities laws filed during the last three years:

*In re ASML Holding N.V. Securities Litigation*, No. 24-cv-08664 (S.D.N.Y.)
*In re General Motors Company Securities Litigation*, No. 23-cv-13132 (E.D. Mich.)
*Jastram v. NextEra Energy, Inc.*, No. 9:23-cv-80833 (S.D. Fla.)

6.      Hollywood Police sought to serve as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years and was not appointed:

*Pembroke Pines Firefighters & Police Officers Pension Fund v. Adobe, Inc.*,
No. 1:23-cv-09260 (S.D.N.Y.)

7.    Hollywood Police has served as a representative party on behalf of a class in the following actions under the federal securities laws filed during the last three years:

*City of Hollywood Police Officers' Retirement System v. Sprout Social, Inc.,*
No. 24-cv-5582 (N.D. Ill.)
*City of Hollywood Police Officers' Retirement System v. First Republic Bank,*
No. 23-cv-1993 (N.D. Cal.)

8.    Beyond its pro rata share of any recovery, Hollywood Police will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this  24th  day of July, 2025.

_____
*David Strauss*
Chairman
Hollywood Police Officers' Retirement System

**EXHIBIT A**

**TRANSACTIONS IN FISERV, INC. COMMON STOCK**

| Transaction Type | Trade Date | Shares | Local Price | Cost/Proceeds |
|---|---|---|---|---|
| Sales | 10/08/24 | (72) | $186.97 | $13,462 |
| Sales | 10/09/24 | (82) | $187.72 | $15,393 |
| Sales | 10/21/24 | (84) | $195.78 | $16,446 |
| Sales | 10/21/24 | (51) | $196.98 | $10,046 |
| Sales | 10/21/24 | (96) | $196.23 | $18,838 |
| Sales | 10/23/24 | (32) | $202.68 | $6,486 |
| Sales | 10/25/24 | (23) | $200.85 | $4,620 |
| Sales | 10/25/24 | (77) | $202.31 | $15,578 |
| Sales | 10/25/24 | (103) | $200.09 | $20,609 |
| Sales | 11/08/24 | (80) | $211.71 | $16,937 |
| Sales | 11/08/24 | (59) | $211.97 | $12,506 |
| Sales | 11/08/24 | (96) | $211.39 | $20,293 |
| Sales | 11/08/24 | (42) | $212.62 | $8,930 |
| Sales | 11/11/24 | (48) | $215.11 | $10,325 |
| Sales | 11/14/24 | (33) | $210.71 | $6,953 |
| Sales | 11/14/24 | (54) | $212.05 | $11,451 |
| Sales | 11/19/24 | (21) | $212.89 | $4,471 |
| Sales | 11/21/24 | (28) | $218.86 | $6,128 |
| Sales | 11/21/24 | (27) | $217.46 | $5,871 |
| Sales | 11/22/24 | (9) | $221.08 | $1,990 |
| Sales | 11/25/24 | (53) | $220.84 | $11,705 |
| Sales | 12/02/24 | (50) | $217.91 | $10,896 |
| Sales | 12/03/24 | (43) | $216.13 | $9,294 |
| Sales | 12/05/24 | (93) | $207.18 | $19,268 |
| Sales | 02/05/25 | (160) | $229.43 | $36,709 |
| Sales | 02/21/25 | (46) | $232.48 | $10,694 |
| Purchases | 03/07/25 | 31 | $214.67 | ($6,655) |
| Purchases | 04/01/25 | 3,360 | $220.45 | ($740,712) |
| Purchases | 04/09/25 | 37 | $207.75 | ($7,687) |
| Purchases | 04/09/25 | 61 | $207.82 | ($12,677) |
| Purchases | 04/10/25 | 36 | $200.98 | ($7,235) |
| Purchases | 04/24/25 | 67 | $185.03 | ($12,397) |
| Purchases | 04/24/25 | 39 | $179.28 | ($6,992) |
| Purchases | 04/25/25 | 40 | $178.95 | ($7,158) |
| Purchases | 04/25/25 | 123 | $179.21 | ($22,043) |
| Purchases | 04/28/25 | 45 | $183.07 | ($8,238) |
| Purchases | 05/06/25 | 1,661 | $185.91 | ($308,797) |
| Purchases | 05/21/25 | 1,974 | $165.06 | ($325,828) |

| Transaction Type | Trade Date | Shares | Local Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 05/29/25 | 130 | $159.31 | ($20,710) |
| Purchases | 05/30/25 | 64 | $161.41 | ($10,330) |
| Purchases | 06/05/25 | 43 | $164.63 | ($7,079) |
| Sales | 06/26/25 | (73) | $170.36 | $12,436 |
| Sales | 07/02/25 | (506) | $171.86 | $86,960 |
| Purchases | 07/21/25 | 82 | $166.95 | ($13,690) |
| Purchases | 07/22/25 | 18 | $166.47 | ($2,996) |