**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | No. 1:25-cv-06094-JR-VF |
| Plaintiff, | Judge Jennifer Rearden |
| vs. | <u>CLASS ACTION</u> |
| FISERV, INC., FRANK J. BISIGNANO, MICHAEL P. LYONS, ROBERT W. HAU, and KENNETH F. BEST, | <u>ORAL ARGUMENT REQUESTED</u> |
| Defendants. |  |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE PENSION FUNDS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF <u>SELECTION OF LEAD COUNSEL</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    ETHENEA IS SUBJECT TO UNIQUE DEFENSES CONCERNING THE TIMING OF ITS CLASS PERIOD TRANSACTIONS AND ITS MOTION SHOULD BE DENIED ................................................................................................ 4

    A.    ETHENEA Made its Only Relevant Purchase After the First Two Disclosures Largely Revealed Defendants' Fraud.................................................. 6

    B.    ETHENEA Made its Only Relevant Purchase After Two Disclosures Had Removed Most of the Inflation From Fiserv's Stock Price .................................... 9

    C.    ETHENEA's Atypical Trading Threatens the Interests of the Class.................... 12

II.    THE PENSION FUNDS SATISFY THE PSLRA LEAD PLAINTIFF REQUIREMENTS AND SHOULD BE APPOINTED AS LEAD PLAINTIFF............. 14

CONCLUSION.................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...................................................................................................5

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)...................................................................................................5

*Bhangal v. Hawaiian Elec. Indus., Inc.*,
    2023 WL 8482871 (N.D. Cal. Dec. 7, 2023)..............................................................9

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)...................................................................................1, 3

*In re Cent. Eur. Distrib. Corp. Sec. Litig.*,
    2012 WL 5511711 (D.N.J. Nov. 14, 2012) ..............................................................12

*China Agritech v. Michael H. Resh*,
    584 U.S. 732 (2018).................................................................................................13

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................................................5

*Erickson v. Snap, Inc.*,
    2017 WL 11592635 (C.D. Cal. Sept. 18, 2017) .........................................5, 10, 11

*Faris v. Longtop Fin. Techs. Ltd.*,
    2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011)..............................................2, 4, 5, 14

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)..................................................................................2, 5

*George v. China Auto. Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..............................................................5

*Hardy v. MabVax Therapeutics Holdings*,
    2018 WL 4252345 (S.D. Cal. Sept. 6, 2018) ..........................................................14

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
    2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)...........................................3, 11, 12

*In re IMAX Sec. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) ........................................................................4, 14

*Karp v. Diebold Nixdorf, Inc.*,
    2019 WL 6619351 (S.D.N.Y. Dec. 5, 2019) ...........................................................................3

*Lemm v. New York Cmty. Bancorp, Inc.*,
    733 F. Supp. 3d 107  (E.D.N.Y. 2024) ..........................................................................8, 9, 12

*Lundy v. Ideanomics, Inc.*,
    2020 WL 7389027 (S.D.N.Y. Dec. 16, 2020) .......................................................................11

*In re Paysafe Ltd. Sec. Litig.*,
    2024 WL 1636415 (S.D.N.Y. Apr. 16, 2024).........................................................................3

*In re Petrobras Sec. Litig.*,
    104 F. Supp. 3d 618 (S.D.N.Y. 2015)....................................................................................5

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, Inc.,
    229 F.R.D. 395 (S.D.N.Y. 2004) ...........................................................................................3

*Schaffer v. Horizon Pharma Plc*,
    2016 WL 3566238 (S.D.N.Y. June 27, 2016) .......................................................................3

*Williams v. KuCoin*,
    2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) ......................................................................13

## Statutes & Rules

Fed. R. Civ. P. 23 ...........................................................................................................................1

15 U.S.C. § 78j(b) ..........................................................................................................................5

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ...............................................................................................1, 3

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)................................................................................................3

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb) ........................................................................................5

28 U.S.C. § 1658(b) .....................................................................................................................13

Proposed Lead Plaintiff the Pension Funds[1] respectfully submit this Memorandum of Law in further support of their Motion for appointment as Lead Plaintiff and approval of selection of Labaton as Lead Counsel; and in opposition to all competing movants.[2]

## PRELIMINARY STATEMENT

The Pension Funds are entitled to appointment as Lead Plaintiff under the PSLRA because they are ***the only*** movant asserting the largest financial interest in this litigation that ***also*** satisfies the PSLRA's adequacy and typicality requirements.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (requiring the appointment of the movant that "has the largest financial interest" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure").  With losses of approximately $1,666,404 in connection with their Class Period transactions in Fiserv common stock and experience successfully representing investors as lead plaintiff in securities class actions, there can be no doubt that the Pension Funds have a substantial financial interest in this litigation and are adequate and typical in all respects.

While ETHENEA Independent Investors S.A. ("ETHENEA") may claim larger losses than the Pension Funds, a movant's losses are only the starting point of the PSLRA's analysis.  Unlike the Pension Funds, ETHENEA's lead plaintiff application is plagued by fatal, unique defenses that undermine its typicality and adequacy and therefore mandate disqualification.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) ("If (for any reason) the court determines that the movant with the largest losses cannot make a threshold showing of typicality or adequacy, then

---

[1] Unless otherwise noted, all defined terms and abbreviations remain unchanged from those in the Pension Fund's opening motion and supporting papers.  *See* ECF Nos. 24-26.  All citations and internal quotations are omitted, and all emphasis is added, unless noted.

[2] In addition to the Pension Funds, three other investors filed for Lead Plaintiff appointment on September 22, 2025.  ECF Nos. 19, 21, and 29.  Two of those investors have subsequently withdrawn their motions.  *See* ECF Nos. 34, 38.  Accordingly, only the Pension Funds and ETHENEA Independent Investors S.A. continue to vie for appointment.

the court should . . . disqualify that movant from serving as lead plaintiff.")  As detailed below, ETHENEA's trading pattern subjects it to "unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).  If ETHENEA is appointed Lead Plaintiff, these unique defenses will expose the Class to substantial risks.  Appointing the Pension Funds would not expose the Class to any such risks.

ETHENEA's superior financial interest rests entirely on a fatal trading quirk which renders it atypical and threatens to overwhelm the focus of the litigation.  Specifically, ETHENEA made ***its only*** Class Period purchase of Fiserv stock on June 25, 2025, ***after*** the Company's fraud was largely disclosed.  ECF No. 31-2.  By the time of this purchase, disclosures on Apr 24, 2025 and May 15, 2025 had already revealed that Fiserv's growth was declining and that the earlier growth Fiserv had demonstrated was unsustainable.  ECF No. 1 ¶¶ 9-10 ("Complaint").  Therefore, ETHENEA is subject to unique defenses concerning the timing of its transaction because ETHENEA's "post-disclosure purchases suggest that [it] invested in [company] securities notwithstanding notice of defendants' misstatements and omissions" and "[t]hese unusual trading patterns may well undermine the ability of [ETHENEA] to assert the fraud-on-the-market presumption of reliance, thereby rendering [it] inadequate." *Faris v. Longtop Fin. Techs. Ltd*., 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011).

In contrast, the Pension Funds' prototypical trading pattern perfectly positions them to serve as Lead Plaintiff.  Therefore, under the sequential PSLRA lead plaintiff process, the Pension Funds are the only movant to satisfy the statutory test and should be appointed as Lead Plaintiff.

## ARGUMENT

The goal of the PSLRA's lead plaintiff provision "is to locate a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to function

2

as an active agent for the class." *In re Cendant Corp. Litig.*, 264 F.3d at 266.  To effectuate this goal, district courts are given broad discretion to reject lead plaintiff applicants upon a showing they are atypical, inadequate, or subject to unique defenses.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). The dispositive issue is whether there exists a "non-speculative risk that the movant [with the greatest financial loss] will not be adequate." *Schaffer v. Horizon Pharma Plc*, 2016 WL 3566238, at *3 (S.D.N.Y. June 27, 2016).  As many courts have noted, the standard of review "is a 'predictive and probabilistic' process that requires evaluation of 'potential' risks" that a movant's unique defense could threaten to become the focus of the litigation. *Karp v. Diebold Nixdorf, Inc.*, 2019 WL 6619351, at *2 (S.D.N.Y. Dec. 5, 2019).

The standard to disqualify a lead plaintiff movant is not ***proving*** inadequacy or that the movant is subject to a unique defense, "instead it is enough [to present] a colorable risk of inadequacy." *In re Paysafe Ltd. Sec. Litig.*, 2024 WL 1636415, at *6 (S.D.N.Y. Apr. 16, 2024); *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020) ("[B]efore disqualifying a potential lead plaintiff on [the basis that he is subject to a unique defense], the Court need not conclude that the defense is likely to or will succeed . . . . Rather, it must only find at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses.").  The breadth of that inquiry underscores that the district court's "ultimate obligation to appoint as lead plaintiff [the candidate] who [is] most capable of representing the interests of the class members." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, Inc., 229 F.R.D. 395, 407 n.19 (S.D.N.Y. 2004).

Here, the Pension Funds are the ***only*** movant that satisfies the financial interest, adequacy, and typicality requirements of the PSLRA and should be appointed as Lead Plaintiff.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Appointing ETHENEA would severely undermine the prosecution

3

of the Class's claims because such a blatantly atypical lead plaintiff may be disqualified or rejected at later stages of litigation—a result that could force the Court to either reopen the lead plaintiff selection process in this litigation or dismiss the Class's claims entirely. *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155, 160 (S.D.N.Y. 2010) (denying class certification and reopening the lead plaintiff selection process where the previously appointed lead plaintiff was "at a minimum . . . subject to unique defenses"). In contrast, the Pension Funds' appointment does not expose the Class to any such risks.

**I. ETHENEA IS SUBJECT TO UNIQUE DEFENSES CONCERNING THE TIMING OF ITS CLASS PERIOD TRANSACTIONS AND ITS MOTION SHOULD BE DENIED**

ETHENEA's financial interest in the Action rests entirely on its purchases of Fiserv stock on June 25, 2025. This purchase came *after* Fiserv revealed that its Class Period growth metrics and projections were unsustainable on April 24, 2025 (the "April Disclosure") and May 15, 2025. (the "May Disclosure"). Complaint ¶¶ 9-10. Therefore, by the time ETHENEA made its *sole* purchase, it largely knew that Defendants' Class Period claims regarding Fiserv's growth metrics and projections were false and misleading. After ETHNEA's purchase, Defendants made one more disclosure on July 23, 2025 (the "July Disclosure"). This final disclosure merely revealed further consequences of Fiserv's slowing growth. As discussed below, ETHENEA was undoubtedly on notice of Defendants' fraud when it made its *only* relevant purchase of Fiserv stock.

Because of this trading pattern, Defendants can and will argue that ETHENEA's post-disclosure purchases "suggest that [it] invested in [Fiserv] notwithstanding notice of [D]efendants' misstatements and omission," undermining its ability to "assert the fraud-on-the-market presumption of reliance, thereby rendering them inadequate class representatives." *Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8. The fraud-on-the-market presumption of reliance is the

bedrock of securities class action lawsuits.[3]  "Without the benefit of the presumption of reliance, requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Erickson v. Snap, Inc.,* 2017 WL 11592635, at *3 (C.D. Cal. Sept. 18, 2017).  Thus, "'post-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a disproportionately large percentage of their purchases post-disclosure.'"  *Id.* (quoting *GAMCO Invs. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013)); *see also Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (finding a lead plaintiff movant subject to a unique defense when it had suffered 87% of its losses on securities purchased after a corrective disclosure).[4]

For these reasons, ETHNEA's post-disclosure purchase of Fiserv stock, its only Class Period purchase, subjects it to unique defenses "that render [ETHENEA] incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb); *Gary Plastic Packaging Corp.*, 903 F.2d at 179 (concluding that a plaintiff "was an inappropriate class representative since its claim is subject to several unique defenses including its continued purchases . . . despite having notice of, and having investigated, the alleged fraud").  ETHENEA is highly vulnerable to this

---

[3] Under Section 10(b) of the Exchange Act, plaintiffs must prove reliance.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988). Plaintiffs may use the fraud-on-the-market theory, which entitles them to a rebuttable presumption of reliance.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013).

[4] *See also, e.g., In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (rejecting movant because its post-corrective disclosure purchases "raise serious questions regarding [the movant's] reliance on the alleged misrepresentations and omissions"); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) (denying class certification where proposed class representatives bought shares post-disclosure, stating that "this will require that each of the named plaintiffs expend considerable time on unique defenses—precisely the situation the case law does not condone").

unique defense because it made its only purchase after two strong disclosures of Defendants' fraud which removed most of the artificial inflation from Fiserv's stock price.

> **A.    ETHENEA Made its Only Relevant Purchase After the First Two Disclosures Largely Revealed Defendants' Fraud**

Defendants can effectively argue that ETHENEA purchased Fiserv stock with notice of Defendants' fraud because the disclosures in April and May largely revealed the fraud alleged in the Action. The July Disclosure, in contrast, only served to reveal continued consequences of the same fraud. This case is about how Fiserv "misled investors by artificially inflating its growth numbers through compelled migration of legacy customers using Payeezy, the Company's older point-of-sale platform, to Clover, its expensive and feature-heavy platform." Complaint ¶ 2. The case largely focuses on a financial metric called gross payment volume ("GPV"), "which represents the total monetary value of transactions [Fiserv] processed through the Clover platform." *Id.* ¶ 4. As the Complaint makes clear, trends in GPV growth indicate future revenue growth for Fiserv. *Id.*

The Action alleges that Defendants failed to disclose that the forced migration of customers to the Clover platform had temporarily and unsustainably boosted Fiserv's growth, including revenue growth and the connected GPV metric. *Id.* ¶ 8. As part of this fraud, the Complaint alleges that Defendants made numerous false and misleading statements during the Class Period, including claiming:

- "[W]e continue to see good overall revenue and volume growth out of our Clover solution." *Id.* ¶ 38 (emphasis omitted);

- "Clover [is] obviously growing very rapidly." *Id.* ¶ 41 (emphasis omitted);

- "90% of new Clover revenue growth is from clients that are new to Fiserv from a merchant acquiring standpoint." *Id.* ¶ 53 (emphasis omitted).

Such claims were false and misleading because Defendants hid that Fiserv's growth was being artificially boosted by Fiserv moving customers from Payeezy, its legacy product, to Clover, its newer platform. *Id.* ¶ 54. The Action alleges this growth was temporary and unsustainable because many of these customers were leaving the Clover platform shortly after being moved. *Id.*

Defendants will be able to argue that the unsustainability of Fiserv's growth, and therefore the falsity of Defendants' Class Period statements, was revealed to the market in the first two disclosures, well before ETHENEA purchased a single share in Fiserv stock. The April Disclosure reported a decline in the Company's GPV growth for the first quarter of 2025. *Id.* ¶ 55. In response, analysts at J.P. Morgan wrote that this disclosure raised concerns "about sustainability of premium growth." *Id.* ¶ 56 (emphasis omitted). Analysts at Cowen Research noted that the April Disclosure raised questions about the sustainability of Fiserv's revenue. *Id.* ¶ 56. Investors were clearly aware that Fiserv's growth was unsustainable immediately after the April Disclosure.

A few weeks later, the May Disclosure more fully revealed Defendants' fraud when Fiserv disclosed that the "GPV growth deceleration would continue throughout 2025." *Id.* ¶ 61. Analysts explained that Fiserv's growth was decelerating because the Company had migrated customers from Payeezy to Clover, and many of those customers subsequently left Fiserv altogether. *Id.* ¶ 62, 64. For instance, analysts at Goldman Sachs wrote that "the main driver of the [deceleration] in Clover was a gateway conversion in the prior year that saw very significant churn subsequent to the conversion." *Id.* ¶ 62. Analysts at Wolfe Research noted that the May Disclosure revealed "drag on Clover's growth." *Id.* ¶ 64. The May Disclosure was therefore a strong revelation of the fraud laid out in the Complaint—that Fiserv had forced customers onto its Clover platform and that those customers had subsequently stopped using Fiserv's services. *Id.* ¶ 8. These customer departures led to the decline in Fiserv's growth metrics, including GPV and revenue. *Id.* By May

15, 2025, at the latest, investors were on notice of both the decline in Fiserv's growth and the fact that this decline was driven by migrated customers leaving Fiserv.

*Only after* the two qualitatively strongest Class Period revelations did ETHENEA choose to make its *only* Class Period purchase of Fiserv common stock. ECF No. 31-2. Mere weeks after ETHENEA's purchase, the July Disclosure revealed that Fiserv had lowered its growth guidance. Complaint ¶ 70. This continued the revelations of the first two disclosures, as the revenue projections in the July Disclosure are linked directly to the GPV metric discussed in the first two disclosures. *Id.* ¶ 4 ("Accelerating GPV growth rates indicate an expanding number of new merchants."). Further, after the May Disclosure, investors already knew the reason for Fiserv's slowing growth—the forced migration of customers to the Clover platform and subsequent customer departures. Accordingly, the July Disclosure merely continued to reveal the ramifications of the information revealed first two disclosures, specifically how the slowing growth impacted Fiserv's future growth projections.

The court in *Lemm v. New York Cmty. Bancorp, Inc.*, rejected a lead plaintiff movant which, like ETHENEA, made its only purchases of relevant securities after a partial disclosure which was "highly germane to the allegations of fraud in the present case." 733 F. Supp. 3d 107, 117-18 (E.D.N.Y. 2024). That case alleged that the defendant company hid that undisclosed, heightened regulatory standards led the company to overstate its financials. *Id.* at 117. The partial disclosure revealed the defendant company's heightened regulatory status and the impact that status was having on its earnings. *Id.* at 117-18. The court held that because of the movant's post-disclosure buying, "the argument that [the movant] relied on [defendants'] misstatements may be questionable and, therefore, subject the class to unnecessary additional litigation and threaten class certification." *Id.* at 118. Similarly, here, the April Disclosure and May Disclosure revealed both

that Fiserv's reported growth was unsustainable and the underlying reason for the slowing growth. The extent of the importance of each respective disclosure need not be decided at this early stage of the litigation.  *Id.* at 118. ("[T]he importance of the various disclosures will not be adjudicated at this stage of the litigation.").  However, clearly, these disclosures are "highly germane to the allegations of fraud in the present case," *Id.* at 117, and, thus ETHENEA cannot be appointed.

Similarly, in *Bhangal v. Hawaiian Elec. Indus., Inc.*, the court rejected a movant who purchased the relevant securities after a partial disclosure of defendants' fraud.  2023 WL 8482871, at *3 (N.D. Cal. Dec. 7, 2023).  In that case, the relevant partial disclosure consisted of news reports revealing that the defendant company "lacked the proper policies and procedures to mitigate fires." *Id.*  A few days after this disclosure, investors learned that a ratings agency had downgraded the defendant company because of fire risks. *Id.*  As in this case, the final disclosure only further revealed the consequences of the information revealed in the first partial disclosure. That is also the case here where the July Disclosure only revealed that the slow growth reported in the first two disclosures had resulted in lowered growth projections.  Based on the above, ETHENEA is clearly subject to a disqualifying unique defense because it made its ***only*** Class Period purchase ***after*** Defendants' fraud was largely disclosed, meaning it arguably did not rely on Defendants' Class Period misstatements at all.

## B.    ETHENEA Made its Only Relevant Purchase After Two Disclosures Had Removed Most of the Inflation From Fiserv's Stock Price

Consistent with the relative strength of the April and May disclosures, it is no surprise that most of the artificial inflation in Fiserv's stock price was removed by the time ETHENEA made its ***sole*** purchase of Fiserv stock.  Fiserv's stock price declined by $93.91 because of all three disclosures combined: $40.20 after the April Disclosure; $30.73 after the May Disclosure; and $22.98 after the July Disclosure.  Clearly, the July Disclosure is quantitively the smallest and least

significant of the relevant disclosures.  Indeed, **75.5 percent** of the relevant stock decline is tied directly to the first two disclosures, with only **24.5 percent** of the decline attributable to the final July Disclosure.  Therefore, most of the inflation had already been removed from Fiserv's stock price by the time ETHENEA made its sole purchase.

The timeline of the Class Period, the revelations of Defendants' fraud, and Fiserv's stock price relative to EHENEA's Class Period purchase is laid out in the chart below:



To be clear, the Pension Funds do not take the position that any purchases after a partial disclosure are disqualifying.  Rather, ETHENEA's trading renders it atypical because it purchased its **entire** position **after** the most impactful corrective disclosures in the Action, which, as discussed, largely revealed Defendants' fraud.  Numerous courts have reached similar conclusions when disqualifying lead plaintiff movants with trading patterns even less extreme than ETHENEA. For example, the court in *Snap, Inc.* denied one movant's motion for lead plaintiff appointment when it had only purchased **60%** of its shares after news broke regarding the very information the

complaint alleged to be fraudulent. *Snap, Inc.*, 2017 WL 11592635, at *3. The court held that "post-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a ***disproportionately large*** percentage of their purchases post-disclosure." *Id.* The court noted that there was "no reason to subject the class to these unique defenses when a non-conflicted candidate for Lead Plaintiff is also before the Court." *Id.* at *4. The situation here is no different, as ETHENEA suffers from the same defect as a potential lead plaintiff. However, ETHENEA is even more vulnerable to this unique defense than the movant in *Snap, Inc.* because it purchased ***100 percent of its position*** after significant disclosures of Defendants' fraud.

Similarly, in *Lundy v. Ideanomics, Inc.*, the court declined to appoint a movant which purchased its entire position after a partial corrective disclosure. 2020 WL 7389027, at *3 (S.D.N.Y. Dec. 16, 2020) ("While post-disclosure purchases are not a per se bar to an appointment as lead plaintiff, [movant] may be subject to a unique defense because he purchased *all* his class period shares after [a] partial corrective disclosures but before the . . . final corrective disclosure.") (emphasis in original). There, the court rejected the movant in part because he made purchases after a partial disclosure which mentioned the fraudulent conduct further revealed in a later disclosure. *See Id.* ("In the present case [earlier] disclosures mention the alleged fraudulent conduct.").

The court in *In re Hebron Technology Co., Ltd. Securities Litigation* declined to appoint a movant which, like ETHENEA, bought its entire position in the relevant securities the same day as the disclosure which lowered the price of those securities. 2020 WL 5548856, at *6 (declining to appoint a movant which "bought all his [relevant securities] . . . at almost precisely the same time that adverse news broke."). The court in that case found that "there is a real risk that the idiosyncrasies of [the movant's] purchases would become . . . a distraction at trial, were [the

movant] appointed lead plaintiff, with his trading serving as a proxy for the class." *Id.* at *7. Similarly, ETHENEA purchased its **entire Class Period position** in Fiserv **after** the Company made two major disclosures which dropped its stock price substantially. ECF No. 31-2. Just like the rejected movants in these cited cases, ETHENEA cannot be appointed Lead Plaintiff because its trading would be a substantial distraction throughout this litigation.

### C.    ETHENEA's Atypical Trading Threatens the Interests of the Class

The unique defense posed by ETHENEA's atypical trading is not an idle concern—it would pose material risks to the interests of the Class if ETHENEA were appointed Lead Plaintiff. The existence of such risks rebuts the presumption of ETHENEA's adequacy and demands that its request for appointment be denied. *New York Cmty. Bancorp, Inc.*, 733 F. Supp. at 118. ("It is sufficient . . . [to show proof of] a *risk* of unique defenses to rebut the presumption of [a movant's] adequacy"); *In re Cent. Eur. Distrib. Corp. Sec. Litig.*, 2012 WL 5511711, at *3 (D.N.J. Nov. 14, 2012) ("The unique defense analysis does not require a final determination that the defense is, in fact, applicable. The point is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole.").

First, if ETHENEA is appointed Lead Plaintiff, it will have to spend substantial time and resources defending its individual issues at the expense of the Class. Specifically, as discussed above, Defendants would be well-positioned to argue that ETHENEA may not rely on the fraud-on-the-market presumption. This argument itself poses a cost on the Class as "even ultimately unsuccessful unique defenses may divert attention from the substance of the basic claim, and class members are entitled to be represented by someone unhindered by such distractions." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at *7; *In re Cent. Eur. Distrib. Corp. Sec. Litig.*, 2012 WL 5511711, at *3 ("[T]he purpose behind the unique defense analysis is to ensure that class

members are not subject to the time and expense of addressing arguably meritorious defenses unique to the lead plaintiff.").

Second, ETHENEA's unique defense creates an enhanced risk that it would be found inadequate to represent the Class at the class certification stage. Denial of class certification is a substantial risk because, if certification fails, and the statute of limitations in the Action has run, the class would have ***no recourse*** to pursue its claims, except to file individual lawsuits. *China Agritech v. Michael H. Resh*, 584 U.S. 732, 735–36 (2018) ("Upon denial of class certification, may a putative class member, in lieu of promptly joining an existing suit or promptly filing an individual action, commence a class action anew beyond the time allowed by the applicable statute of limitations? Our answer is no."). As in most securities class action lawsuits brought pursuant to the PSLRA, pursuing claims individually is simply not viable for most Class members in this Action. *See Williams v. KuCoin*, 2021 WL 5316013, at *16 (S.D.N.Y. Oct. 21, 2021) ("[M]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible."). Securities fraud claims have a two-year statute of limitation which has already begun to run in the Action. 28 U.S.C. § 1658(b). If the risk posed by ETHENEA's unique defense materializes at the class certification stage, most Class members will be completely out of luck.

Third, ETHENEA's atypical trading could also doom the Class if, at any time in the litigation, the Class Period is altered such that ETHENEA's purchase or the July Disclosure is cut out of the case. Courts routinely alter class periods over the course of litigation under the PSLRA, including at the motion to dismiss, class certification, and summary judgement stages. If at any time in that process the Class Period is altered to exclude ETHENEA's single purchase in June

2025 (at the end of the filed Class Period) or to exclude the July Disclosure, ETHENEA will lose its standing and the Class will suddenly need a new Lead Plaintiff, causing serious undo delay and subjecting litigants to unwarranted expense. *See Hardy v. MabVax Therapeutics Holdings*, 2018 WL 4252345, at *5 (S.D. Cal. Sept. 6, 2018) ("[T]he class period may change due to subsequent developments in the litigation, which inevitably may impact who is an appropriate lead plaintiff."); *In re IMAX Sec. Litig.*, 272 F.R.D. at 155, 160 (denying class certification and reopening the lead plaintiff selection process where the previously appointed lead plaintiff was "at a minimum . . . subject to unique defenses").

Under these circumstances, appointing ETHENEA as Lead Plaintiff would place the interests of the entire Class at unreasonable risk. This risk is entirely unnecessary here, given that the Pension Funds, experienced lead plaintiffs, do not suffer from the same debilitating trading issues. *See Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (finding "no reason to subject the class to this potential defense where there is another movant" that does not suffer from the same potential unique defenses arising from post-disclosure trading).

## II.    THE PENSION FUNDS SATISFY THE PSLRA LEAD PLAINTIFF REQUIREMENTS AND SHOULD BE APPOINTED AS LEAD PLAINTIFF

The Pension Funds are the only movant able to satisfy the PSLRA's statutory criteria for appointment as Lead Plaintiff. As indicated in their moving papers, the Pension Funds incurred $1,666,404 in losses as calculated on a LIFO basis as a result of its transactions in Fiserv stock during the Class Period. *See ECF No. 26-2 (the Pension Funds' Loss Analysis). Indisputably, the Pension Fund incurred a larger loss than any movant besides ETHENEA. *See ECF Nos. 20-3, 23-2. Further, each lead plaintiff movant, other than ETHENEA and the Pension Funds, has withdrawn their motions. *See ECF Nos. 34, 38.

The Pension Funds are typical because their claims are premised on the same facts and legal theories as those of the Class. *See* ECF No. 25 at 7-8. Finally, the Pension Funds are adequate because they are highly incentivized to vigorously prosecute this litigation and oversee its qualified choice of counsel, and because they lack any antagonism towards the Class. *See id.* at 8-9.

Each of the Pension Funds are public pension funds that provide retirement benefits to their members. ECF No. 26-3 ¶¶ 2-3. Hollywood Police managers approximately $460 million in assets for the benefit of approximately 733 active and retired members and beneficiaries. *Id.* ¶ 2. Miami Beach F&P manages approximately $1.2 billion in assets for the benefit of over 1,300 active and retired members and beneficiaries. *Id.* ¶ 3. Each fund also has extensive experience serving as lead plaintiff in class actions lawsuits under the PSLRA, both alongside one another and jointly with other institutional investors. *Id.* ¶ 6. Based on this record, the Pension Funds have substantial fiduciary experience, including the oversight of outside counsel, and undoubtedly possess the sophistication and resources to effectively monitor counsel in complex litigation.

Moreover, the Pension Funds have already been effectively monitoring and directing counsel. First, after reviewing its counsel's investigation into the allegations against Fiserv, Hollywood Police directed its counsel to file the complaint asserting these securities fraud claims against Fiserv and certain of its executives. *Id.* ¶ 4. Then, after continuing to review the findings of counsel's investigation, each of the Pension Funds determined to seek appointment as Lead Plaintiff. *Id.* ¶ 5. Moreover, as a group of two sophisticated institutions, the Pension Funds are precisely the type of Lead Plaintiff envisioned by the PSLRA. ECF No. 25 at 9. Accordingly, the Pension Funds, as sophisticated institutional investors and fiduciaries, are the most adequate plaintiff under the PSLRA and best suited to vigorously represent the Class.

15

## **CONCLUSION**

For the reasons set forth above and in its opening brief, the Pension Funds respectfully request that the Court appoint the Pension Funds as Lead Plaintiff, approve their selection of Labaton as Lead Counsel for the Class, and deny the competing motions.

DATED: October 6, 2025

Respectfully submitted,

*/s/ Francis P. McConville*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Proposed Lead Plaintiff and
Proposed Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 NW 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Proposed Lead Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Lead Plaintiff Movant the Pension Funds certifies that this Memorandum of Law in support of the Pension Funds Motion contains 4,833 words and is in compliance with the word-count limitation of Local Civil Rule 7.1(c).

Dated: October 6, 2025

<u>*s/ Francis P. McConville*</u>
Francis P. McConville

**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com