**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FISERV, INC. SECURITIES LITIGATION | No. 1:25-cv-06094-JHR-VF |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS


**Page**

I. NATURE OF THE ACTION .......... 2

A. Fiserv's Success—And the Individual Defendants' Own Potential Gains Through the Executive Compensation Plan—Depended on Sustaining Growth .......... 5

B. The Individual Defendants' Executive Compensation Plan Required Fiserv to Meet Financial Metrics to Trigger Defendants' Bonuses .......... 7

C. In Response to Declining Performance, Defendants Devised and Employed a Fraudulent Scheme to Create a Misleading Impression of Fiserv's Growth .......... 8

1. Defendants Publicly Touted Clover's Success While Concealing that a One-Off Gateway Conversion, Hidden Fees, and Unwanted Services Drove Its Results .......... 8

2. Defendants Publicly Touted Fiserv's Organic Revenue Growth While Concealing that its Double-Digit Results Were Achieved by Exploiting Unsustainable Hyperinflation in Argentina .......... 12

3. Defendants Publicly Touted Fiserv's Financial Segment's Stability While Cutting Essential Resources and Hemorrhaging Revenue as Client Dissatisfaction Reached a Fever Pitch .......... 14

D. Defendants' Scheme Allowed Fiserv to Appear to Meet Financial Metrics Required to Trigger the Individual Defendants' Bonuses .......... 17

E. Bisignano Made Suspiciously Timed Stock Sales that Avoided Fiserv's Stock Declines and Yielded Nearly $700 Million .......... 17

F. Defendants Began to Reveal Fiserv's Poor Performance While Continuing to Offer False Reassurances to Investors .......... 19

G. On October 29, 2025, Defendants Shocked Investors by Revealing Fiserv's Need to "Reset" Financially and Abandon Short-Term Revenue Initiatives .......... 21

II. JURISDICTION AND VENUE .......... 23

III. PARTIES .......... 24

A. Plaintiffs .......... 24

B. Defendants ... 25

1. Corporate Defendant ... 25

2. Individual Defendants ... 25

C. Former Fiserv Employees Referenced as CWs ... 28

IV. SUBSTANTIVE ALLEGATIONS ... 30

A. Fiserv's Financial Technology Business ... 30

1. Fiserv's Merchant Solutions Segment ... 33

2. Clover: Fiserv's Flagship Merchant Solutions Product ... 34

3. Fiserv's Financial Solutions Segment ... 36

B. The Individual Defendants' Executive Compensation Plan Required Fiserv to Achieve Double-Digit Organic Revenue Growth ... 37

C. Defendants Devised and Employed a Fraudulent Scheme to Manipulate Fiserv's Appearance of Growth through Unsustainable Revenue Boosts ... 40

D. Defendants' Fraudulent Scheme Concealed Fiserv's Declining Performance through Short-Term Initiatives ... 44

E. Clover's Growth Rested on Unsustainable Practices ... 49

1. Clover's Performance Data: GPV, VAS, and Spread ... 49

2. Fiserv Concealed the Extent of Temporary Gateway Conversion Revenue Boosts ... 51

3. Fiserv Forced High Fees and Unwanted VAS on Clover Customers to Boost Short Term Revenue ... 55

F. Fiserv's Argentina Business Fueled Its Misleading Double-Digit Organic Revenue Growth ... 61

1. Fiserv's Organic Revenue Growth: a Misleading Metric that Disproportionately Drew on Argentinian Hyperinflation ... 61

2. Defendants Exploited Argentinian Hyperinflation to Misleadingly Overstate Organic Revenue Growth ... 64

3. Defendants' Own Revelations Confirm That They Obscured Fiserv's Reliance on Argentina to Inflate Organic Revenue ... 66

4. CW Accounts Detail that Defendants Knowingly Relied on Argentina's Hyperinflation to Misleadingly Overstate Revenue............. 69

G. Defendants Cut Resources to Financial Solutions to Drive Artificial Growth in Merchant Solutions, as Clients Fled and Revenue Declined............... 70

H. Bisignano and Gibbons Enriched Themselves through Illicit Insider Sales......... 80

I. Defendants Coupled Their Fraudulent Scheme with Misstatements Touting Fiserv's Growth while Failing to Disclose the True Drivers of Its Success........................................................................................................ 83

1. Defendants Emphasized Clover's Purported Strength, While Omitting One-Time Gateway Conversion, Fees, and VAS Boosts.......... 83

2. Defendants Misleadingly Reported Fiserv's Organic Revenue Growth, Keeping Investors in the Dark as To Argentina's True Contribution........................................................................................ 85

3. Defendants Touted Booming Demand and Excellent Client Service in Financial Solutions while Losing Customers in Droves...................... 88

J. On April 24, 2025, The Truth Began to Emerge as Fiserv Reported Poor Financials and Offered False and Misleading Reassurances to Investors ........... 89

K. On May 15, 2025, Defendants Revealed Continued Clover GPV Declines, while Continuing to Mislead Investors.............................................................. 90

L. On July 23, 2025, Defendants Disclosed Deteriorating Organic Revenue and GPV Growth, while Continuing to Mislead Investors about Fiserv's Outlook ......................................................................................................... 92

M. On October 29, 2025, Defendants Revealed Fiserv's Need to "Reset" Financially to Correct Its Heavy Reliance on Short-Term Revenue Drivers ....... 93

V. POST-CLASS PERIOD EVENTS ....................................................................... 97

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................ 100

A. February 6, 2024 – Q4 2023 and Full-Year Financial Results .......................... 101

B. April 23, 2024 – Q1 2024 Financial Results.................................................... 105

C. July 24, 2024 – Q2 2024 Financial Results ...................................................... 109

D. October 22, 2024 – Q3 2024 Financial Results ................................................ 114

E. February 5, 2025 – Q4 2024 and Full Year Financial Results........................... 115

F. March 11, 2025 – Wolfe Research FinTech Forum ... 117

G. April 24, 2025 – Q1 2025 Financial Results ... 118

H. May 15, 2025 – J.P. Morgan Global Technology, Media and Communications Conference ... 120

I. July 23, 2025 – Q2 2025 Financial Results ... 121

VII. LOSS CAUSATION/ECONOMIC LOSS ... 123

A. April 24, 2025 – First Partial Corrective Disclosure/Materialization of the Risk ... 124

B. May 15, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk ... 127

C. July 23, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk ... 129

D. October 29, 2025 – Final Corrective Disclosure/Materialization of the Risk ... 132

VIII. ADDITIONAL INDICIA OF SCIENTER ... 137

A. The Individual Defendants' Admissions Support Scienter ... 137

B. The Individual Defendants' Personal Involvement in the Fraud and Admissions Support Scienter ... 138

C. The Individual Defendants' Compensation Plans Tied to Fiserv's Misleading Financial Disclosures Support Scienter ... 142

D. Defendants' Misstatements and Responses to Analysts' Questions Throughout the Class Period Support an Inference of Scienter ... 143

E. The Suspiciously Timed Departures of Hau and Fiserv's Audit Committee Chair, and the Reassignment of Gibbons, Support Scienter ... 145

F. Fiserv's Merchant Solutions and Financial Solutions Segments Were Responsible for All of Fiserv's Business and Potential Revenue ... 146

G. The Individual Defendants' Suspiciously Timed Stock Sales Support Scienter ... 148

H. Defendants' SOX Certifications Support Scienter ... 152

I. The U.S. Government's Probe into Fiserv and Bisignano Supports Scienter ... 153

IX. CLASS ACTION ALLEGATIONS ..... 154

X. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE..... 156

XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..... 158

XII. CONTROL PERSON ALLEGATIONS..... 159

XIII. CAUSES OF ACTION ..... 161

COUNT I For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) against Defendants Fiserv, Bisignano, Hau, and Lyons..... 161

COUNT II For Violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against All Defendants..... 162

COUNT III For Violation of § 20(a) of the Exchange Act against the Individual Defendants ..... 164

XIV. PRAYER FOR RELIEF ..... 165

Lead Plaintiffs ETHENEA Independent Investors S.A. ("ETHENEA"), City of Hollywood Police Officers' Retirement System ("Hollywood Police"), and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Miami Beach F&P"), and additional plaintiff City of Pontiac Reestablished General Employees' Retirement System ("PGERS") (collectively, "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Fiserv, Inc. ("Fiserv" or the "Company") during the period from February 6, 2024 through October 28, 2025, inclusive (the "Class Period"), subject to certain exclusions (the "Class"), against Defendants Fiserv, Frank J. Bisignano ("Bisignano"), Michael P. Lyons ("Lyons"), Robert W. Hau ("Hau"), and John Gibbons ("Gibbons") (the "Individual Defendants," and collectively with Fiserv, "Defendants").[1]

The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters. Such information and belief is based upon the investigation conducted by and under the supervision of Lead Counsel, together with additional counsel for Plaintiffs (collectively, "Counsel"), which included a review of: Fiserv's SEC filings; securities analysts' reports and advisories concerning the Company; press releases and other public statements issued by the Company; media reports regarding the Company; financial research

---

[1] Excluded from the Class are: (i) Defendants; (ii) Individual Defendants' immediate family members; (iii) any officer, director, or control person of Fiserv during the Class Period, and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Fiserv's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

platforms; interviews of former Fiserv employees with knowledge of the matters alleged, referred to as "confidential witnesses" or "CWs"; and consultation with forensic accountants. Counsel's investigation into the matters alleged is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1. For decades, Fiserv's traditional banking products and stable client relationships anchored recurring, solid returns for investors. That changed during the Class Period when, unbeknownst to investors, Defendants replaced the drivers of Fiserv's ostensible success with an undisclosed battery of temporary cash grabs. Defendants employed these unsustainable levers to artificially achieve growth, particularly through Fiserv's new products and services.

2. Defendants, led by CEO Bisignano, misleadingly portrayed Fiserv's financial results to enrich themselves through their exorbitant executive compensation plan ("Executive Compensation Plan"), which triggered equity and cash payments to them upon the Company's achievement of certain growth benchmarks, including double-digit "organic" revenue growth. Defendants carried out this fraudulent scheme in three ways that painted an unrealistic—and false—image of a company demonstrating growth and continued stability.

3. First, as Defendants touted the success of the Company's new digital payment platform, Clover, they padded its results through undisclosed, adhesive, and unwanted fees and services—including those derived from forcing customers on Fiserv's existing payment platform,

Payeezy, to switch to Clover.[2] While this engineered a publicly perceived boost in Clover's success, unbeknownst to investors, these short-term initiatives were driving customers away in droves.

4. Second, Defendants artificially created double-digit "organic" revenue growth by exploiting an unsustainable hyperinflationary environment in Argentina. Critically, because the "price" of everyday transactions reflected in Argentina's currency was markedly higher than normal, Defendants were able to create the misleading appearance that Fiserv's revenue was growing exponentially. Ultimately, Defendants reported Fiserv's double-digit organic revenue growth over the Class Period by concealing the true (and massive) extent to which hyperinflation contributed to its seemingly double-digit organic growth figures.

5. Third, to push Fiserv's temporary growth sky-high and hit their bonus benchmarks, the Individual Defendants diverted resources away from Fiserv's largest source of stable recurring revenue—its traditional banking business—by drastically cutting costs and essential technology in that area of the Company. Having starved this historically unshakeable segment, Defendants faced severe client attrition and dwindling revenue, all while touting the strength of Fiserv's demand and client relationships in the segment, leaving investors completely unaware of its impending collapse.

6. After Defendants had cashed out and the truth came to light as Defendants' temporary revenue streams dried up, investors lost billions when Fiserv's stock plummeted, eliminating **73%** of shareholder value and nearly **$92 billion** in market capitalization over the Class Period. But the Individual Defendants profited tremendously. In 2024 alone, Defendants

[2] Clover fits under the umbrella of payment "gateway," a hardware and software platform to facilitate purchases between merchants and consumers via credit card, debit card, or mobile device.

Bisignano, Hau (former CFO), and Gibbons (former Head of the Financial Institutions Group) received a collective **$41.5** million through the Executive Compensation Plan, approximately **93%** of which was paid in equity awards of Fiserv stock for purportedly achieving performance benchmarks, including double-digit "organic" revenue growth.[3]

7. Because the undisclosed reality of Fiserv's impressive "growth" was little more than a heap of unsustainable revenue grabs, however, its faulty foundation inevitably collapsed when these initiatives could not generate sustainable, ongoing revenue and harmed Fiserv's client relationships.

8. The damage to Fiserv's infrastructure was so severe that it prompted a financial "reset" on October 29, 2025, alongside stunning admissions that Fiserv's results had previously "**relied on short-term initiatives**" and placed "**too much emphasis on pursuing in-quarter results**." On that day alone, the revelations caused Fiserv's stock price to fall by **44%** and eliminated **$29 billion** in market capitalization.

9. Strikingly, Defendants' admissions constituted a near mirror image of their undisclosed conduct and misstatements during the Class Period, revealing that: (i) to rehabilitate Clover's declining revenue, Fiserv would deprioritize "certain short-term revenue initiatives, including the elimination of certain fees . . . that were initiated a year ago and are no longer consistent with our business strategy"; (ii) "excluding Argentina, the company's overall organic revenue growth rate was in the mid-single-digits in both 2023 and 2024"; and (iii) Financial

[3] In December 2024, Bisignano was nominated to serve as Commissioner of the Social Security Administration ("SSA"). Once confirmed, Bisignano resigned from Fiserv and sold **99.9%** of his and his family's Fiserv stock (including 98.8% of his personal holdings), trading at all-time highs, under the cover of ethical obligation. Suspiciously, he did so on the eve of Fiserv disclosing negative performance on July 23, 2025, which yielded Bisignano and his family proceeds of nearly **$700 million**.

Solutions' historically recurring revenue was broken by "decisions to . . . cut certain costs," which "improved margins in the short-term, but are now limiting [Fiserv's] ability to . . . execute product launches . . . and grow revenue[.]"

10. Analysts described downgrades in reaction to the resulting valuation decline as the "most painful ratings change we have had to do," citing "**lost confidence into the company's visibility into its financial metrics**." They concluded that the "magnitude of the reset speaks to the [Company's] **lack of transparency**" regarding "**over-earning** in its Argentina business," "focusing on short-term outcomes . . . to **routinely make numbers**," and "perpetuating aggressive pricing" that caused "**client frustration and possible defection**." In sum, analysts declared that Fiserv had "lost its prestigious 'high quality' label."

### A. Fiserv's Success—And the Individual Defendants' Own Potential Gains Through the Executive Compensation Plan—Depended on Sustaining Growth

11. Fiserv is a financial technology company that generates most of its revenue by charging fees—essentially an intermediary's cut—to facilitate financial transactions, such as credit card payments and electronic money transfers. During the Class Period, Fiserv boasted that its business reached nearly 100% of U.S. households and that it operated in more than 100 countries. Indeed, Fiserv reported $19.09 billion and $20.46 billion in revenue in 2023 and 2024, respectively.

12. Fiserv's customers include businesses of all sizes, referred to as "merchants," as well as large financial institutions, including some of the world's largest banks and credit unions. During the Class Period, Fiserv was divided into two equally weighted business segments, accounting for the entirety of its business, split by customer type and service: (i) Merchant Solutions, which involved providing services to merchants; and (ii) Financial Solutions, which

catered to banks and other financial institutions. Fiserv aligned its reportable business segments in this manner beginning in Q1 2024.[4]

13. Within Merchant Solutions, Fiserv predominantly facilitated consumer payments to merchants' businesses. For example, Fiserv might act as the link between the consumer's credit card and the merchant, facilitating a purchase transaction at the point of sale by "processing" payments at a neighborhood coffee shop each time the consumer swipes or taps her credit card. For every payment that Fiserv processes, the Company receives a fee from the transaction, paid by the merchant to Fiserv.

14. Notably, Merchant Solutions encompasses Clover, Fiserv's payment processing platform, which includes hardware and software leased and/or offered to merchants through subscription-based services to facilitate transactions between merchants and consumers. For example, Clover's platform includes the handheld payment devices commonly used by consumers to pay the check at a restaurant. Due to Clover's expansive merchant footprint, the platform accounted for roughly 35% of Fiserv's total revenue. As a result, analysts remarked, "**Clover is all that matters**," and Fiserv's "**share performance is inextricably tied to Clover**."

15. Within Financial Solutions, Fiserv services large institutional and corporate clients, including the largest U.S. banks and credit unions, by selling the use of its "core" processing platform, as well as facilitating services such as account transfers, bill payment, debit card services, and banking software. Fiserv historically (and well into the Class Period) emphasized its Financial Solutions segment's financial stability, touting its "**long-term contracts, high recurring revenue and high revenue retention**." Analysts echoed this sentiment, characterizing Financial Solutions

[4] Fiserv's fiscal quarters are abbreviated as "Q1," "Q2," "Q3," and "Q4" herein.

as "the much steadier business" at Fiserv and lauding the segment's "continued stability" as contributing to "conviction" in their modeling.

16. Fiserv's results from its Merchant Solutions and Financial Solutions segments rolled up into its companywide growth metrics. In 2023, leading up to the Class Period, Bisignano highlighted Fiserv's "**37 years of consecutive double-digit adjusted earnings per share [EPS] growth**." Fiserv's track record of growth was largely premised on the stability and security of the Company's more traditional business within its Financial Solutions segment. Unsurprisingly, analysts and investors keenly tracked these metrics.

### B. The Individual Defendants' Executive Compensation Plan Required Fiserv to Meet Financial Metrics to Trigger Defendants' Bonuses

17. Under the Executive Compensation Plan, Bisignano, Hau, and Gibbons received awards of performance share units ("PSUs") for achieving certain benchmarks, including organic revenue growth targets, over a three-year period. The value of those PSUs was much greater than the Individual Defendants' salaries, which accounted for just over 5% of their total compensation.

18. Accordingly, the Individual Defendants had the motive and opportunity to misrepresent Fiserv's true financial condition, including, among other things, the Company's organic revenue growth, to meet those benchmarks and therefore receive PSUs valued in the millions of dollars.

19. Throughout the Class Period, Fiserv met the benchmarks required to trigger the awards of PSUs to the Individual Defendants. In the absence of Defendants' fraudulent scheme, however, the Company would not have met those benchmarks, and the Individual Defendants would not have received their incentive-based compensation.

20. In turn, those same metrics triggered 80% of the payouts available under the Executive Compensation Plan, which required the achievement of double-digit percentage growth

targets for both organic revenue and EPS. Specifically, organic revenue growth and EPS growth each accounted for 40% of the plan (80% in total), with adjusted EPS comprising the remaining 20%.

### C. In Response to Declining Performance, Defendants Devised and Employed a Fraudulent Scheme to Create a Misleading Impression of Fiserv's Growth

21. Despite Fiserv's long-term success and Defendants' rosy messaging to investors, by 2024 Fiserv had lost its competitive edge. For example, as electronic and mobile payments became ubiquitous, payment processing options for merchants proliferated. Merchants could now choose from a crop of low-cost competitor platforms such as Toast and Square that provided flexible payment solutions tailored to their specific business needs. At the same time, many banks and financial institutions were consolidating, shrinking the pool of Financial Solutions clients.

22. In response to Fiserv's slipping performance, the Individual Defendants—whose compensation primarily depended on Fiserv's EPS and organic revenue growth—engaged in acts, practices, and a course of business to fuel Clover's growth through unsustainable revenue grabs. Moreover, to continue to fuel the growth drivers necessary to hit the performance benchmarks under the Executive Compensation Plan, the Individual Defendants diverted funds away from the Company's most stable source of recurring revenue, Fiserv's Financial Solutions business segment. This included reducing essential technology and customer service, which led to mass client defections that Defendants concealed while falsely portraying sustained success.

#### 1. Defendants Publicly Touted Clover's Success While Concealing that a One-Off Gateway Conversion, Hidden Fees, and Unwanted Services Drove Its Results

23. Leading up to the Class Period, many of Fiserv's Merchant Solutions customers, including many small and medium sized businesses ("SMBs"), did not use Clover. Overwhelmingly, those customers still used Payeezy—Fiserv's older, and very popular, payment

platform. Payeezy was attractive to Fiserv's SMB customers because, unlike Clover, it provided streamlined, low-cost functionality, ease of use, and excellent customer service—with no added frills or costs. Beginning in late 2023, however, Fiserv initiated a mandatory "Gateway Conversion," requiring merchants using Payeezy to switch to Clover, notwithstanding its added and unwanted, **yet non-optional**, bells and whistles, as well as the **costs** inevitably accompanying such superfluous baubles.

24. Fiserv's mandatory Gateway Conversion allowed Defendants to manipulate investors' perception of Clover's, and by extension, the Company's, growth by generating one-time revenue boosts from forced customer migration and by imposing unwanted fees, price increases, and so-called "value-added services" ("VAS") on Clover's merchant customers. These practices temporarily inflated Fiserv's reported financial results but ultimately alienated merchants and drove many customers away from Fiserv altogether.

25. Defendants' scheme further obscured the true drivers of Clover's performance through selective disclosures regarding customer usage, transaction volume, and revenue data. Critically, Defendants masked declines in Clover's total transaction volume—referred to as gross payment volume or "GPV," from which Fiserv earned a percentage—the most reliable indicator that merchants actually used Clover for payment transactions, thereby concealing deteriorating platform engagement from investors.

26. Instead, Defendants falsely assured investors that the success of Clover's VAS was driving Clover's strength. In reality, however—and as detailed herein through accounts of former Fiserv employees—many merchant customers expressed extreme dissatisfaction with these expensive, adhesive, and critically, **unwanted-yet-non-optional** VAS. This dissatisfaction was

particularly acute among SMBs that liked Payeezy and wished ideally to continue using that low-cost, streamlined, and tailored platform suited to their business needs.

27. On the first day of the Class Period, February 6, 2024, CFO Hau misleadingly attributed Clover's success to "***higher penetration of value-added solutions, channel mix shift and some pricing***." This statement to investors was materially misleading because it omitted any mention of contributions from **one-time** revenue generated through **forced** customer migration, hidden fees, and the extent to which both the Gateway Conversion and Clover's VAS not only temporarily propped up Clover's purported success, but also created a torrent of undisclosed problems that drove merchant customers to flee Fiserv.

28. CW accounts describe various temporary internal initiatives that Defendants used to boost Clover's perceived success at the expense of sustainable long-term growth. CW recollections indicate that Defendants used Fiserv's Gateway Conversion to lock customers into unwanted software services and subsequently raise fees. *See* Sections IV.C-D, *infra*.

29. CW-6 explained that customers were locked into a monthly fee after they were converted from Payeezy to Clover. CW-6 said that Clover's growth was simply because the customers had no choice. CW-6 indicated that these customers were paying for features that they did not ask for and were not going to use. CW-6 recalled that about 90% of customers did not need or want these additional features. Additionally, CW-6 stated that she left Fiserv in June 2025 and customers contacted her beginning in Fall 2025 after her departure to tell her that Fiserv raised their merchant activity-specific Clover fees 200% on average.

30. Moreover, CW accounts detail that the Gateway Conversion lagged on for months and that Fiserv's onerous fees caused severe backlash from customers, including significant departures. *See* Sections IV.D-E, *infra*.

31. Regarding problems with the conversion of customers from Fiserv's legacy Payeezy product to the newer Clover products, CW-4 advised that she learned through Bank of America that it felt pressured into it. CW-4 noted that the conversion process dragged on for a long time and a lot of customers were dissatisfied with the process.

32. CW-7 detailed that 40% of all Fiserv SMB customers, including both banks and merchants, departed the Company in 2024 and 2025. According to CW-7, customers left Fiserv largely because the Company began imposing additional and higher fees without announcing them beforehand beginning in Q1 2024.

33. CW accounts also show that Fiserv's problems stemming from Clover fee increases—including customer complaints and attrition—were known by Company leadership. *See* Sections IV.D-E, *infra*. For example, CW-7 noted that she reported NPS (Net Promoter Scores) and customer attrition in leadership meetings in 2024 and 2025 and that this information made its way to the C-Suite.

34. Tellingly, at the end of the Class Period, on October 29, 2025, Defendants disclosed that the Gateway Conversion had been propping up Clover's GPV through the end of 2024. However, nearly a year earlier, on April 23, 2024, Bisignano told investors that the Gateway Conversion was "***completed, migrated***" and that Fiserv was "***closing the books on that from a conversion standpoint***." Accordingly, the undisclosed reality of Fiserv's short-term revenue boosts from the Gateway Conversion, including adhesive, unwanted-yet-non-optional VAS, stand in stark contrast to Bisignano's public representations because Fiserv continued to squeeze revenue relentlessly from one-time conversions for months thereafter. *See* Section IV.E, *infra*.

### 2. Defendants Publicly Touted Fiserv's Organic Revenue Growth While Concealing that its Double-Digit Results Were Achieved by Exploiting Unsustainable Hyperinflation in Argentina

35. From the first day of the Class Period, February 6, 2024, Fiserv also misleadingly reported double-digit organic revenue growth of "***12%***," a metric that investors viewed as a central indicator of the Company's success. For example, that same day, in a press release, Bisignano called organic revenue growth a "**key measure[] of our financial performance**." Analysts echoed this sentiment, with William Blair, for example, referring to organic revenue growth as "**key to [Fiserv's] valuation**." Throughout the Class Period, Defendants continued to tell investors that Fiserv's organic revenue growth was steadily climbing, with Fiserv reporting a stunning "***16%***" organic revenue growth rate in 2024.

36. Critically, Defendants reported and represented that Fiserv's organic revenue growth **excluded** the impact of foreign currency "fluctuations." For this reason, investors believed the metric conveyed the most accurate picture of Fiserv's growth. Indeed, this exclusion was particularly important to investors because Fiserv conducts business in dozens of currencies worldwide—all of which fluctuate sporadically against the United States Dollar ("USD").

37. As a general matter, routine foreign currency fluctuations—which Fiserv claimed were excluded from organic revenue growth—are typically modest and do not signal underlying weakness in a particular market or currency. Hyperinflation, by way of contrast, is an extremely rapid, out-of-control increase in the cost of goods and services in a local economy, typically accompanied by a decline in the value of currency, and therefore indicates extreme weakness in the currency or local market.

38. Ignoring foreign currency fluctuations from a hyperinflationary market masks weakness in that market by treating currency as though it has not devalued at all. For these reasons,

accounting for foreign revenue tied to a currency experiencing hyperinflation will necessarily inflate the appearance of organic revenue growth.

39. Full disclosure of **all** sources of organic revenue is thus vital to investors' understanding of growth in instances where—as was the case with Fiserv—a portion of that growth is derived from hyperinflationary environments.

40. However, Defendants deliberately concealed from investors the material fact that **half** of Fiserv's organic revenue growth in 2023, and **two-thirds** of its growth in 2024, was attributable to Argentina, a country experiencing record hyperinflation. While investors knew that Argentina was experiencing hyperinflation and analysts regularly asked about the impact of this hyperinflation on Fiserv's business, Defendants actively concealed the extent to which the Company's business there was contributing to its reported organic revenue growth. Indeed, and unbeknownst to investors, but known to Defendants, Fiserv's soaring organic revenue growth during the Class Period was **almost entirely** fueled by sales from Argentina.

41. In fact, CW accounts indicate that the Individual Defendants considered hyperinflation in Argentina as a great opportunity for Fiserv to enter the market in Latin America and spur a temporary revenue boost, including through its cash-advance or "Anticipation" revenue. *See* Section IV.F.4, *infra*.

42. Moreover, at the end of the Class Period, CEO Lyons, who replaced Bisignano, admitted that Argentina's contribution to organic revenue growth was merely "noise," and that Fiserv was, in truth, "a **mid-single-digit** growth company" during the Class Period rather than the double-digit success story Defendants falsely represented to investors. Indeed, at the end of the Class Period, J.P. Morgan detailed that Fiserv "had **not previously disclosed that Argentina was**

**driving such a large portion of companywide growth** . . . which **obscured the true magnitude** of the contribution."

43. Lyons again admitted on November 12, 2025 at a conference that "**the biggest factor in changing from organic growth of double digits** the last couple of years back to more traditional areas of organic growth for Fiserv **was Argentina**."

44. Critically, by misleadingly presenting organic revenue growth dependent on hyperinflation in Argentina, Bisignano, Hau, and Gibbons enabled Fiserv to appear to achieve the double-digit growth targets required to trigger their Executive Compensation Plan bonuses. Inevitably, when Defendants could no longer draw illusory growth from Fiserv's Argentina business, Fiserv's organic revenue growth fell, forcing Defendants to reveal the extent to which hyperinflation in Argentina had driven organic revenue growth. In fact, excluding Argentina, Fiserv's organic revenue growth was a mere **6%** in both 2023 and 2024, roughly two to two-and-a-half times lower than the growth rates Defendants publicly represented.

### 3. Defendants Publicly Touted Fiserv's Financial Segment's Stability While Cutting Essential Resources and Hemorrhaging Revenue as Client Dissatisfaction Reached a Fever Pitch

45. Prior to and throughout the Class Period, Defendants touted the historic stability of Fiserv's Financial Solutions segment, which services some of the world's largest banks and credit unions. Indeed, Fiserv frequently hailed this segment's "**long-term contracts, high recurring revenue and high revenue retention**."

46. Notwithstanding this historical success and its importance to analysts and investors, Defendants' scheme to defraud pushed them to defund Fiserv's Financial Solutions business segment. Indeed, Defendants diverted significant resources away from Financial Solutions and into Merchant Solutions to prop up the appearance of growth in that segment. As opposed to the steady, single-digit revenue growth consistently generated by Financial Solutions, short-term

revenue boosts from Defendants' newer products, such as adhesive VAS, in the Merchant Solutions segment could fuel the (temporary) double-digit growth metrics necessary to trigger payout targets under the Executive Compensation Plan.

47. Because investors had come to rely on the steady and reliable returns generated from Fiserv's Financial Solutions segment, they had no indication that Defendants' conduct had caused the segment to lose its footing in an industry that Fiserv had historically monopolized.

48. Yet, according to the accounts of CWs, Fiserv implemented extreme cost-cuts, including to essential technology, within Financial Solutions in 2023 and 2024 to fund initiatives contributing to the appearance of growth in Merchant Solutions. Multiple CW accounts detail the widespread problems that resulted, including product delays, as well as difficulty obtaining new business and retaining existing clients, of which Fiserv's senior leadership was aware. *See* Section IV.G, *infra*.

49. CW-2 explained that this defunding took important resources out of Financial Solutions and led to a revenue decline in the business segment. CW-2 added that Fiserv destroyed its Financial Solutions business by defunding it. Additionally, CW-2 detailed that in previous years, Fiserv sold hundreds of core processing systems but only sold three core processing systems on the banking side last year, referring to 2025.

50. Moreover, CW accounts detail that Fiserv's large institutional clients decided either (i) not to renew their licensing contracts (*i.e.*, service subscriptions), or (ii) to negotiate renewals at steeply discounted rates—and that senior leadership was aware of these problems. *See* Section IV.G, *infra*.

51. For example, CW-5 stated that Bisignano and current Vice Chairman Chris Foskett were aware that customers were leaving the Company because they received and reviewed at-risk

client reports and monthly loss review reports. Moreover, CW-2 stated that Bisignano and Hau were aware that Fiserv was losing clients. CW-2 detailed that if a bank or credit union customer with a total contract value of over $10 million informed Fiserv that it was leaving, this information was disseminated to Fiserv's Deal Review Boards (DRB). CW-2 detailed that Gibbons ran a DRB for clients with a total contract value of between $2 and $10 million.

52. CW accounts confirm that Fiserv's DRB meetings were run by Hau and Gibbons and attended by Bisignano and other members of Fiserv's senior leadership team. *See* Section IV.G, *infra*.

53. Despite these problems, Defendants concealed ongoing declines in Fiserv's Financial Solutions segment, which investors and analysts believed remained stable through its highly recurring revenue. Instead, Defendants misleadingly touted Fiserv's "***large demand for our services out of financial institutions***," claiming that it was "***winning in the marketplace***" and its client base was "***growing***." Moreover, Defendants attributed this purportedly "***tremendous***" demand to Fiserv's so-called "***relationship management model***" with banking clients—as those relationships were actively crumbling, unbeknownst to the investing public.

54. Defendants' admissions at the end of the Class Period belied and corrected these knowing misstatements. As the admissions confirm, starting no later than 2024, Defendants knew that Financial Solutions clients were failing to renew their licensing agreements and terminating their relationships with the Company due to dissatisfaction, which diminished the segment's large recurring revenue on which investors had come to rely.

55. These revelations stunned analysts and prompted questions about management's candor and transparency. For example, Bernstein Research said it was "struggling to understand

what transpired in the 3rd quarter," asking rhetorically: "how can a business such as Fiserv have **such low visibility into near-term trends especially in the highly recurring banking segment**."

### D. Defendants' Scheme Allowed Fiserv to Appear to Meet Financial Metrics Required to Trigger the Individual Defendants' Bonuses

56. By the end of 2024, Defendants' fraudulent scheme caused Fiserv's stock price to soar—consistently trading over $200 per share—and to exceed the Company's target for organic revenue growth under the Individual Defendants' compensation plans, reporting "***16%***" organic revenue growth for fiscal year 2024. In turn and for example, in 2024 alone, Bisignano, Hau, and Gibbons received **91%** of their total annual compensation ($27 million, $8.4 million, and $6 million, respectively) through shares of Fiserv stock trading at artificially inflated prices because of their own fraud.

### E. Bisignano Made Suspiciously Timed Stock Sales that Avoided Fiserv's Stock Declines and Yielded Nearly $700 Million

57. On December 4, 2024, then President-elect Trump announced his intention to nominate Bisignano to serve as the Commissioner of the SSA. Notably, a few months prior to his nomination, Bisignano began selling Fiserv shares while the stock was trading at artificially inflated prices. He executed those trades pursuant to a prearranged Rule 10b5-1 trading plan that he knew became effective on June 21, 2024, approximately four-and-a-half months **after** Defendants commenced their fraudulent scheme.

58. On May 6, 2025, the Senate confirmed Bisignano as head of the SSA, at which point he resigned as Fiserv's CEO. In preparation for assuming that role, Bisignano prepared a letter—as all incoming department heads do when taking a government role—dated February 24, 2025, which outlined measures he would take to eliminate potential or actual conflicts of interest by divesting himself and his family of certain personal assets. Pursuant to this so-called "ethics

agreement," Bisignano had 120 days—through and including September 3, 2025—to sell his and his family's Fiserv shares.

59. Despite being in possession of material nonpublic information from his role as CEO, including information related to organic growth guidance and revenue, Bisignano did not enter into a blind trust or a Rule 10b5-1 plan to execute those sales. Instead, on July 21 and 22, 2025, during the Company's blackout window which prohibited trading shortly before corporate earnings were announced, Bisignano sold 861,545 shares of his and his family's Fiserv stock for $142,548,771.

60. The **next day**, July 23, 2025, Defendants announced Fiserv's Q2 2025 financial results, in which the Company refined its full-year organic revenue growth outlook downward by approximately 10%; reported Merchant Solutions' organic revenue growth was 9%, significantly below analysts' expectations of 12%; and that Clover's GPV growth stayed flat at 8% due to "gateway [conversion] impact" with continued headwinds. Upon the announcement of this news, Fiserv stock price dropped by **13.9%**. These strategically timed trades—made with the benefit of material nonpublic information regarding the Company's upcoming financial results—allowed Bisignano to avoid tens of millions in losses that he would have suffered had he waited only one day longer to sell.

61. By July 23, 2025 (approximately six weeks before his deadline to do so), Bisignano had sold **99.9%** of his and his family's Fiserv holdings (including **98.8%** of his individual Fiserv holdings), for **$683,689,109** in proceeds, just before the Company's share price fell into freefall as Defendants' fraud emerged.

### F. Defendants Began to Reveal Fiserv's Poor Performance While Continuing to Offer False Reassurances to Investors

62. By April 2025, Defendants began to lose runway on their fraudulent scheme as they exhausted the undisclosed short-term initiatives on which Fiserv relied. As a result, Defendants had no choice but to begin revealing declines caused by Fiserv's temporary performance boosts, including its forced Gateway Conversion and exploitation of Argentinian hyperinflation. Rather than reveal the truth in one fell swoop, however, Defendants trickled information out to investors publicly over four disclosures.

63. On April 24, 2025, for example, Defendants disclosed a steep decline in Clover's transaction volume, with GPV dropping from 14% to 8% due to "a difficult comparison against the gateway conversion." Defendants also revealed a decline in organic revenue growth, which was 8%, well below analysts' 12% expectations.

64. In response to this news, Fiserv stock price dropped by **18.5%** to close at $176.90 per share. Analysts at Goldman Sachs noted that "the contribution of a **late 2023 gateway conversion was larger than previously known**," confirming the previously undisclosed nature of the degree to which the Gateway Conversion was driving Clover's revenue. Specifically, investors learned that the forced Gateway Conversion disguised the short-term nature of Clover's revenue growth, which was premised on adhesive and unwanted fees, and concealed ongoing client attrition as a result of Defendants' undisclosed tactics.

65. Nevertheless, on the same day, Defendants assured investors that "we continue to see ***Merchant Solutions organic revenue growth of 12% to 15% in 2025, driven in large part by . . . increase in VAS penetration***." This statement continued to mislead investors because Merchant Solutions was still receiving boosts from temporary drivers, particularly Clover's adhesive, unwanted VAS and the undisclosed impact of Argentinian hyperinflation.

66. Then, on May 15, 2025, Defendants revealed further deterioration in performance, citing additional declines in Clover's GPV growth, which remained flat at 8%, due to increasing "headwinds" from the Gateway Conversion. In response, Fiserv's stock price dropped by **16.2%** to close at $159.13 per share. Analysts at Goldman Sachs noted that "the **main driver of the decel[eration] in Clover was a gateway conversion** in the prior year that saw **very significant churn**," or customer loss.

67. Still, Defendants reinforced their false assurances, stating on that same day that "***we expect that to subside*** [referring to "headwinds" from the Gateway Conversion] ***going forward*** . . . ***Q3 and Q4***," which continued to conceal what Defendants knew at the time: that Clover's growth, particularly from VAS, was at best temporary and unsustainable.

68. On July 23, 2025—one day after Bisignano completed his divestiture of **99.9%** of his and his family's Fiserv holdings (including 98.8% of his personal holdings) for an astonishing **$683,689,109** while in possession of material nonpublic information—Fiserv revised Merchant Solutions' organic revenue down to 9% and reported flat Clover GPV due to ongoing headwinds "dependent upon retention of the converted merchant base." Fiserv also lowered its full year organic revenue growth outlook to 10%.

69. In response, Fiserv's stock price dropped by **13.9%** to close at $143.00 per share. Goldman Sachs again noted that the Gateway Conversion had apparently been supporting "**Clover results much more than expected**." In turn, Bernstein Research analysts noted that "**material negative impact from Argentina likely contributed to the revenue & margin miss this quarter**."

70. Nevertheless, to assuage concerns and buoy the stock price, Hau falsely reassured investors that "***we expect both segments to grow towards the low end of their guidance ranges***

***for organic revenue growth***"—echoing comments by Lyons quoted in Fiserv's press release that same day. However, as demonstrated by their revelations a few months later (including Fiserv's stunning admission of reliance on temporary levers), at that time, Defendants had not come close to revealing the full extent of their scheme to exploit short-term revenue boosts to the detriment of stable and sustainable revenue and growth—conduct that spurned customers, artificially concealed problems, and tanked the Company's long-term growth and stock price. In truth, by the time Hau and Lyons offered their misleading reassurances, Defendants had accumulated a critical mass of internal data, including reports reflecting severe client attrition, that made their ongoing adherence to Fiserv's publicly reported yet misleading guidance untenable.

### G. On October 29, 2025, Defendants Shocked Investors by Revealing Fiserv's Need to "Reset" Financially and Abandon Short-Term Revenue Initiatives

71. Before the market opened on October 29, 2025, Defendants shocked investors by announcing the need to "reset" Fiserv's financials and, in essence, its business. Defendants also admitted to Fiserv's undisclosed overreliance on short-term, unsustainable revenue streams (including one-time revenue bumps from the Gateway Conversion and unwanted VAS), impacts of Argentinian hyperinflation, and sharp declines in customer renewals and, in turn, profit, in its Financial Solutions segment. On this news, Fiserv's stock price fell **44%**. This October 29, 2025 disclosure of previously concealed and obscured facts removed approximately **$29 billion** of Fiserv's market capitalization in **a single day**.

72. Perhaps most extraordinary were Lyons's comments admitting that Fiserv's financial "reset" was driven by a combination of factors, including "**slowing cyclical growth in Argentina**, the **recalibration of optimistic growth assumptions in the original guidance** . . . and the **deprioritization of short-term revenue and expense initiatives**." Notably, the "reset" was the inevitable consequence of Defendants' scheme to defraud and its intentional reliance on

short-term business conditions that Defendants knew were temporary and unsustainable, but which created a façade of continued growth throughout the Class Period.

73. In providing greater specificity, Lyons admitted that, throughout the Class Period, Defendants propped up the appearance of Merchant Solutions' organic revenue and GPV growth through "short-term revenue initiatives, including . . . fees . . . that were initiated a year ago and are no longer consistent with our business strategy."

74. Lyons also admitted that due to the impact of Argentinian hyperinflation, Fiserv actually exhibited only "mid-single-digit" organic revenue growth, rather than the double-digit growth Defendants publicly represented throughout the Class Period.

75. Finally, in explaining the cause of the shocking decline in Financial Solutions, Paul Todd (who took over for Hau as Fiserv's CFO) identified problems tied to the Company's short-term initiatives, including "lower periodic license revenue" and unfavorable "industry dynamics," which led to negative pricing action to "position [Fiserv] competitively for the longer term."

76. Key leadership changes accompanied Fiserv's financial "reset," including Hau's departure as CFO. In announcing the previously unexpected departures and business restructuring, Lyons cited "**dissatisfaction with the way we do the process**."

77. The market reacted sharply to these disclosures with Fiserv's stock losing **nearly half its value** in one day. Fiserv's stock price dropped **44%**, a reduction of $55.57 per share, to close at $65.19. As RBC Capital Markets crisply summarized:

> [t]he **magnitude of the reset speaks to the lack of transparency** that the prior strategy/model and management followed, which appears to be **deeply rooted in over-earning in its Argentina business** (which is now normalizing), **focusing on short-term outcomes/deferred investments to routinely make numbers**, and **perpetuating aggressive pricing, leading to client frustration and possible defection** . . . .

78. In the wake of these revelations, J.P. Morgan Research noted that Fiserv "had **not previously disclosed that Argentina was driving such a large portion of companywide growth**," and that it "**obscured the true magnitude of the contribution**." Citi concluded that "**short term initiatives on the Clover front exaggerated both revenue growth** (hardware and data sales) **as well as volume growth** (gateway conversion in 2024)."

79. Autonomous Research noted that Fiserv's "competitive positioning in Financial Solutions leaves something to be desired after **admitting to overcharging its clients**." Moreover, BTIG stated that Fiserv "**has lost its prestigious 'high quality' label**, as its 39-year streak of double-digit EPS growth has been abruptly upended."

80. All told, during the Class Period, Fiserv stock declined by roughly **73%** due to Defendants' fraud, falling from a Class Period high of $237.79 per share on March 3, 2025, to just $65.19 per share on October 30, 2025. This **$92 billion** market cap decline, caused by the revelation of Defendants' fraudulent scheme and false and misleading statements during the Class Period, harmed investors, necessitating this securities fraud class action.

## II. JURISDICTION AND VENUE

81. The claims asserted arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Jurisdiction is conferred by § 27 of the Exchange Act, 15 U.S.C. § 78aa.

82. Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as, upon information and belief, Fiserv shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, Defendants' false and misleading statements were disseminated in and affected this District, and the manipulative conduct was carried out in part in this District.

83. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

84. Lead Plaintiff ETHENEA, based in Luxembourg, is an institutional investor that actively manages assets worth approximately 2.38 billion Euros as of March 2025 (the equivalent of more than $2.8 billion). As set forth in its certification, filed herewith (Exhibit A), ETHENEA purchased Fiserv common stock through its flagship investment fund (Ethna-AKTIV), a *fonds commun de placement* established under Luxembourgian law, on the New York Stock Exchange ("NYSE") during the Class Period, and was damaged by Defendants' violations of the federal securities laws alleged herein.

85. Lead Plaintiff Hollywood Police is a public pension fund that provides retirement and other benefits to police officers in Hollywood, Florida. Hollywood Police manages approximately $507 million in assets for the benefit of approximately 734 active and retired members and beneficiaries. The fund is administered by the Board of Trustees of the Police Officers' Retirement System. As set forth in its certification, filed herewith (Exhibit B), Hollywood Police purchased Fiserv common stock on the NYSE during the Class Period, and was damaged by Defendants' violations of the federal securities laws alleged herein.

86. Lead Plaintiff Miami Beach F&P is a public pension fund that provides retirement and other benefits to firefighters and police officers in Miami Beach, Florida. Miami Beach F&P manages approximately $1.2 billion in assets for the benefit of over 1,300 active and retired members and beneficiaries. The fund is a defined benefit plan created under Chapter 23414 Laws

of Florida, Special Acts of 1945, as amended through November 20, 2024. As set forth in its certification, filed herewith (Exhibit C), Miami Beach F&P purchased Fiserv common stock on the NYSE during the Class Period, and was damaged by Defendants' violations of the federal securities laws alleged herein.

87. Additional plaintiff PGERS is a public retirement plan that provides retirement benefits to employees and beneficiaries of the City of Pontiac, Michigan. As of March 31, 2026, PGERS managed more than $440 million in assets. As set forth in its certification, filed herewith (Exhibit D), PGERS purchased Fiserv common stock on the NYSE during the Class Period, and was damaged by Defendants' violations of the federal securities laws alleged herein.

## B. Defendants

### 1. Corporate Defendant

88. Defendant Fiserv is incorporated under the laws of Wisconsin, with its principal executive offices located in Milwaukee, Wisconsin. During the Class Period, the Company's common stock traded on the NYSE under the ticker symbol "FI." Since November 11, 2025, in connection with management and other changes announced at the end of the Class Period, the Company's common stock has traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "FISV."

### 2. Individual Defendants

89. Bisignano served as Fiserv's Chief Executive Officer ("CEO") from July 1, 2020 to May 6, 2025, and as its Chairman of the Board of Directors ("Chairman") from May 18, 2022 to May 6, 2025. As Fiserv's CEO, Bisignano participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the nature and extent of the sources driving Fiserv's purported growth and the implications of the unsustainable business practices he concealed from investors. In his role

as CEO, Bisignano also signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), which falsely certified that the Company's quarterly and annual reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

90. Prior to these roles at Fiserv, Bisignano was Chairman and CEO of First Data Corporation ("First Data"), which Fiserv acquired on July 29, 2019. Bisignano initially led the newly merged companies' day-to-day operations as President and Chief Operating Officer ("COO"). Earlier in his career, Bisignano was the co-COO of JPMorgan Chase & Co. and the CEO of its Mortgage Banking unit. Previously, Bisignano also held several roles at Citigroup, including Chief Administrative Officer for the Corporate and Investment Bank, CEO of the Global Transactions Services business, and managed the integrations for all Citigroup's mergers and acquisitions. During the Class Period, Bisignano sold approximately 4.3 million shares, receiving $709,454,433.90 in proceeds.

91. Lyons has served as Fiserv's CEO and a Company director since May 6, 2025, when he took over for Bisignano. Previously, Lyons was President and CEO-elect of Fiserv since January 27, 2025. Before joining Fiserv, Lyons served as President of The PNC Financial Services Group ("PNC") following his tenure as head of Corporate & Institutional Banking at PNC. Before PNC, Lyons held various leadership roles at Bank of America. In his role as CEO of Fiserv, Lyons participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the nature and extent of the sources driving Fiserv's purported growth. Also, in his role as CEO, Lyons signed certifications pursuant to SOX that the Company's quarterly and annual reports complied with the requirements

of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

92. Hau served as Fiserv's Chief Financial Officer ("CFO") from March 14, 2016 to October 31, 2025. Hau transitioned to a senior advisor role through Q1 2026. Further, in his role as CFO of Fiserv, Hau participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the nature and extent of the sources driving Fiserv's purported growth. Also, in his role as CFO, Hau signed certifications pursuant to SOX that the Company's quarterly and annual reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

93. Gibbons served as Head of Fiserv's Financial Institutions Group from October 2023 until April 2, 2025, where he was heavily involved in leading Fiserv's merchant services strategies. Previously, Gibbons served, along with Andrew Gelb, as Co-Head of the Financial Institutions Group. Gibbons also previously served as Head of Europe, Middle East, and Africa ("EMEA") region upon joining Fiserv in 2019 as part of the First Data acquisition. At First Data, Gibbons served as Head of EMEA region since 2018. Before First Data, Gibbons led global transaction banking at Deutsche Bank from 2016 to 2018 and served in various leadership roles at JPMorgan Chase & Co. from 2011 to 2016. During the Class Period, Gibbons sold 35,250 shares, totaling $6,823,328.90 in proceeds.

94. Because of their positions with the Company, the Individual Defendants possessed the power and authority to control Fiserv's operations, the contents of reports to the SEC, press

releases, presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market), and public statements. The Individual Defendants received copies of the Company's reports and press releases alleged to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected or rendered complete, accurate, and non-misleading.

95. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that their positive representations were materially false and/or misleading when made. The Individual Defendants are liable for the false statements and fraudulent scheme pleaded herein, and their scienter is imputed to Fiserv.

### C. Former Fiserv Employees Referenced as CWs[5]

96. CW-1 was employed with Fiserv from March 1999 to December 2024, most recently as a Senior Director of Operations from September 2019 to December 2024. She advised that as Senior Director of Operations, she worked in the Company's Financial Institutions Group ("FIG") and consulted and trained banking clients on payment processing. She noted that she most recently reported to current President of Core Account Processing Solutions, Dudley White.

97. CW-2 was employed with Fiserv from over thirty years prior to the start of the Class Period to late 2024 in various sales and leadership roles, including upper-level management. Prior to Fiserv's acquisition of First Data, she worked for Fiserv. Most recently, she was employed as a segment leader within the Company's Financial Solutions business segment. In this role, she was responsible for bank segment sales and for selling software to financial institutions. She most

[5] CWs are identified herein by number (CW-1, CW-2, etc.) and are described in the feminine to help protect their identities.

recently reported to former Chief Sales Officer Joe Profeta and had regular communication and contact with the C-suite and executive leadership.

98. CW-3 was employed with Fiserv as an Analyst from the beginning of the Class Period until early 2025. She advised that during her tenure, she was responsible for implementing price increases for Clover and CardConnect customers.[6] She noted that her supervisor reported to current SVP Partner Development Erik Nicholson. She stated that Erik Nicholson instructed her to increase fees for CardConnect customers and current Head of ISV (Integrated Software Vendor) Kim Molinaro directed her to increase fees for Clover accounts.

99. CW-4 was employed with Fiserv for more than ten years prior to the Class Period through early 2025 in various roles. Most recently, she was a senior financial leader within Fiserv's Merchant Solutions business segment. She initially joined First Data, which was later acquired by Fiserv and worked in various finance and operations roles. CW-4 worked with the members of the C-suite and senior management on various budgeting and financial projects. She was also a part of Fiserv's Financial Planning & Analysis (FP&A) team. CW-4 advised that her supervisor reported directly to Hau. In CW-4's various roles at the Company, she met periodically with Bisignano and regularly with Hau.

100. CW-5 was employed with Fiserv from 2011 to March 2025 in several positions, including Enterprise Sales Strategist from 2011 to 2015; Director of Business Development from 2015 to 2018; Vice President, National Sales Manager from 2018 to 2024; and Vice President, Head of Core Processing Sales from 2024 to March 2025. She advised that as Vice President, Head of Core Processing Sales, she managed salespeople that sold core processing solutions to

---

[6] CW-3 detailed that CardConnect was a separate company that Fiserv acquired and maintained its own category of accounts. CW-3 noted that Fiserv was made up of acquisitions and that CardConnect was one of the largest acquisitions.

large banks and community banks. She stated that she most recently reported to current Head of Financial Institution Sales Erik Ball and current SVP, Head of Sales and Relationship Management, Financial Institutions Group, Rocco Marcello.

101. CW-6 worked for Fiserv from April 2017 to May 2019 and, later, as a Business Consultant from January 2022 to June 2025. She explained that, in between these direct employments with Fiserv, she worked at an ISO (Independent Sales Organization) that used Fiserv, during which time she was the go-between between Fiserv and First Financial Bank. CW-6 explained that, at the ISO, she sold Clover to First Financial Bank's clients. She added that, at the ISO, she was a preferred provider for Fiserv, which made up about 80% of her portfolio.

102. CW-7 was employed with Fiserv as a Director, Client Experience from April 2020 to October 2020 and as an SMB Senior Regional Sales Director from October 2020 to January 2026. As a Director, Client Experience, she was responsible for monitoring and retaining clients and handling pricing disputes, among other things. She added that as an SMB Senior Regional Sales Director, she managed seventeen sales representatives and twenty-three financial institutions. She explained that bank clients referred their SMB merchant customers to her and her team, which sold Clover and other products to these SMB merchants. In this role, she noted that she most recently reported to current Vice President, Head of Financial Institution Sales Clayton Vaughan.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Fiserv's Financial Technology Business

103. Founded in 1984, Fiserv operates in the financial technology, or "fintech," industry. Broadly, Fiserv provides technology products and services to support businesses, including "merchants," banks and other financial institutions, and corporate clients by supplying the

hardware, software, services, and support necessary to facilitate financial transactions such as payment processing and transfers.

104. At a high level, Fiserv generates revenue through a combination of transaction-based fees, software licensing and subscriptions, and VAS—such as accounting or payroll products—designed to help businesses manage their sales and operations. During the Class Period, Fiserv derived the overwhelming majority of its total revenue (approximately 81% in 2024) from brokering and facilitating financial transactions—acting as an intermediary to enable the transaction to occur and earning fees in return. For example, Fiserv collects fees based on the transaction value when it facilitates credit and debit-card payments made to merchant customers.

105. Fiserv's model is far-reaching and spans the globe. Fiserv's 2024 Annual Report, for example, claimed the "breadth and scale of the franchise cannot be overstated: We do business in more than 100 countries." Similarly, in 2023, Fiserv's Annual Report boasted that "Fiserv enjoys broad reach and scale, spanning more than 100 countries, 1,000 products and services, supporting nearly 10,000 financial institution clients and more than 6 million merchant locations." Fiserv's business is divided into two segments: Merchant Solutions and Financial Solutions. Each segment accounts for roughly 50% of Fiserv's total revenue.[7]

106. In the four decades leading up to the Class Period, Fiserv built significant credibility with investors as a leader in the fintech industry, with some industry commentators calling it a "landlord" in the space due to its operational entrenchment with its customers. Indeed, leading into and during the Class Period, Defendants touted Fiserv's ability to adapt to the evolving fintech industry over time and to produce consistent profit growth, and, in turn, stable investor returns.

---

[7] Fiserv's current "50-50" business structure is the result of a re-segmenting announced in late 2023 that took effect on January 1, 2024.

107. For example, less than three months before the start of the Class Period, during Fiserv's November 15, 2023 Investor Day presentation—which Gibbons and Hau attended—Bisignano boasted of Fiserv's "significant ability to invest in innovation during good times and sustain profit growth in tough years." To emphasize this point, he pointed to the Company's track record, bragging that Fiserv had "**proven this resilience with 37 years of consecutive double-digit adjusted earnings per share growth**." Likewise, during the Class Period, on July 24, 2024, when asked on a televised CNBC interview about Fiserv's double-digit earnings growth "in a changing economic environment," Bisignano again cited Fiserv's history of success, preening that "we have 30-plus years of it . . . so the **double-digit earnings growth is a hallmark of the company**."

108. As a result, analysts frequently referenced the long-term stability of Fiserv stock. For instance, less than four months before the Class Period began, on October 20, 2023, analysts at UBS Research emphasized that Fiserv "has delivered **double digit EPS growth for what is now approaching ~40 years**." This contributed to what analysts at Bernstein Research referred to one month prior to the Class Period, on January 8, 2024, as "**growing investor confidence re** [Fiserv's] **long-term ability to deliver double-digit/teens earnings growth** with disciplined capital allocation."

109. Taking cues from Fiserv management's consistently favorable portrayal, analysts often reinforced Fiserv's messaging by assuaging investors' concerns through reference to the Company's historical financial growth and stability. For example, on December 5, 2024, Compass reported "[i]nvestors worried about FI [Fiserv] as an investment would be wise to remember that 2024 is FI's 39th year of double-digit EPS growth . . . ."

110. Fiserv, as it operates today, is the product of a July 29, 2019 acquisition of First Data by Fiserv. Bisignano had been CEO of First Data since April 2013. First Data's business was primarily focused on servicing merchants through "payment processing" platforms (described below), including the Clover platform, which First Data had developed prior to the acquisition. Prior to acquiring First Data, Fiserv's business centered on servicing large banks and financial institutions via its "core" processing platforms, which are key infrastructure necessary to manage transactions and accounts.

### 1. Fiserv's Merchant Solutions Segment

111. According to Fiserv, its Merchant Solutions segment provides "commerce-enabling products and services" to its business customers, referred to as merchants.[8] Fiserv's merchant customers can range from a large corporation to SMBs such as local restaurants and retailers. For instance, an SMB merchant selling goods or services to consumers can access a suite of Fiserv's products and services designed to support its operational needs. Notably, according to Enlyft (a platform that provides information about businesses), of all customers using Clover, "**a majority (90%) are small (<50 employees)**, 2% are large (>1000 employees) and **7% are medium-sized**."

112. Fiserv's Merchant Solutions segment derives revenue largely from its "payment processing" functions. Payment processing is a broad term encompassing facilitation of electronic money transfers in exchange for goods and services. Companies like Fiserv act as intermediaries between consumers, merchants, and banks to securely authorize, clear, and settle transactions. Generally, Fiserv earns a fee from each transaction it facilitates.

[8] Much of Fiserv's current Merchant Solutions segment came from the Company's July 29, 2019 acquisition of fellow fintech giant First Data, of which Bisignano was Chairman and CEO.

### 2. Clover: Fiserv's Flagship Merchant Solutions Product

113. Throughout the Class Period, the success of Fiserv's flagship product—payment processing platform Clover—was critical to the success of its Merchant Solutions segment. Clover falls under the umbrella of a payment "gateway." As a general matter, a payment gateway (which can include hardware and software) offers a secure, frictionless experience that allows retail and other consumers to make purchases with various forms of payment, including credit cards, debit cards, or mobile devices. The merchant, in turn, receives payment for providing goods or services to the consumer without having to independently develop, operate, or service its own payment processing system.

114. Merchants typically lease Clover devices or "terminals" from Fiserv, which have built-in screens, printers, and card readers to accept and process various forms of payment using physical credit cards and mobile wallets, as displayed in the image below from Fiserv's website.




115. Leading up to the Class Period in 2023, however, many of Fiserv's merchant customers still used Fiserv's legacy payment gateway, Payeezy. Payeezy's streamlined, inexpensive, and no-frills platform focused on SMBs specifically, helping them to establish and

grow their online stores in a relatively simple way—without having to pay for unwanted features and fees, and with established customer service and technical support to address any issues.

116. Despite merchants' broad satisfaction with Payeezy, beginning in late 2023, Fiserv initiated a mandatory "Gateway Conversion" for merchants using Payeezy that required them to switch to Clover. Fiserv claimed to customers that the mandatory migration was necessary for "operational reasons," because Payeezy had purportedly become costly to service and, by the Company's account, outdated. By migrating these merchants, Fiserv aimed to consolidate its user base onto Clover, its newer payment processing platform.[9]

117. Undisclosed to investors, however, was that Defendants implemented this Gateway Conversion for several interrelated reasons known only internally at Fiserv: (i) to lock existing customers into expensive contracts that were difficult to terminate; (ii) to induce customers' dependency on Clover (and hence Fiserv) by overhauling their network of electronic payment hardware and software systems; (iii) to impose substantial conversion fees; and (iv) to foist upon customers lucrative, and mandated, service contracts.

118. Relatedly, as electronic and mobile payments proliferated, the market for payment gateways had expanded significantly. By the 2020s, merchants had numerous competitive alternatives tailored to their needs, including offerings from Fiserv's competitors such as Toast and Square, which primarily served SMBs through streamlined, lower-cost platforms.

119. During and following the onset of the Gateway Conversion, Fiserv and investors alike closely monitored Clover's performance, as it was widely understood to be an important marker of Fiserv's health, since Clover accounted for approximately 35% of the Company's total

[9] Fiserv and analysts often referred to merchants subject to the Gateway Conversion as the "back book," denoting that these were existing customers (through Payeezy) rather than new ones.

revenue. Indeed, Clover was front-and-center for investors and analysts. In fact, on February 6, 2024—the first day of the Class Period—following Fiserv's earnings release, analysts at Truist Securities noted in a report titled, in part, "**Clover is all that matters**," that Fiserv's "**share performance is inextricably tied to Clover**," and that Clover is the "**apple of the Street's eye**."

### 3. Fiserv's Financial Solutions Segment

120. Fiserv's Financial Solutions segment generated roughly half of the Company's revenue by selling software and charging fees for facilitating payment transactions on behalf of banks of all sizes, including 95 of the largest and most prominent U.S. banks, over 3,300 credit unions, and mortgage lenders and insurance firms. Through this segment, Fiserv facilitated a wide range of financial transactions, including online banking, funds transfers, and electronic bill payments.

121. Fiserv's Financial Solutions segment revolved around its "core" processing platforms. These platforms are the engines that allow banks, credit unions, and other financial institutions to facilitate and manage accounts, transactions, and ledger activity. Fiserv's "core" platforms are essential infrastructure and deeply entrenched in the operations of its financial institution clients.

122. Within Financial Solutions, Fiserv also sold renewable software licenses to banking and corporate customers for its core processing platforms and account-related functions, such as transfers, payments, and fraud protection. Other major drivers of Fiserv's Financial Solutions revenue were its STAR and ACCEL debit card networks, which enable banking customers to issue debit cards that consumers use to pay for goods and withdraw cash from ATMs.

123. Defendants emphasized Fiserv's Financial Solutions' ability to drive revenue with large institutions on a predictable, recurring basis, providing investors with confidence in the segment's reliability and long-term viability. For example, on November 15, 2023, during Fiserv's

Investor Day presentation, Gibbons emphasized to investors and analysts that "**Financial Solutions drives trusted relationships with long-term contracts, high recurring revenue and high revenue retention**."

124. Taking Fiserv at its word, on April 2, 2025, analysts at RBC remarked that Fiserv's "**continued stability in Financial Solutions, increases our conviction in the stability of the model**," and analysts at Raymond James noted on October 29, 2025 that Financial Solutions was understood as "the much steadier business" within Fiserv.

### B. The Individual Defendants' Executive Compensation Plan Required Fiserv to Achieve Double-Digit Organic Revenue Growth

125. Fiserv's stable and continued growth trajectory was also critical to the Individual Defendants because their Executive Compensation Plan was tied, in large part, to the achievement of growth-based performance targets, notably including organic revenue growth.

126. First, under Fiserv's Executive Compensation Plan, the Individual Defendants received awards of PSUs for achieving certain benchmarks over a three-year period. For instance, under the 2022 incentive plan, Bisignano, Hau, and Gibbons stood to receive a maximum of 169,712 vested shares (worth $16.5 million),[10] 42,428 vested shares (worth $4.1 million), and 17,820 shares (worth $1.722 million) at the end of 2024, respectively, for achieving certain metrics in 2022, 2023, and 2024.

127. The charts below reflect the target metrics under the Executive Compensation Plan for 2022, 2023, and 2024. Notably, in 2024, the target for organic revenue growth **doubled**.

---

[10] The maximum value of the PSUs is calculated using the grant-date fair value of $96.76 per share. At vesting and as detailed in Section IV.B, based on the achievement of the performance target and the stock price, the value of the PSUs could be worth significantly more.

| 2022 PSUs | Organic Revenue Growth (30% Weighting) | Adjusted Operating Income (25% Weighting) (in millions) | Adjusted Earnings Per Share (15% Weighting) | Performance Multiplier |
|---|---|---|---|---|
| Maximum | 11% | $6,700 | $7.55 | 200% |
| Target | 8% | $6,550 | $7.35 | 100% |
| Threshold | 5% | $6,400 | $7.15 | 50% |

| 2023 / 2024 PSUs | Organic Revenue Growth (40% Weighting) | Adjusted Earnings Per Share (20% Weighting) | Performance Multiplier |
|---|---|---|---|
| Maximum | 11% | $7.55 | 200% |
| Target | 8% | $7.35 | 100% |
| Threshold | 5% | $7.15 | 50% |

| 2023 / 2024 PSUs | Organic Revenue Growth (40% Weighting) | Adjusted Earnings Per Share (20% Weighting) | Performance Multiplier |
|---|---|---|---|
| Maximum | 19% | $9.00 | 200% |
| Target | 16% | $8.63 | 100% |
| Threshold | 13% | $8.30 | 50% |

| | Three-Year Company TSR Relative Ranking | Performance Multiplier |
|---|---|---|
| Maximum | 90th percentile or greater | 200% |
| Target | 55th percentile | 100% |
| Threshold | 30th percentile | 50% |

128. Likewise, under the 2023 and 2024 incentive plans, at the end of the performance period, Bisignano would receive a maximum of 225,842 shares (worth $29,161,622) in 2026 and 167,798 shares (worth $27,553,102) for 2027; Hau would receive 46,660 shares (worth $6,024,739) in 2026 and 36,316 shares (worth $5,963,232) for 2027; and Gibbons would receive a maximum of 25,456 shares (worth $4,179,978) in 2027, respectively.

129. Therefore, for 2023, Bisignano's total compensation was $25 million, including a base salary of $1.4 million and equity awards of $20.6 million (of which $12.36 million were PSUs); and Hau's total compensation was $6,968,750, including a base salary of $718,750 and equity awards of $5.35 million (of which $2.675 million were PSUs).

130. Indeed, Defendants' fraudulent scheme enabled Bisignano, Hau, and Gibbons to achieve double-digit organic revenue growth in both 2023 and 2024, exceeding the maximum

target for 2023 and the threshold target for 2024. On April 2, 2025, Fiserv issued its 2025 Proxy, announcing that the 2022 PSUs had fully vested. As a result of Fiserv's performance, the 2022 PSUs, whose performance period ended on December 31, 2024, were vested at **organic revenue growth of 166.9% of the target award level**, average adjusted operating income growth of 136.8% of target, and average adjusted EPS growth of 144.7% of target. In turn, Defendants Bisignano, Hau, and Gibbons received 141,625 shares (valued at $**29,092,607.50**), 35,407 shares (valued at **$7,273,305.94**), and 14,871 shares (valued at **$3,054,800.82**), respectively.[11]

131. In total, for 2024, Bisignano received $27 million in total compensation, of which $1.4 million was base salary and $25.6 million was tied to equity awards. In anticipation of his departure for the SSA, the $25.6 million equity awards were all paid out in restricted stock units ("RSUs") as opposed to PSUs that would be subject to a three-year performance period (because Bisignano would no longer have been at the Company at the time the PSUs would have vested). Similarly, Hau received $8.4 million in total compensation, of which $750,000 was base salary and $7.65 million was tied to equity awards (of which $3.825 million were PSUs). And Gibbons received $6 million in total compensation, of which $750,000 was base salary and $5.25 million was tied to equity awards (of which $2.625 million were PSUs).

132. In addition to equity awards, the Individual Defendants also received annual cash compensation awards for exceeding the threshold adjusted revenue target and the target adjusted operating income target in 2024:

| Performance Objective (in millions) and Weighting | Threshold | Target | Maximum | Actual |
|---|---|---|---|---|
| Adjusted Revenue for Incentive Compensation (50%) | $ 18,900 | $ 19,400 | $ 19,900 or more | $ 19,123 |
| Adjusted Operating Income (50%) | $ 7,200 | $ 7,450 | $ 7,725 or more | $ 7,537 |

[11] Dollar amount calculated using Fiserv's stock price on the vesting day.

133. Specifically, for 2024, Bisignano received $2,547,500, Hau received $764,250, and Gibbons received $764,250.

134. Accordingly, because a significant portion of Bisignano's, Hau's, and Gibbons's compensation came from equity and cash awards based on the Company meeting certain financial metrics, they had motive and opportunity to misrepresent Fiserv's true financial condition, including, among other things, the Company's organic revenue growth. In the absence of the fraudulent scheme, investors and analysts would have seen Fiserv's true financial condition and these Individual Defendants would not have been able to achieve the financial benchmarks that triggered outsized personal benefits payable under the Executive Compensation Plan.

### C. Defendants Devised and Employed a Fraudulent Scheme to Manipulate Fiserv's Appearance of Growth through Unsustainable Revenue Boosts

135. Having directed investors' attention to both Fiserv's "hallmark" growth record and the importance of Clover, Defendants devised and employed a deceptive scheme to falsely portray the appearance of Fiserv's purportedly ongoing success—and embellish its growth trajectory—by disguising short-term revenue tactics as sustainable, long-term performance and stable revenue generation. Moreover, to push this perceived growth to the levels necessary to pay out their exorbitant personal bonuses and equity-based "incentives," Defendants diverted critical resources away from Fiserv's historically stable Financial Solutions segment, which further compounded the Company's worsening financial performance.

136. Specifically, Defendants misleadingly presented Fiserv as a healthy and expanding company driven by genuine client demand and increased use of its products and services. In reality, and unbeknownst to investors, Defendants propped up Fiserv's reported organic revenue growth and the Company's overall success and stability through a series of short-term, unsustainable measures designed to generate temporary revenue.

137. To carry out this fraudulent scheme, Defendants misrepresented Fiserv's growth throughout the Class Period to conceal the extent to which its purported success depended on unsustainable sources, including: (i) forcing merchants who preferred Payeezy to migrate to Clover, tacking on one-time fees and unwanted services to their accounts, and imposing contracts that were difficult for merchants to terminate; (ii) padding Fiserv's organic revenue growth through an undisclosed overreliance on Argentina's hyperinflationary environment; and (iii) channeling critical resources and essential technology away from Financial Solutions—Fiserv's historically stable and recurring source of revenue—and concealing from investors the segment's performance declines and client defection.

138. Defendants bolstered and furthered this long-running scheme through their fraudulent conduct and false and misleading statements regarding issues they knew were the most critical indicators of financial health and growth to the market.

139. First, as detailed in Sections IV.A.1-2, *supra*, Defendants touted Clover as an in-demand and superior product in the payment processing space generally (and as compared to Payeezy) due to its supposed technological capabilities, and emphasized its contribution to the Company's growth based on its purported ability to drive the sale of Fiserv's new VAS offerings to help merchants—particularly SMBs, which accounted for over 90% of Clover's users—enhance their businesses.

140. Unbeknownst to investors, however, Fiserv had temporarily and artificially induced Clover's growth by mandating the Gateway Conversion and then imposing hidden or excessive fees for unwanted-yet-non-optional services—all of which generated lucrative short-term revenue for the Company, but roiled merchants.

141. Having foisted Clover, along with its extra fees and services, on its unwilling and (in many cases) unwitting merchants to generate short-term revenue, Defendants' scheme drove away many customers. Ultimately, as was revealed at the end of the Class Period, Defendants' actions cannibalized Clover's market position and ability to contribute to the Company's long-term health in a stable or sustainable way, but only after the Individual Defendants had met the targets under the Executive Compensation Plan (and Bisignano had departed the Company, leaving others holding the bag).

142. Second, as detailed in Section IV.B, *infra*, Defendants touted Fiserv's organic revenue growth—a key indicator of performance at the heart of the Executive Compensation Plan—claiming it was consistently growing by double digits based on strength in the underlying business. For example, in 2024, Fiserv reported a stunning ***16%*** in year-over-year organic revenue growth, a double-digit number that quite conveniently triggered Defendants' Executive Compensation Plan bonuses for the year. But, unbeknownst to investors, Fiserv's organic growth was propped up by revenue in Argentina, which was experiencing record hyperinflation.

143. Indeed, as analysts with J.P. Morgan noted at the end of the Class Period, Fiserv's management had a "prior lack of transparency around Argentina's outsized contribution and the perceived obfuscation of its importance to overall growth," and therefore until the end of the Class Period, on October 29, 2025, no investor or analyst knew the extent to which Argentina, and its hyperinflationary environment, propped up Fiserv's ostensible 16% organic growth. Critically, and as Defendants **admitted** at the end of the Class Period, without the benefit of the unsustainable "noise" from hyperinflation, Fiserv was, in truth, growing in the mid-single digits.

144. Third, as detailed in IV.A.3, *supra* and IV.G, *infra*, although Fiserv's Financial Solutions segment had been, historically, a stable source of recurring revenue through sales to

banking and corporate clients, Defendants shunted resources away from the segment to prop up the artificial growth in Merchant Solutions. Essentially robbing Peter to pay Paul (and as Lyons later admitted), Defendants starved Fiserv's essential technology and neglected the client relationships that drove Fiserv's dominance in the core processing space.

145. The Financial Solutions segment thereby declined as previously recurring banking and corporate clients left Fiserv altogether or negotiated contract renewals at steep discounts. Investors remained in the dark, however, still believing Financial Solutions to be Fiserv's unshakeable, steady revenue stream, until Defendants shockingly revealed the segment's upending at the end of the Class Period.

146. Defendants' scheme was self-dealing in nature: not only could Fiserv distinguish itself in an ever-crowded field of fintech companies and artificially bolster (and buoy) its stock price with materially misleading representations to the market, but the inaccurately positive portrayal of the Company's financial and operational condition, coupled with artificially inflated growth and other metrics, triggered financial benchmarks that resulted in the payout of exorbitant bonuses to the Individual Defendants under their Executive Compensation Plans. The Executive Compensation Plan awarded PSUs and RSUs that were weighted in accordance with three Company performance metrics: (i) relative total shareholder return (40% of the plan); (ii) organic revenue growth (40% of the plan); and (iii) adjusted EPS (20% of the plan).

147. In fact, most of Bisignano's, Hau's, and Gibbons's compensation during the Class Period—a stunning **91%** in 2024—came from this plan and could pay out **only** if Fiserv achieved double-digit organic revenue growth over a three-year period. In essence, the Individual Defendants knew they would receive these **outsized** incentive payouts only by exploiting short-term revenue streams, manipulating Fiserv's growth metrics, and misleading the investing

public—all with the intent to artificially inflate the Company's financials and stock price. Accordingly, Defendants engaged in both a scheme to conceal the true nature of Fiserv's growth and misleadingly presented short-term revenue grabs as sustainable, ongoing growth.

**D. Defendants' Fraudulent Scheme Concealed Fiserv's Declining Performance through Short-Term Initiatives**

148. The Class Period begins on February 6, 2024. That day, Fiserv released its fourth-quarter and full-year financial results for fiscal year 2023. Having focused investors on Clover's purported success, up "**25%**" in revenue, and Fiserv's "***12%***" double-digit organic revenue growth, Defendants' scheme to misleadingly prop up Fiserv's appearance of consistent and sustainable growth was underway.

149. Contrary to Defendants' favorable public portrayal, however, multiple CWs—all well-placed former Fiserv employees from the Company's Merchant Solutions and Financial Solutions business segments—have detailed the short-term initiatives that Defendants used behind the scenes and hid from investors to propel Fiserv's misleading growth. *See* Sections IV.D-G, *infra*.

150. Specifically, CW accounts—including those from high-level former employees within Fiserv's Merchant Solutions and Financial Solutions business segments—support that, in 2024 and 2025, Defendants implemented, monitored, and approved various tactics to fuel short-term growth while concealing the nature of these initiatives and the Company's declining financial performance.

151. For example, CW-4, a former Finance Leader in Fiserv's Merchant Solutions segment, explained that it was no secret within the Company that for several quarters since 2024, Fiserv was "burning the furniture" to meet its quarterly numbers. CW-4 explained further that Fiserv used one-off initiatives to generate an extra revenue hit at that time, but there was no growth

for the Company because these were not sources of recurring revenue. CW-4 added that the one-offs included the sale of data sets, which could only be sold once and would not be purchased again; these were not short-term, but one-off initiatives. She noted that the time frame for these initiatives were in the fourth quarter of 2024 and the first quarter of 2025, with the sale of data sets occurring in the fourth quarter of 2024.

152. In particular, CW-4 described that, when it came to Fiserv "burning the furniture" to generate revenue, she observed in 2024 that Fiserv held daily meetings or calls to discuss revenue opportunities for Merchant Solutions and how to bring extra revenue to the table, with senior leaders in various divisions, including Jen LaClair, Head of Merchant Solutions, to meet Fiserv's quarterly targets. CW-4 observed that these daily meetings began occurring during the last three quarters of 2024 and continued into the first quarter of 2025, after which she left the Company.

153. CW-4 indicated that these initiatives were "backed into the forecasts." She explained that revenue forecasts were prepared, and then the initiatives that were discussed at the meetings were laid on top of the earlier forecasts. CW-4 added that if the number was not big enough, and the business segment had to do more, then the segments were directed to be more creative, develop one-offs and "sugar highs" to meet the targets.

154. CW-4 explained that to create a sustainable recurring revenue stream through providing a new service takes time and cannot be done quickly. She advised that it takes six months or so, but that time was not available, so the business segments had to come up with immediate initiatives and ideas to make revenue "tomorrow," by adding fees, extending contracts, offering sales, and other ideas. CW-4 indicated that it was clear that this was done to hit Fiserv's

EPS targets. She noted that Fiserv has a history of EPS growth for quarter over quarter for years, so the pressure to continue hitting the EPS targets drove these practices.

155. Regarding how these ideas were tracked internally, CW-4 explained that the information from the Financial Planning and Analysis team was entered into SharePoint, with the initiatives and the leaders for those initiatives identified. CW-4 explained that whether the initiatives were one-offs or recurring was tracked in SharePoint as well. CW-4 commented that, in 2024 and 2025, Fiserv made a lot of its savings by "starving" the technology organization within the Company, that is, cutting costs. She noted that the Technology organization has by far the biggest budget in the whole organization.

156. Similarly, CW-2, a senior sales leader in Fiserv's Financial Solutions business segment, recalled that Fiserv's Merchant Solutions was putting up strong numbers, 18% growth year-over-year, as compared to Fiserv's Financial Solutions business segment, which was growing simultaneously by 3 or 4% year-over-year. Therefore, CW-2 explained that it was understood internally that Fiserv's senior executives took resources that the Company had previously invested in Financial Solutions and diverted those resources into Merchant Solutions to maintain and increase its high growth figures.

157. CW-2 noted that this was disconcerting because by artificially propping up the Merchant Solutions business segment, Fiserv defunded the Company's Financial Solutions business segment, which had historically been a stable source of revenue for the Company. CW-2 added that this defunding took important resources out of Financial Solutions and led to a revenue decline in the business segment. CW-2 added that Fiserv destroyed its Financial Solutions business by defunding it.

158. CW-2 illustrated this by explaining that the fundamental product driving Fiserv's Financial Solutions segment was the Company's core processing engine, which was central to its bank and credit union customers. CW-2 noted that if a Company owns the core processing engine, as Fiserv does, that Company also owns the relationships with the banks and credit unions because the core processing engine is deeply entwined with their business and heavily disruptive to switch.

159. CW-2 detailed that in previous years, Fiserv sold hundreds of core processing systems but only sold three core processing systems on the banking side last year, referring to 2025. CW-2 recalled that at its peak, Fiserv sold between 100 and 125 new banking deals per year. CW-2 explained that in recent years Fiserv's sales teams had to focus their attention inward and on retaining customers because there was an increasing amount of at-risk customers.

160. Additional CW recollections support senior management's knowledge—through meetings and internal reports—of the multiplying problems Fiserv faced as its performance declined, while Defendants perpetuated a fraudulent scheme propelled by a false narrative of growth.

161. CW-4 advised that, at monthly meetings that she attended, there were discussions that the one-off initiatives would create problems in the future for comparing actual performance to forecasts. CW-4 emphasized that she, personally, certainly raised the concern that the one-off initiatives would create problems. She explained that she called out that one-off items were something that would have to be overcome in the following year's budget, because they created a "hole" that they had to get out of.

162. CW-4 commented that the main thrust of her complaint was that the Company was misleading about its growth. She explained that the additional fees charged may be recurring and not one-offs, but the assumption that the higher fees would not affect growth was naïve. She

elaborated that the fees caused client attrition; and it was not reality to assume that raising fees does not affect client attrition. CW-4 added that she saw the link between raised fees and client attrition, and that link and related attrition was why the new CEO rolled back the additional fees.

163. CW-4 described the setting of targets as a "push down" of numbers from the top. In communicating these targets, she continued, management would state, hypothetically, that the Company is $100 million short of its goal. CW-4 explained that the figure was pushed down and divided among the heads of the divisions to be added to their targets. CW-4 added that this directive was communicated by email, at meetings, and entered formally into Fiserv's performance tracking. CW-4 further explained that these emails were sent by Hau and came down every quarter; they were part of the annual budgeting process.

164. According to CW-2, Fiserv was run as a top-down business under Bisignano's leadership. CW-2 stated that Fiserv's decision to redirect its investment in Financial Solutions to Merchant Solutions was Bisignano's decision and that Fiserv's upper management was aware of it. CW-2 added that former Head of the Financial Institutions Group John Gibbons approved renewal concessions. CW-2 added that approval for price concessions initially occurred during meetings. CW-2 noted that written approval for price concessions would then go to Fiserv's finance team, who would subsequently adjust documents to reflect the pricing concessions. CW-2 described the bank and credit union industry as the "world" of Gibbons.[12]

165. As other CW accounts detail through corroborative recollections of what was occurring behind closed doors at Fiserv during the Class Period, Defendants' portrayal of Clover's

---

[12] CW-2 detailed that Fiserv's Financial Institutions Group (FIG) falls within the Company's Financial Solutions segment, describing FIG as traditional Fiserv as opposed to First Data and Merchant Solutions—which became part of Fiserv following the First Data acquisition.

purported success, Fiserv's organic revenue growth, and the Company's ostensibly stable results in the Financial Solutions segment were belied by a series of short-term, inherently unsustainable practices designed to fuel the appearance of growth.

## E. Clover's Growth Rested on Unsustainable Practices

166. From the first day of the Class Period, February 6, 2024, Defendants, aware of Fiserv's declining performance, embellished the growth of the Company's keystone product, Clover, to create the false impression that it was performing well and contributing to an increasing revenue trajectory. In reality, Clover's purported "success" was fueled by undisclosed short-term initiatives designed to squeeze revenue out of customers—particularly those in the back book, who wanted to continue using Payeezy. That revenue was generated through the forced Gateway Conversion and the imposition of unwanted fees and services, which ultimately alienated merchants and drove them away, but only after Fiserv (and the Individual Defendants) reaped the benefits associated with reported short-term growth.

### 1. Clover's Performance Data: GPV, VAS, and Spread

167. Throughout the Class Period, Defendants falsely represented Clover's success and long-term viability through a series of misstatements, half-truths, and omissions. As part of their scheme, Defendants misleadingly portrayed key aspects of Clover's performance. This included their failure to disclose the slew of short-term initiatives driving Clover's performance, which Fiserv disclosed through various performance indicators, including: (i) GPV (gross payment volume); (ii) VAS (value-added services); and (iii) Clover's "spread" between GPV and revenue growth.

168. First, GPV growth measures the total dollar value of merchant transactions processed through the Clover platform during a given period, as compared to a prior period. Fiserv reported Clover's GPV growth on a quarterly basis. Because GPV growth reflects increased use

of Clover to process payments—and because Fiserv earns a percentage of each transaction—GPV growth served as a key proxy for Clover's revenue growth.[13] As analysts from Truist Securities stated, "Clover's pace of volume growth matters relatively more in terms of impacting Fiserv's valuation multiple" because "**outsized volume growth – is viewed as a more sustainable growth driver**" and "**is critical to the Fiserv bull case**."

169. Second, VAS are added products, typically software, that Fiserv offered in addition to Clover's core transaction processing function. For instance, Fiserv offered VAS in the form of software applications, including Clover Online, designed to assist merchants with managing their businesses, such as payroll management, revenue monitoring, accounting functionality, and marketing support. While not an official Fiserv metric, investors and analysts closely tracked the extent to which Clover's VAS were contributing to product growth.

170. As an additional example of VAS, Fiserv offered Clover Capital and "Anticipation," two types of cash advance services. Anticipation was particularly important to Fiserv's business in Argentina. Indeed, at the KBW Fintech Payments Conference, held shortly after the Class Period ended, Defendant Lyons disclosed that Anticipation was "the biggest factor" in Argentina and "the biggest chunk of Merchant [in Argentina] is [A]nticipation." Fiserv claimed that VAS was a key differentiator between it and its competitors.

[13] Notably, however, Fiserv did not separately or consistently report Clover's revenue growth throughout the Class Period. Indeed, Fiserv provided a quantifiable dollar figure reflecting Clover's revenue for the first time in Q4 2024, indicating that Clover's total revenue was about $2.7 billion. Even then, Defendants failed to disclose whether this figure represented Generally Accepted Accounting Principles (or "GAAP") revenue, adjusted revenue, or organic revenue, thereby limiting its usefulness. This gave Defendants the opportunity to further obscure the true drivers of Clover's performance by revealing proxies for revenue growth (based on misleading information about the drivers behind them) without revealing the revenue growth itself.

171. Third, investors closely tracked Clover's "spread"—the difference between revenue and GPV growth, on a quarterly basis—because a widening spread signals that Clover's revenue growth is fueled by factors other than GPV growth (such as VAS sales growth). Thus, the spread widens as GPV contributes less to revenue. Throughout the Class Period, Defendants emphasized that greater spread was driven by VAS. For example, in April 2024, Hau stated that "[c]ertainly the delta between revenue and volume was driven by VAS."

172. By presenting Clover's growth through these various proxies, Defendants provided a piecemeal look at the drivers behind Clover's growth. However, unbeknownst to Class Period investors, Defendants' public statements regarding these aspects of Clover's performance did not reflect the product's actual, underlying success, but rather, reflected the unsustainable impact of a string of internal, temporary initiatives designed to achieve short-term revenue boosts through deceptive means.

### 2. Fiserv Concealed the Extent of Temporary Gateway Conversion Revenue Boosts

173. Throughout the Class Period, Defendants misled investors concerning the extent to which the Gateway Conversion from Payeezy to Clover provided Fiserv with temporary boosts for several quarters thereafter. In truth, the Gateway Conversion allowed Defendants to boost the appearance of revenue through a battery of short-term cash grabs by imposing hidden fees and unwanted VAS products on "new" Clover merchant accounts. These merchants would not have transitioned to Clover had Fiserv not mandated its adoption, and the Gateway Conversion caused widespread merchant dissatisfaction, drove down GPV, and resulted in massive merchant attrition.

174. As detailed herein, CWs have provided corroborating accounts confirming that many of Fiserv's merchant customers that were forcibly migrated from Payeezy to Clover protested the Gateway Conversion or left Fiserv as soon as possible.

175. For example, CW-6 described a deliberate corporate strategy in which existing Payeezy customers were reclassified as "new" Clover clients, creating the false appearance of organic growth. CW-6 stated that it was understood internally that the conversion from Payeezy to Clover was necessary to give the false appearance to the market that Clover was growing when, in reality, it was not growing.

176. Specifically, CW-6 recalled that Fiserv sales personnel were directed to convert Payeezy customers to Clover by a certain drop-dead-date. CW-6 recalled that the sales managers initially instructed salespeople to convert Payeezy customers to Clover during monthly sales calls in 2024. CW-6 elaborated that, during the same time period as the conversions, the sales staff were forced to put software programs for Clover Online on every single account that they signed. CW-6 noted that this had not been the policy for the prior ten years; sales were never required to put software additions on until then.

177. CW-6 indicated that every day that a salesperson signed an account, that person had to put software on to the account or they were put on a call to explain why they did not do so. According to CW-6, this was "obvious to anyone internally" that this is not organic growth; it was being forced on them. CW-6 added that sales staff were told that they had to put the software on these accounts, or their job was in danger, so they did it. CW-6 characterized this as not organic or "legitimate" growth.

178. CW-6 said that because Fiserv had touted Clover to Wall Street, the sales force was basically told that they could no longer offer Payeezy and that every existing customer would be forced to migrate over to Clover. CW-6 explained that Fiserv's upper management rammed it down everyone's throat because nobody was choosing it.

179. CW-6 explained that customers were locked into a monthly fee after they were converted from Payeezy to Clover. CW-6 said that Clover's growth was simply because the customers had no choice. CW-6 reported widespread dissatisfaction among merchants and sales personnel due to increased costs, reduced functionality, and operational challenges during the Clover transition. CW-6 stated that Fiserv exploited customer dependence by gradually raising monthly fees for the Clover software programs, knowing merchants were unlikely to switch providers.

180. Regarding problems with the conversion of customers from Fiserv's legacy Payeezy product to the newer Clover products, CW-4 advised that she learned through Bank of America that it felt pressured into it. Specifically, CW-4 continued that Bank of America felt that its merchants were pushed into it. CW-4 indicated that Bank of America resisted the transition of its clients from Payeezy to Clover. She described how Bank of America did not "feel in control" of the transition, as these were the bank's clients, the Bank did not want to transition all its clients to Clover.

181. CW-4 advised that Bank of America's launch of its own merchant servicing product strained the relationship between the two companies, and the relationship remained strained. She noted that many Bank of America customers moved from Payeezy to Bank of America's service.

182. Further, CW-4 noted that the conversion process dragged on for a long time and a lot of customers were dissatisfied with the process. She explained that the migration to Clover took a long time, from eighteen months to two years—during which some merchants were successfully converted while others took longer—because some customers resisted the conversion and others had technical difficulties.

183. Additionally, CW-4 observed that Clover kept adding fees, which alienated customers. She explained that the added fees made it harder for salespeople, made Clover more expensive for customers, and generated many customer complaints.

184. The ultimate effect of the forced Gateway Conversion was a sharp, limited-in-time spike in GPV growth, meaning a portion of the Company's reported GPV growth in 2024 was caused by the Gateway Conversion itself, **not actual growth**. Indeed, based on Fiserv's own subsequent disclosures on October 29, 2025, Clover's GPV was boosted by approximately 2-4% each quarter in 2024 by the Gateway Conversion. *See* ¶186.

185. On April 24, 2025, Defendants began to run out of runway on their scheme as GPV dropped to a stagnant 8% growth, a partial revelation of Defendants' fraud that resulted in a decline in Fiserv's stock. Attempting to justify its falling GPV growth, Fiserv made the bold admission that the previous year's Q1 GPV had been inflated by the Gateway Conversion and was weighing down the Q1 2025 numbers. In other words, Fiserv's 2025 GPV increased so little from 2024 because the Company artificially inflated 2024 GPV through the forced Gateway Conversion. While Fiserv's "ex-gateway [conversion]" metric made Fiserv's 2025 GPV growth rate stronger, it revealed the truth about the 2024 GPV metrics.

186. Notwithstanding this revelation, Defendants continued to conceal the full extent to which the Gateway Conversion had allowed Fiserv to tack on adhesive, unwanted, and often unknown fees that were causing customers to flee Fiserv entirely. By October 29, 2025, Defendants had fully revealed the extent of the short-term initiatives underpinning Clover's purported success. Indeed, Defendants' disclosures during and after the Class Period of "ex-gateway" GPV growth in 2025 allowed calculation of Fiserv's true 2024 GPV growth without the

benefit of the Gateway Conversion. Specifically, 2024 GPV growth was 2-4% lower than what Fiserv told investors, as shown in the chart below that Counsel created.[14]

**Fiserv - Merchant Solutions**
**Data Sourced from Quarterly Earnings Presentations**

| **Clover GPV Analysis** | | **Q1 2024** | **Q2 2024** | **Q3 2024** | **Q4 2024** |
|---|---|---|---|---|---|
| Annualized GPV *(in billions) - as disclosed* | | $274 | $313 | $311 | $310 |
| GPV growth *(y/y) - as disclosed* | | 19% | 17% | 15% | 14% |
| Calculated annualized GPV w/o Gateway Conversion | [1] | $267.9-$270.3 | $302.3-304.9 | $302.3-$304.9 | $300.5-$303.2 |
| Caluclated GPV Growth w/o Gateway Conversion (rounded) | | 16-17% | 13-14% | 11-12% | 11-12% |
| Inflation caused by including Gateway Conversion customers | | 2-3% | 3-4% | 3-4% | 3-4% |

[1] Precise number not ascertainable from public disclosures but falls within range

187. Despite knowing that GPV growth in 2024 was artificially inflated by 2-4% as a result of the forced Gateway Conversion, Defendants actively and consistently concealed that the mandatory Gateway Conversion that they directed—rather than actual, unmanipulated customer demand, transaction volume, and organic growth—was driving GPV growth.

### 3. Fiserv Forced High Fees and Unwanted VAS on Clover Customers to Boost Short Term Revenue

188. In addition to imposing the Gateway Conversion on the back book of customers, Defendants forced excess and unnecessary (often hidden) fees and VAS on Clover merchants. This ultimately drove merchants away from Clover, contributing to lower usage and reduced GPV.

---

[14] Fiserv historically disclosed Clover's annualized GPV and GPV growth. Starting in 2025, Fiserv disclosed Clover's annualized GPV and GPV growth **excluding volume attributed to the Gateway Conversion**. From those disclosures, Counsel calculated Clover's 2024 annualized GPV and GPV growth excluding volume attributed to the Gateway Conversion. For example, Fiserv disclosed that annualized GPV, inclusive of Gateway Conversion volumes, was $310 billion in Q4 2024. Comparatively, in Q4 2025, Fiserv disclosed that annualized GPV was $329 billion, which grew 9% excluding the Gateway Conversion volumes that occurred in 2024. To grow 9%, the ex-gateway annualized GPV in Q4 2024 was necessarily between $300.5 billion and $303.2 billion, meaning roughly $8 billion of annualized GPV was attributable to the Gateway Conversion. Comparing the true (excluding Gateway Conversion) Q4 2024 GPV to the previous year reveals the Gateway Conversion's impact on GPV growth.

Like Fiserv's other initiatives during the Class Period, this increased revenue in the short term at the expense of long-term and sustainable growth and customer retention.

189. Numerous CWs recount the Company regularly hitting merchants with a battery of hidden fees and unwanted services—at the direction of Fiserv management—as a means of quickly inflating Clover's revenue through deceptive means.

190. CW-7**,** a former SMB Senior Regional Sales Director, stated that prior to Q1 2024, Fiserv only charged Clover customers platform fees. However, CW-7 recalled that beginning in Q1 2024, Fiserv began charging Clover customers hidden fees, including vault fees.[15]

191. Likewise, CW-6 explained that some of Fiserv's merchant customers did not need all of Clover's features, including recurring billing, and were paying $29.99 a month for Clover just to get $9.99 functionality that they used to have on Payeezy. CW-6 indicated that these customers were paying for features that they did not ask for and were not going to use. CW-6 recalled that about 90% of customers did not need or want these additional features.

192. Additionally, CW-6 said that—separate from the SaaS [Software-as-a-Service] or software plan, referred to as Clover Online—Fiserv made its Wall Street numbers by simply raising its merchant activity-specific fees to customers by increasing the customer's basis points just to boost revenue when needed if there was a shortfall. CW-6 recalled that this was a process referred to internally as portfolio expansion.

193. CW-6 explained that after a customer was converted from Payeezy to Clover, Fiserv's Finance Team easily increased the cost of their Clover software plan, akin to "pushing a button." CW-6 continued that if organic growth is not high enough, Finance changes the fee rate

[15] Clover Vault is a software feature that allows merchants to store, access, and manage data.

to, for example, cost plus 30 basis points, so Fiserv can make the number exactly what is needed to hit their growth targets just by raising basis points.

194. CW-6 added that the Clover price increases were rolled out in 2024 and were ongoing in 2025. CW-6 stated that she left Fiserv in June 2025 and customers contacted her beginning in Fall 2025 after her departure to tell her that Fiserv raised their merchant activity-specific Clover fees 200% on average. CW-6 specified that one specific customer who had initially signed a fee structure of 33 basis points of margin called CW-6 in late Fall 2025 and told her that his fee structure was 110 basis points. CW-6 noted that during her tenure, her average margin was 40 basis points.

195. Moreover, CW-3 detailed that Fiserv maintained a list of between 50,000 and 80,000 Clover and CardConnect accounts that were being charged excessive fees, which was referred to internally as the "Magic List." According to CW-3, all Clover and CardConnect customers were on the Magic List, excluding the largest accounts and customers who complained the most about fees.

196. CW-3 noted that she and members of her team referred to this list as the "Price Gouging List." CW-3 explained that when Fiserv needed to generate revenue in order to hit certain targets, she was instructed to increase fees for the accounts on the Magic List in order to generate the required revenue.

197. CW-3 recalled that Fiserv ramped up fees and revenue targets in the second half of 2024. CW-3 stated that current SVP Partner Development Erik Nicholson instructed her to increase fees for CardConnect customers and current Head of ISV (Integrated Software Vendor) Kim Molinaro directed her to increase fees for Clover accounts. CW-3 explained that fees were increased for customers on the Magic List every few months throughout 2024 specifically to reach

certain revenue targets. According to CW-3, revenue targets were filtered down to Nicholson and Molinaro from Company leadership.

198. CWs also described a torrent of merchant customer departures from Clover as a result of these fees, that left Fiserv long before Defendants' fraud came to light.

199. CW-7 recalled that SMB customer attrition began in Q1 2024 and reached its peak in June 2025. CW-7 detailed that 40% of all Fiserv SMB customers, including both banks and merchants, departed the Company in 2024 and 2025. According to CW-7, customers left Fiserv largely because the Company began imposing additional and higher fees without announcing them beforehand beginning in Q1 2024.

200. Additionally, CW-3 recalled that some of Fiserv's third-party merchant services partners previously asked Fiserv not to increase fees for their merchants, which Fiserv generally agreed to. Moreover, CW-3 detailed that Fiserv opted these merchants back into fee increases in 2024 without telling merchant services partners, thereby overriding previous requests. CW-3 explained that Fiserv billed all customers a security bundle fee, even if their merchant services partners opted them out of price increases.

201. CW-3 detailed that in order to hit a $63 million revenue target at the end of 2024, Fiserv charged customers on the Magic List a monthly $149 security bundle fee for several months in 2024 instead of an annual $350 security bundle fee. CW-3 noted that she had access to certain spreadsheets which reflected the $63 million revenue goal. CW-3 added that the amount of customers on the Magic List decreased by the end of her tenure because these customers left Fiserv due to the fee increases.

202. CWs further detailed that Fiserv's senior management was aware of worsening merchant customer attrition through reports discussed in leadership meetings beginning in 2024.

203. For example, CW-7 stated that she was responsible for determining Net Promoter Scores (NPS) during her tenure. CW-7 explained that NPS is a market research metric that is determined by asking for and receiving feedback from departed customers. CW-7 detailed that in 2024 and 2025, she received feedback from customers that they left Fiserv due to increased fees and additional unannounced charges. CW-7 noted that she reported NPS and customer attrition in leadership meetings in 2024 and 2025 and that this information made its way to the C-Suite.

204. CW-7 explained that Fiserv moved customers from its large financial institutions segment to its strategic segment to make it appear as if the strategic segment achieved revenue growth. CW-7 recalled that she ran vintage analysis reports from 2023 to 2025. CW-7 stated that these reports retroactively measured revenue from the year prior. CW-7 detailed that she ran a vintage analysis report in Q1 2025 which revealed that Fiserv did not actually achieve revenue growth in its strategic segment in 2024 but made it appear as if it did because of duplicate accounts. CW-7 noted that she was moved from vintage analysis reports after she brought this up to her superiors.

205. Moreover, CW-6 explained that any emails from upper management were marked as "From the Desk of Frank Bisignano," or other senior executives. CW-6 continued that all directives were passed down from the top by word of mouth to the regional directors, to the sales managers, and then to the salespeople; as a rule, therefore, she did not get emails directly from the CEO. She reiterated that communications were all word-of-mouth trickling downhill. CW-6 noted that she received emails "from the desk of" Gibbons a few times per year, and that Gibbons was one of the people "beating the drum" to convert accounts to Clover and bring in third party gateway accounts.

206. As demonstrated herein, Defendants' Class Period admissions, coupled with Fiserv's related announcement of the "reset" in the final corrective disclosure before the market opened on October 29, 2025, confirmed many previously concealed aspects of this scheme, as corroborated through the accounts of the CWs. The media took note as the aftermath unfolded, emphasizing aspects of the previously unrevealed information regarding the scheme. For example, in an article dated October 30, 2025, titled "Fiserv's $30 Billion Plunge Followed Client Backlash on Fees," Bloomberg Law reported that:

> **Over and over, clients repeatedly voiced frustration that they've had enough of the superfluous fees they were being charged for Clover**, Fiserv's flagship point-of-sale system, according to people familiar with the matter, who asked not to be named discussing non-public deliberations. **They were increasingly looking to take their business to cheaper alternatives, like . . . Square or Toast . . . and they weren't looking back**.

207. Bloomberg further reported that Fiserv "started loading up [Clover] with a slew of fees as part of its so-called 'value-added services' for merchants. **The move juiced revenue in the short term but the results of [the ultimate disclosures] suggest it might have cost Fiserv in the long run** . . . ."

208. Similarly, Fiserv's former Product Director of Issuing for Southern Europe, who was interviewed for the AlphaSense platform, explained:

> [T]he previous CEO, **Frank Bisignano, was very public with the investment community about saying that all Clover sales were actually net new additions**, merchants that were new to Fiserv. Until eventually, it transpired that, first of all, **that was not the case**. These were **merchants that were being upsold without their consent to a more expensive platform, which they didn't sign up to and they didn't need**, and it resulted in both a class action, which has had a lot of resonance, as well as a sharp downward revision of past and future volume growth. That is something that is behind the drop in share price that has been seen last year.

209. These accounts by Bloomberg and Fiserv's former Product Director's interview with AlphaSense, which describe Fiserv's business practices and their impact on the Company, as

concealed by Defendants during the Class Period, are consistent with, and further corroborate, the CW accounts detailed herein.

### F. Fiserv's Argentina Business Fueled Its Misleading Double-Digit Organic Revenue Growth

210. During the Class Period, Defendants obscured the extent to which they used unsustainable hyperinflation in Argentina to drive purported double-digit organic revenue growth. The fleeting nature of this hyperinflation, however, provided only a temporary boost to growth that Defendants understood could not possibly continue in the long term. Despite the short-term nature of these revenue boosts, Fiserv leveraged them to publicly report that fleeting contributions from these ploys actually reflected sustainable long-term growth, when that was not, in fact, true.

#### 1. Fiserv's Organic Revenue Growth: a Misleading Metric that Disproportionately Drew on Argentinian Hyperinflation

211. While Fiserv claimed that its organic revenue growth metric provided investors with clarity, Defendants concealed the material contribution that hyperinflation in Argentina had, and was continuing to have, on that same metric. By measuring revenue growth from one period to the next, while excluding the impact of purported confounding factors—such as acquisitions and divestments and, most importantly, foreign currency exchange rates—Defendants' scheme conveyed a false sense of security and transparency to investors.

212. However, this presentation intentionally distorted the public portrayal of Fiserv's revenue and financial condition by exploiting an unsustainable hyperinflationary environment in Argentina. Defendants used this undisclosed distortion to maintain the appearance of double-digit organic growth, despite knowing that this growth was not reflective of Fiserv's true underlying performance and was temporary at best.

213. As noted earlier, the most important (and therefore most closely tracked) metrics for Fiserv's investors were those measuring revenue growth, specifically year-over-year revenue

growth. Put simply, revenue growth metrics convinced the market that Fiserv's stock was worth purchasing. Thus, as Fiserv reported double-digit revenue growth, its stock price soared higher. Three categories of reported revenue growth metrics were particularly important to investors, each meant to signal the Company's health.

214. The first type of revenue metric was revenue reported pursuant to GAAP, which reported the total revenue Fiserv received from all businesses across all countries, converted to USD.

215. The second type of revenue metric was adjusted revenue. This metric measured GAAP revenue while excluding the impacts of postage reimbursements, which Fiserv indicated did not reflect core business growth.[16]

216. The third type of revenue metric—and the one most critical to Defendants' scheme—was organic revenue growth, Fiserv's most widely cited revenue metric by both Fiserv and analysts. Organic revenue growth purported to strip out yearly currency exchange rate fluctuations to allow "apples-to-apples" comparisons. To calculate it, Fiserv used the previous year's currency exchange rates, which it claimed would strip out irrelevant information and provide an accurate picture of growth to investors.

217. Throughout the Class Period, Fiserv directed investors to organic revenue growth as a primary metric for measuring the Company's growth. In fact, organic revenue growth was listed alongside adjusted EPS growth as the Company's two "key financial metrics" in every earnings presentation during the Class Period.

---

[16] The U.S. Postal Service reimburses mailers who meet certain standards of reducing the volume of mail that is required to be forwarded or returned.

218. At the outset of the Class Period, in a February 6, 2024 press release, Bisignano referred to organic revenue growth as a "**key measure**[] **of our financial performance**." Accordingly, the market viewed organic revenue growth as one of the most important indicators of growth and Company success. For instance, on October 22, 2024, William Blair referred to organic revenue growth as "**key to** [the] **valuation**" of the Company.

219. Constant-currency metrics such as organic revenue growth are useful in situations where exchange rate fluctuations are not reflective of business in local markets (as opposed to scenarios where exchange rate fluctuations are caused by local currency devaluation, such as in hyperinflation).[17] For example, in September 2022, *The Wall Street Journal* reported that many large companies such as Adobe started using constant currency growth metrics when a strong USD lowered exchange rates worldwide.[18]

220. However, organic revenue growth may become misleading if a company reports significant revenue from a country experiencing hyperinflation, which can dramatically distort organic revenue by disproportionally inflating it in a manner inconsistent with actual business growth.[19] For that reason, many companies with large international operations exclude revenue

[17] Exchange rates between foreign currency and USD are affected by numerous factors, including a strong or weak USD, geopolitical instability, investor sentiment, or underlying devaluation of a foreign local currency.

[18] Kristin Broughton, *Companies Focus on Constant-Currency Metrics to Soothe Investors' Nerves*, Wall St. J. (Oct. 24, 2022), https://www.wsj.com/articles/companies-focus-on-constant-currency-metrics-to-soothe-investors-nerves-11666603801?msockid=3ced27d3af3066770dae327cae9d67b1

[19] Hyperinflation distorts organic revenue growth because, unlike many types of currency fluctuations, hyperinflation involves a rapid devaluation of local currency corresponding with the foreign exchange rate shifting. Take a scenario where hyperinflation causes the value of a peso to halve and the exchange rate with USD to double. Fiserv would sell one Clover terminal for 50 pesos in Year One and one Clover terminal for 100 pesos in Year Two—but the exchange rate for USD would correspondingly go from 1:1 to 0.5:1. Under GAAP revenue, Fiserv would report a flat growth rate (50 pesos: 50 USD in Year 1, 100 pesos: 50 USD in Year 2.). But under organic revenue growth, which uses the previous year's exchange rate, Fiserv would report that its growth

from hyperinflationary countries from similar constant-currency growth calculations in order to avoid overstating underlying performance.

221. Moreover, hyperinflation is inherently unsustainable. So not only does hyperinflation provide an illusory and disproportionate boost to organic revenue growth, that growth will not last.

222. Accordingly, full disclosure of the **sources** of **all** organic revenue growth is necessary to avoid misleading investors—particularly where organic revenue growth is temporarily propped up by a country experiencing hyperinflation. In such circumstances, a company **must** disclose the extent to which organic revenue growth stems from that country in order to avoid misleading investors. Otherwise, organic revenue goes from providing investors with more information to misleading them, as was the case here.

### 2. Defendants Exploited Argentinian Hyperinflation to Misleadingly Overstate Organic Revenue Growth

223. Despite the blatant confusion and misleading impression it caused, Defendants **chose** throughout the Class Period **not** to break out organic revenue growth by country, thus misleading investors about the magnitude of the impact that Argentina's hyperinflation had on Fiserv's reported organic revenue growth. Although analysts repeatedly asked about Argentina's contribution to organic revenue, Defendants referred to undefined and vague "transitory factors from Argentina" or "excess" factors that were a mere fraction of Argentina's total contribution.

224. During the Class Period, Fiserv began reporting that organic revenue growth was rising exponentially. Historically, Fiserv's organic revenue growth had averaged approximately 10% year-over-year. Beginning in 2024, however, the Company began to report massive increases

---

had **doubled** (50 pesos: 50 USD in Year 1, 100 pesos: 100 USD in Year 2), even though its true revenue had not actually grown.

in organic revenue growth, approaching 20% in some quarters. Despite repeatedly highlighting these results—metrics that were indisputably material to investors—Defendants concealed that the surge in organic revenue growth was primarily driven by Fiserv's Merchant business in Argentina, which was experiencing record hyperinflation. In doing so, Defendants left investors in the dark.

225. Fiserv maintained a robust presence in Latin America, particularly in Argentina, where it held a 40-50% market share in credit card processing. Fiserv's business lines in Argentina included payment processing (which involved facilitating credit card payments), as well as an Anticipation business through which Fiserv provided cash advances to merchants.[20]

226. Argentina, however, had been battling record inflation since at least 2019. In 2023, its hyperinflation rose to historic levels. Indeed, Argentina's inflation rate reached 100% by early 2023 and continued to escalate, peaking at 292% in April 2024—its highest level in more than 30 years.

227. While the hyperinflationary crisis was devastating to the local economy, Fiserv's reported financial results benefited. As the Argentinian peso lost value daily, Fiserv necessarily collected exponentially more Argentinian pesos—although those Argentinian pesos were growing increasingly less valuable. As a result, Fiserv reported massive, companywide organic revenue growth despite (and because of) Argentina's currency devaluation.

228. Adding another layer to the illusion of organic revenue growth, the devaluation of the Argentinian peso accelerated sales of certain of Fiserv's products—including "Anticipation" cash advances. In a hyperinflationary environment, cash-in-hand is substantially more valuable than future cash, meaning hyperinflation resulted in higher sales for Fiserv's Anticipation business.

[20] Historically, Fiserv used legacy payment platforms in Argentina, such as the "PosNet" payment system. In recent years, however, Fiserv began to channel more Argentinian merchant customers into Clover.

However, this revenue growth was inherently temporary: once hyperinflation ceased, so would Fiserv's increased organic revenue from Anticipation.

229. Nevertheless, Defendants reported stable, double-digit organic revenue growth throughout the Class Period, while keeping investors unaware that these growth rates were almost entirely fueled by Argentina.

230. Indeed, Defendants presented Fiserv's purportedly consistent companywide double-digit organic revenue growth as follows throughout the Class Period:

| Date | Fiserv's Organic Revenue Growth |
|---|---|
| February 6, 2024 | ***Organic revenue growth was 12% in the fourth quarter of 2023.***[21] |
| April 23, 2024 | ***Organic revenue growth was 20% in the first quarter of 2024.*** |
| July 24, 2024 | ***Organic revenue growth was 18% in the second quarter of 2024.*** |
| October 22, 2024 | ***Organic revenue growth was 15% in the third quarter of 2024.*** |
| February 5, 2025 | ***Organic revenue growth was 13% in the fourth quarter of 2024.*** |
| April 24, 2025 | Organic revenue growth was 7% in the first quarter of 2025. |
| July 23, 2025 | Organic revenue growth was 8% in the second quarter of 2025. |
| October 29, 2025 | Organic revenue growth was 1% in the third quarter of 2025. |

231. Fiserv obscured the extent of Argentina's contributions to organic revenue growth by claiming that the record, yet unsustainable, hyperinflation in Argentina provided a "transitory benefit" which contributed to a small increase in organic growth, but that overall organic revenue growth was still strong and in the double digits.

### 3. Defendants' Own Revelations Confirm That They Obscured Fiserv's Reliance on Argentina to Inflate Organic Revenue

232. Defendants' attributions drastically undercounted Argentina's true contribution, however, with the supposed "transitory benefits" well below Argentina's actual contribution. For example, Defendants claimed that just 5% of Fiserv's 16% organic revenue growth in 2024 was

---

[21] As set forth fully in Section VI, *infra*, Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly or recklessly materially false and misleading, affirmatively or by omission.

caused by "transitory benefits" in Argentina. In truth, unsustainable contributions from Argentina contributed a whopping 10% of the Company's organic revenue growth that year—double what Defendants had suggested.

233. As Lyons ultimately admitted at the end of the Class Period, on October 29, 2025, Argentina's hyperinflationary environment "greatly benefit[ed] our anticipation business there." In fact, Argentina was **almost entirely** driving Fiserv's organic revenue growth during the Class Period, and without Argentina's unsustainable revenue contribution, Fiserv was, in Lyon's own words, a "mid-single digit growth" company. On November 12, 2025, Lyons even admitted that "**the biggest factor in changing from organic growth of double digits** the last couple of years back to more traditional areas of organic growth for Fiserv **was Argentina**."

234. The chart below, released (for the first time) by Defendants on October 29, 2025 in connection with Fiserv's earnings presentation, illustrates the extent to which Argentina drove the Company's organic revenue growth. In 2023, Argentina contributed 6% of Fiserv's 12% organic revenue growth. Worse, in 2024, Argentina contributed 10% of Fiserv's 16% organic revenue growth. The data in this chart was presented for the first time at the end of the Class Period, shocking investors and revealing for the first time the full magnitude of Argentina's contribution.




235. Moreover, Argentina's distortion to organic revenue growth massively inflated the Merchant Solutions segment in particular. Although Merchant Solutions reported organic growth rates of 19% and 27% in 2023[22] and 2024, respectively, substantially higher than previous years, virtually all of that growth was driven by Argentina. Without this unsustainable input, the Merchant Solutions segment only sluggishly grew in single digits.

236. The chart below—compiled by Counsel using data provided by Fiserv on October 29, 2025—illustrates Argentina's near-total contribution to the Merchant Solutions segment's organic revenue growth (with the light blue row reflecting growth if Argentina were excluded).

[22] The 2023 organic revenue growth number was reported out of Fiserv's "Merchant Acceptance" segment. Starting in 2024, Fiserv re-segmented its three segments, combining two and renaming the third—Merchant Acceptance—to Merchant Solutions. The new Merchant Solutions segment also included ~$600 million of products from the other two segments that had been re-segmented.

| | [1] | [2] | [3] | [4] | [5] | |
|---|---|---|---|---|---|---|
| **Period** | **FY22** | **FY23** | **FY24** | **Q1'25 - Q3'25** | **FY25** | |
| Fiserv "Organic" Revenue | $17,002 | $18,572 | $20,719 | $14,958 | $19,840 | [a] |
| Merchant Solutions "Organic" Revenue | $7,471 | $8,627 | $11,120 | $7,665 | $10,193 | [b] |
| Fiserv "Organic" Growth (as originally reported) | 11% | 12% | 16% | 5% | 4% | [c] |
| Fiserv "Organic" Growth (ex-Argentina as reported in Q3 2025) | | 6% | 6% | 3% | 2% | [d] |
| Merchant Solutions (as % of total) | 44% | 46% | 54% | 51% | 51% | [e] = [b] / [a] |
| Merchant Solutions "Organic" Growth (as originally reported) | 17% | 19% | 27% | 7% | 6% | [f] |
| Impact of Argentina on Merchant Solution "Organic" Growth | | 13% | 19% | 4% | 4% | [g] = ([c] - [d]) / [e] |
| **Merchant Solution "Organic" Growth (ex-Argentina)** | | **6%** | **8%** | **3%** | **2%** | [h] = [f] - [g] |
| *Percent of Merchant Solutions Growth that is Argentina* | | *68%* | *69%* | *56%* | *65%* | [i] |

237. As detailed herein, despite Argentina's outsized impact on Fiserv's growth figures, Defendants downplayed Fiserv's reliance on Argentina's unsustainable hyperinflation to publicly report, and misleadingly maintain, Fiserv's double-digit organic revenue growth.[23]

### 4. CW Accounts Detail that Defendants Knowingly Relied on Argentina's Hyperinflation to Misleadingly Overstate Revenue

238. CWs detailed that Defendants were aware of the Company's high degree of reliance on Argentina's unsustainable hyperinflationary environment to boost the appearance of revenue growth and increase Fiserv's numbers.

239. CW-1, a former Senior Director of Operations, recalled that Fiserv's current Head of Latin America (LATAM) Region, Gustavo Marin, spoke to the Company in an all-hands meeting in Q1 2024. CW-1 stated that after this all-hands meeting in Q1 2024, she spoke with the CFO of Fiserv's Financial Institutions Group, who reported directly to Hau. CW-1 detailed that the Financial Institutions Group CFO told her at this time that Hau believed that hyperinflation in Argentina could help drive revenue growth for Clover in LATAM.

[23] The disproportionate impact of Argentina on Fiserv's organic revenue growth was particularly stark when compared to the actual GAAP revenue Fiserv obtained from its Argentina business. In 2024, Fiserv reported $705 million in revenue from Argentina, representing roughly 3.5% of total Company revenue. Similarly, in 2023, Fiserv reported $546 million in revenue from Argentina—roughly 3% of total Company revenue.

240. CW-1 noted that the Financial Institutions Group CFO explained to her that Hau projected that hyperinflation in Argentina could double Clover revenue in LATAM and drive a 40% uptick in Clover earnings in LATAM. CW-1 added that the Financial Institutions Group CFO stated that Hau believed that the hyperinflation in Argentina provided a great opportunity for Fiserv to enter the LATAM market and that it would lead to ongoing and continued revenue for the Company.

241. Additionally, CW-4 advised that she had exposure to foreign exchange issues in her prior role in Financial Planning and Analysis (FP&A). CW-4 explained that, because of inflation, within Argentina, there appeared to be a lot of growth, but it was not real growth. CW-4 elaborated that Fiserv had created a product offering that exploited Argentina's high inflation; if inflation dropped, the revenue dropped. She described it as a factoring product which offered short-term loans or capital to merchants and recalled that the name of the product is Anticipation. CW-4 described this as a cash advance. She explained that the product served a need in a high-inflation market, as the quicker merchants could get their money, the more that money was worth. She reiterated that Fiserv exploited the opportunity created by high inflation.

### G. Defendants Cut Resources to Financial Solutions to Drive Artificial Growth in Merchant Solutions, as Clients Fled and Revenue Declined

242. Throughout the Class Period, Defendants also concealed that, to fuel growth and hit performance targets necessary to trigger payouts under the Executive Compensation Plan, they diverted critical resources away from Fiserv's historically reliable Financial Solutions segment. This included starving the business of essential technology—such as the core processing capabilities at the heart of the segment—and implementing severe cost cuts, which wreaked havoc on Fiserv's longstanding client relationships with institutions such as banks and credit unions.

243. These problems prompted Fiserv's Financial Solutions clients to negotiate steeply discounted contract renewals or take their business away from the Company altogether. Fiserv meticulously tracked and escalated these problems for internal review by Bisignano, Hau, and Gibbons themselves, which drastically undermined the segment's consistent, recurring financial performance years before Defendants revealed its deterioration to investors.

244. To mask these declines and bolster their scheme, Defendants misleadingly touted stable and growing demand for Fiserv's Financial Solutions segment, attributing its performance to top-notch products and customer service. In a stark reversal, however, at the end of the Class Period on October 29, 2025, Defendants revealed to investors completely unexpected and shocking declines in this historically stable segment. That day, Defendants admitted that they had "cut certain costs," which "improved margins in the short-term, but are now limiting our ability to . . . execute product launches . . . and grow revenue to our full potential."

245. Analysts reacted to this news with surprise. For example, Autonomous Research noted that Fiserv's "competitive positioning in Financial Solutions leaves something to be desired after **admitting to overcharging its clients**." Moreover, BTIG stated that Fiserv "**has lost its prestigious 'high quality' label**, as its 39-year streak of double-digit EPS growth been abruptly upended."

246. Fiserv's short-term fixes in Financial Solutions through severe cost cutting allowed Defendants to redirect those resources to maintaining Fiserv's misleading appearance of massive growth in its Merchant Solutions segment, while creating a false impression that Financial Solutions was continuing to generate stable, uninterrupted returns. However, Defendants simply compounded Fiserv's performance problems by creating a new shortfall—mass client

dissatisfaction and defection in Financial Solutions due to the segment's lack of customer resources, technology, and service. Defendants concealed these details from investors.

247. As CW accounts detail, by 2024, Fiserv faced crippling problems as Financial Solutions customers took their business away from the Company and renegotiated steeply discounted contract renewal rates in response to Fiserv's excessive pricing, poor technology, and dismal customer service—all of which were implemented by Defendants to shunt resources to Merchant Solutions in furtherance of achieving short-term growth.

248. For example, CW-2 stated that the Company's Financial Solutions segment began to diminish in 2023 and 2024. CW-2 detailed the following events that diminished the financial solutions segment: (i) Fiserv defunded its Financial Solutions, which caused its products to be less competitive; (ii) Financial Solutions laid off experienced and knowledgeable employees to cut costs; and (iii) Fiserv's bank and credit union clients hired consultants to drive their renewal contract prices down. According to CW-2, Fiserv also attempted to backfill that lost revenue with short-term product sales.

249. Likewise, CW-5 recalled that in approximately 2021, core processing customers began leaving Fiserv or threatened to leave Fiserv. CW-5 noted that this trend got worse and peaked in 2023, 2024 and 2025.

250. According to CW-5, Fiserv pushed short-term products and statements of work (SOW) in 2024 and 2025 to drive up in-quarter revenue. CW-5 stated that in 2024 and 2025, there was a "huge, huge push" to hit in-quarter revenue goals. CW-5 noted that this in-quarter revenue push came from Gibbons and was filtered through current Head of Financial Institution Sales Erik Ball and current SVP, Head of Sales and Relationship Management, Financial Institutions Group, Rocco Marcello.

251. CW-5 clarified that prior to 2024, in-quarter revenue was rarely pushed. However, CW-5 noted that in 2024 and 2025, in-quarter revenue became part of Fiserv's practice and entered the Company's nomenclature. CW-5 recalled that she personally heard Gibbons push in-quarter revenue on many occasions in 2024 and 2025.

252. Moreover, CW-1 detailed that in 2024, Fiserv lost approximately 100 of its 2,500 Financial Institutions Group customers to competitors.

253. CWs further explained how Defendants' removal of resources from the Financial Solutions segment led to delayed launches, deficient products, and disgruntled customers. Notably, Defendants touted the success of these products during the Class Period despite an avalanche of undisclosed problems.

254. Recalling specific problems within Financial Solutions, CW-2 detailed that Fiserv faced increasing pressure from banking clients in 2023 and 2024 due to the Company's new platform, Experience Digital ("XD"). However, CW-2 stated that the launch of XD was very delayed and the bank customers subsequently became more disgruntled about XD. CW-2 noted that Fiserv's C-Suite was aware that there was a huge deficiency in XD. CW-2 noted that there were a lot of meetings related to XD because it was one of Fiserv's biggest deficiencies in the marketplace. CW-2 specified that Gibbons was very involved with XD and that former President, Digital and Financial Solutions Whitney Stewart Russell oversaw the XD program. CW-2 recalled that XD was a common topic of discussion at senior sales meetings and other leadership meetings.

255. CW-2 stated that moving resources from Financial Solutions to Merchant Solutions contributed to the problems with XD. CW-2 added that only three employees were working on XD because everyone else who was supposed to work on the digital platform had been let go by

the Company. CW-2 stated that a lot of banking customers signed up for XD in 2023 and 2024, however, Fiserv could not deliver to these customers because XD was not ready to launch.

256. Therefore, CW-2 noted that XD generated a very limited amount of revenue for Fiserv in 2023 and 2024 and customers had to go live with Fiserv's outdated digital platform instead. CW-2 stated that she consistently expressed concerns about XD to attendees at sales leadership meetings in 2023 and 2024, including to current Chief Sales Officer Joe Profeta, which flowed up to Bisignano.

257. Likewise, according to CW-2, Finxact, a platform acquired by Fiserv for $650 million, was supposed to be the be-all and end-all platform for specialty banks. However, CW-2 explained that Finxact was not ready for broad distribution and did not generate a lot of revenue for Fiserv during her tenure, which concluded in October 2024. Similarly, CW-2 stated that Cash Flow Central (CFC) was just coming together when she departed Fiserv in October 2024.

258. As Defendants stripped Financial Solutions of key resources and personnel, Fiserv's Financial Solutions clients revolted. CWs explained how client dissatisfaction resulted in negotiations that steeply reduced clients' contract renewal prices to retain them, as well as client attrition, both of which hampered Fiserv's long-term growth.

259. CW-2 explained that Fiserv was forced to lower its prices in order to retain Financial Solution clients who were at risk of not renewing their contracts with the Company, which diminished its revenue stream. Specifically, CW-2 recalled that it became an increasing trend for Fiserv's Financial Solutions clients to hire "price compression" consultants to help reduce the cost of their renewal contracts, which harmed Fiserv's long-term revenue. According to CW-2, Fiserv gave Financial Solutions customers concessions during renewals because the Company wanted to retain customers and keep its revenue streams intact.

260. Importantly, unlike investors, Defendants possessed long-term visibility into the future performance of and revenue from Fiserv's licensing in its Financial Solutions.

261. CW accounts confirmed that the Company's negotiations over renewals and pricing with clients occurred months or years before the actual renewal was booked and that, if a client did not renew, Fiserv charged costly fees and took months to unwind the relationship, which temporarily boosted the Company's revenue.

262. For example, CW-2 detailed that Fiserv offered five, seven, and 10-year contracts to customers. CW-2 stated that customers typically brought in consultants to negotiate their contract renewals approximately eighteen months before their contracts expired. CW-2 explained that negotiations between consultants and Fiserv typically lasted between six and twelve months. CW-2 recalled that renewal pressures at Fiserv began to reach a "fever pitch" in 2021 and 2022 and remained at that level throughout the rest of her tenure.

263. Likewise, CW-5 recalled that Fiserv created a "saves" team in 2021 or 2022 that was dedicated to retaining clients. CW-5 noted that the saves team was created as a direct result of clients leaving the Company. CW-5 explained that the saves team worked exclusively with existing clients that were at risk of leaving Fiserv.

264. CW-5 explained that clients that were going to shop around and look elsewhere unless Fiserv gave them pricing concessions to renew their contracts hired consultants, who issued an RFP (Request for Proposal) to the Company. According to CW-5, Fiserv subsequently retained a lot of at-risk customers but the Company was forced to discount their renewal contracts. CW-5 added that Fiserv gave customers seven-figure credits upfront to retain them and those customers then used those credits on future invoices.

265. CW-2 detailed that consultants put pressure on Fiserv to reduce renewal contracts as well as the remainder of current contracts. Therefore, CW-2 noted that decline in performance in 2024 was a result of discounts and non-renewals. CW-2 noted that she subsequently created a "saves" team that was responsible for retaining at-risk customers. CW-2 noted that the headwinds related to renewals got worse in 2024. CW-2 explained that if customers renewed, revenue for the Company was reduced because customers renewed at a discount and the discount typically took effect immediately.

266. CW-2 described that if banks did not renew their contracts with Fiserv, it was more favorable to the Company in the short term than it would be if they did renew. CW-2 detailed that if customers did not renew their contracts, they continued to pay the rate of their contract until it expired, which generated revenue for Fiserv, along with the imposition of a 10% holdover premium and exit fees, which were taken to revenue immediately. CW-2 clarified that banks were only charged a premium fee if they were "out of term," meaning if they began the renewal process outside of the window and paid a holdover premium. CW-2 noted that de-conversion fees were onerous, hundreds of thousands of dollars. CW-2 explained that when banks made the decision to depart Fiserv, it took months to unwind the relationship.

267. According to CW-2**,** the loss of clients beginning in 2024 led to a decline in issuing and licensing revenue. CW-2 explained that the loss of licensing revenue was more impactful than the loss of issuing revenue. CW-2 added that licensing revenue was worth millions of dollars to Fiserv.

268. CWs further detailed additional problems and short-term fixes in Financial Solutions.

269. For example, CW-2 stated that when existing customers wanted to add new solutions to their existing bundle, they paid more for the new solutions. According to CW-2, banks subsequently hired consultants to negotiate with Fiserv to lower prices because banks were upset that they were being overcharged by the Company.

270. Additionally, CW-5 recalled that in order to drive in-quarter revenue in 2024 and 2025, Fiserv forced customers to upgrade their solutions and renewed customer contracts that were two years away from expiring. CW-5 detailed that Fiserv counted part of the revenue that was generated from contract renewals in 2024 and 2025 as in-quarter revenue even though these were not new deals. CW-5 referred to this practice as "funny business."

271. CW-5 recalled that it seemed odd that Fiserv was able to count revenue that was generated from contract renewals in 2024 and 2025 as in-quarter revenue and that she could not understand how the Company was able to do that. CW-5 explained that counting revenue generated from contract renewals as in-quarter revenue was previously done on occasion prior to 2024 but became common practice at Fiserv in 2024 and 2025.

272. Additionally, CW-2 recalled that if Fiserv was short on revenue at the end of quarters, the Company approached existing license clients who were not at the threshold and offered them discounts to generate revenue.

273. The extent of Fiserv's mounting problems with declining revenue and client attrition were well-documented internally. CWs recalled specific tracking reports and meetings regularly distributed to top leaders of the Company.

274. For example, CW-2 stated that everything at Fiserv was put into an internal Customer Relationship Management (CRM) database, a Salesforce product referred to internally as "eCRM," and generated out of it. CW-2 added that Fiserv maintained a Loss Client Report,

which tracked customer non-renewals, and a Revenue Compression report. CW-2 recalled that the Loss Client Report was circulated monthly to Fiserv's leaders, including CEO Bisignano, CFO Hau and Head of the Financial Institutions Group Gibbons.

275. CW-2 detailed that the Loss Client Report included the names of clients that informed Fiserv that they were leaving, the exact months that clients were moving over to a new vendor, and the amount of revenue that would run off once the client departed. CW-2 explained that there were large Financial Solutions clients that did not renew their contracts with Fiserv in 2024, which cost the Company millions of dollars per year.

276. CW-5 recalled that Bisignano and current Vice Chairman Chris Foskett were aware that customers were leaving the Company because they received and reviewed at-risk client reports and monthly loss review reports.

277. CW-5 recalled that Fiserv tracked customers that were at-risk of leaving the Company in Salesforce. CW-5 explained that at-risk client data was pulled from Salesforce and summarized in at-risk client reports, which were sent to Bisignano at least monthly.

278. CW-5 recalled that she viewed and discussed at-risk client reports in meetings with former Head of the Financial Institutions Group Gibbons. CW-5 noted that she spoke with Gibbons' organization bi-weekly and discussed customers that were leaving or threatening to leave. CW-5 added that Fiserv also maintained reports that showed customer churn.

279. CWs also indicated that Defendants were aware of the mass exodus of clients due to Bisignano's, Hau's, and Gibbon's involvement with Fiserv's Deal Review Board ("DRB"), an internal team of Fiserv's leadership that met to discuss departing Financial Solutions clients.

280. For example, CW-2 stated that Bisignano and Hau were aware that Fiserv was losing clients. CW-2 detailed that if a bank or credit union customer with a total contract value of

over $10 million informed Fiserv that it was leaving, this information was disseminated to Fiserv's Deal Review Boards (DRB). CW-2 detailed that Gibbons ran a DRB for clients with a total contract value of between $2 and $10 million.

281. According to CW-2, Hau ran a corporate DRB for clients with a total contract value over $10 million. CW-2 detailed that Hau's corporate DRB included Hau, Bisignano, Gibbons, current Vice Chairman Chris Foskett, former Head of Merchant Solutions, Chief Revenue Officer Jennifer LaClair and current Vice Chairman Guy Chiarello. CW-2 noted that Hau's corporate DRB required a quorum of three members on a DRB call. CW-2 added that the DRB received reports that bank and credit union customers with a total contract value of over $10 million were departing Fiserv.

282. According to CW-5, Fiserv's Deal Review Board (DRB) met to discuss proposals to retain certain customers that were at risk of leaving the Company. CW-5 clarified that there were two types of DRB meetings, one run by Gibbons and Gibbons's direct reports, and the other by a smaller management committee. CW-5 clarified that generally Gibbons and his direct reports ran DRB meetings which reviewed at-risk clients with a total contract value between $2 and $10 million and the management committee DRB reviewed at-risk clients with a total contract value exceeding $10 million. CW-5 stated that Bisignano and current Vice Chairman Chris Foskett were part of the management committee DRB.

283. CW-5 explained that if a customer that generated a significant amount of revenue threatened to leave Fiserv, this deal would have been brought to a small management committee to discuss, including Bisignano and Foskett. CW-5 noted Bisignano and current Vice Chairman Chris Foskett sat in on DRB meetings if the DRB discussed more significant at-risk deals. CW-5

recalled that Bisignano sat in on the Gibbons DRB meeting for a prospective bank client that would have generated less than $10 million annually.

284. After the Class Period, Defendants admitted to the causes of these outwardly surprising declines in Fiserv's historically stable Financial Solutions segment, revealing "lower periodic license revenue" and unfavorable "industry dynamics" in its Financial Solutions segment, which, in turn, led to negative pricing action, which undermined the Company's ability to "position [itself] competitively for the longer term." In the wake of these disclosures, Autonomous Research noted that Fiserv's announcements amounted to "admitting to overcharging its customers" and that Fiserv's "competitive positioning in Financial Solutions leaves something to be desired."

285. Months later, on May 14, 2026, Lyons admitted during Fiserv's Investor Day presentation that the Company's core revenue attrition, "when measured as a percentage of total Financial Solutions revenue," had "over the last few years . . . **roughly doubled** from 75 basis points to 150 basis points." This admission confirmed that, during the Class Period, Fiserv was losing roughly double the revenue from its banking clients leaving than in previous years.

### H. Bisignano and Gibbons Enriched Themselves through Illicit Insider Sales

286. As Defendants' fraudulent scheme and accompanying misstatements artificially launched Fiserv's stock price to record highs, the Individual Defendants reaped personal financial benefits through exorbitant bonuses triggered when Fiserv hit certain financial targets specified in the Individual Defendants' Executive Compensation Plans. In addition, Defendants Bisignano and Gibbons obtained huge payouts from insider sales of Fiserv common stock while in possession of material nonpublic information.

287. First, on June 10, 2024, Gibbons sold 2,800 shares at a price of $148.76 per share for proceeds of $416,528. On August 21, 2024, Gibbons sold 18,890 shares of Fiserv common stock at an average price of $168.21 per share for proceeds of $3,177,486.90. Similarly, Bisignano

began selling his Fiserv shares in Fall 2024. On September 20, 2024, he sold 145,000 shares of Fiserv common stock under his June 21, 2024 trading plan for proceeds of $25,718,035.88 at an average price of $177.47 per share.[24] Notably, his trading plan was enacted after the commencement of the fraudulent scheme. As discussed in Section VIII.G, *infra*, this was his first sale of Fiserv stock since the control period extending from May 16, 2022 to February 5, 2024.[25]

288. Then, on March 3, 2025, Gibbons sold 13,560 shares of Fiserv common stock at an average price of $238.15 per share for proceeds of $3,229,314.

289. On December 4, 2024, then President-Elect Trump nominated Bisignano as Commissioner of the SSA. Notably, although the nominees for presidentially appointed government positions typically learn of their public nomination close in time to the announcement, the vetting process often begins months earlier and commonly predates the announcement and the presidential election itself.

290. During Bisignano's ongoing confirmation process before the Senate Finance Committee, on February 5, 2025, Fiserv announced its financial results for the 2024 fourth quarter and fiscal year. On the earnings call, Bisignano misled the market by claiming that Fiserv reached "***16%***" organic revenue growth and that excluding "***transitory factors from Argentina, total company organic revenue growth in 2024 was 11%***."

291. On May 6, 2025, the Senate confirmed Bisignano as head of the SSA, at which point he resigned as Fiserv's CEO. In preparation for assuming that role, Bisignano prepared a

---

[24] On June 21, 2024, during the Class Period, Bisignano entered into a Rule 10b5-1 trading plan. Pursuant to SEC rules, Bisignano was not permitted to sell the securities subject to the plan for 90 days, *i.e.*, until September 19, 2024.

[25] In securities litigation, a "control period" refers to a period equal in length to the class period and is used to analyze executives' trading during the class period for signs of suspicious insider trading, such as sales that are significantly out of line with prior trading practices.

letter—as all incoming department heads do, when taking a government role—dated February 24, 2025, outlining measures he would take to eliminate potential or actual conflicts of interest by divesting himself and his family of certain personal assets. Pursuant to this so-called "ethics agreement," Bisignano had 120 days—through and including September 3, 2025—to sell his and his family's Fiserv shares.

292. Armed with material nonpublic information from his role as CEO, including information related to organic growth guidance and revenue, Bisignano could have entered into a blind trust at this time, or a Rule 10b5-1 plan, before trading. He chose not to do so. Instead, Bisignano executed those divestitures prior to Fiserv disclosing increasingly negative news related to slowing organic revenue and stagnant Clover GPV growth.

293. Most egregiously, on July 21 and 22, 2025, during the Company's blackout window (which prohibits trading shortly before corporate earnings are announced), Bisignano sold 861,545 shares of his and his family's Fiserv stock for total proceeds of $142,548,771. The next day, Defendants announced Fiserv's Q2 2025 financial results, in which the Company revised its full-year organic revenue growth outlook downward by approximately 10%; reported Merchant Solutions' organic revenue growth was 9%, significantly below analysts' expectations of 12%; and revealed that Clover's GPV growth stayed flat at 8% due to "gateway [conversion] impact" with continued headwinds. Upon the announcement of this news, Fiserv's stock price dropped by 13.9%. These strategically timed trades—made with the benefit of material nonpublic information regarding the Company's upcoming financial results—allowed Bisignano to avoid tens of millions in losses that he would have suffered had he just waited one day longer to sell.

294. All in, by July 23, 2025 (approximately six weeks before his deadline to do so), Bisignano had sold **99.9%** of his and his family's Fiserv holdings, for **$683,689,109** in proceeds, just before the Company's share price fell into freefall as Defendants' fraud emerged.

### I. Defendants Coupled Their Fraudulent Scheme with Misstatements Touting Fiserv's Growth while Failing to Disclose the True Drivers of Its Success

295. Starting on the first day of the Class Period, February 6, 2024, Defendants furthered their fraudulent scheme with a series of misrepresentations, half-truths, and omissions to investors regarding: (i) Clover's success and the sources of that ostensible success; (ii) Fiserv's double-digit organic revenue growth and the contribution to that growth of economic conditions in Argentina; and (iii) the strength, stability, and drivers behind the purported success of Fiserv's Financial Solutions business segment.

#### 1. Defendants Emphasized Clover's Purported Strength, While Omitting One-Time Gateway Conversion, Fees, and VAS Boosts

296. When it came to Clover, Defendants knowingly misled investors in several ways. For example, on February 6, 2024, the first day of the Class Period, Hau touted Clover's "***25%***" increase in revenue, attributing this success to "***higher penetration of value-added solutions, channel mix shift and some pricing***."

297. However, Hau's statement was false and misleading because it omitted that the true causes of Clover's "***higher penetration of value-added solutions***" and "***pricing***" were fees and add-on services forced on merchants, many of whom never wanted to use Clover and did not even realize the Company had imposed these unwanted charges. *See* Section VI.A, *infra*.

298. Analysts remained in the dark as to the short-term initiatives driving Clover and, instead, echoed Fiserv's enthusiasm, with Mizuho reporting on February 7, 2024 that "**Clover is Fiserv's most important asset, and continues to exceed expectations**." Similarly, Bernstein

Research commented that Clover's "**performance remained stellar**," citing as "most important" Fiserv's "growing VAS penetration to 19% up from 16%."

299. Again, on July 24, 2024, during a Fiserv earnings call, Hau represented that "***Clover revenue grew 28%***" and that Clover's "***spread between revenue and volume growth continues to reflect a higher penetration of value-added solutions, continued channel mix shift, and value-based pricing***." During the call, Hau also attributed the Company's maintenance of its 2024 financial outlook to "***the strength of things like Clover selling very well***, [including] ***value-added solutions both in our Small Business and in our Enterprise business***."

300. In reality, Fiserv did not disclose that Defendants achieved Clover's purported "***strength***," "***higher penetration of value-added-services*** [VAS]," and supposed "***value-based pricing***" primarily through a battery of short-term cash grabs, hidden fees, and unwanted VAS, which temporarily created the appearance of revenue growth. In fact, and concealed from investors' view, Fiserv's merchants (many of whom never sought to become Clover users in the first place) were complaining and taking their business elsewhere.

301. However, analysts were again encouraged by Defendants' reassurances, believing that VAS would contribute to Clover's sustainable growth. For example, on July 23, 2024, Seaport Research noted, "We continue to expect solid performance from Clover going forward as it gains share TTC [through the cycle] and also leans further into pricing/VAS."

302. Second, Defendants failed to disclose that the Gateway Conversion from Payeezy to Clover generated unsustainable revenue and that the Gateway Conversion padded revenue for much longer than Defendants represented to the market. For example, on April 23, 2024, Bisignano represented on an earnings call that the Clover transition was "***completed, migrated***," with Fiserv "***closing the books on*** [the Payeezy migration] ***from a conversion standpoint***."

303. In reality, as CWs detailed, the Gateway Conversion not only dragged on in some instances, but Fiserv squeezed the effects of the forced migration from customers by attaching one-time fees and unwanted services as part of the compulsory transition—which drove customers (particularly SMBs) away from Clover altogether. *See* Sections IV.E.2-3, *supra*.

304. Moreover, although Fiserv reported strong GPV growth numbers in 2024, it failed to disclose that those growth numbers were propped up 2-4% by the Gateway Conversion. For example, in Q3 2024, Fiserv announced that its GPV grew 15%, but failed to disclose that, absent the Gateway Conversion, it would have grown only 11-12%. *See* Sections VI.D-E, *supra*.

305. Had Fiserv disclosed these material facts, investors would have been apprised of the short-term nature of Clover's growth during the Class Period. Rather than doing this, however, Defendants perpetuated their fraudulent scheme by giving investors the perception that Fiserv's ongoing, ordinary, and unchanged operations allowed it to "remain on pace to meet our 2026 targets." As Defendants ultimately revealed at the end of the Class Period, Clover's success was driven by unsustainable, temporary initiatives.

### 2. Defendants Misleadingly Reported Fiserv's Organic Revenue Growth, Keeping Investors in the Dark as To Argentina's True Contribution

306. Similarly, when it came to Fiserv's organic revenue growth, Defendants continuously pulled the wool over investors' eyes. From the first day of the Class Period, February 6, 2024, Defendants misleadingly represented double-digit organic revenue growth, reporting "***12% in the fourth quarter of 2023***." When it came to organic revenue contributions from purportedly "transitory" factors in Argentina, meaning temporary hyperinflation, Fiserv told investors that contribution was "***an estimated 7 points of growth***." Defendants continued this charade for the entire Class Period.

307. For example, on July 24, 2024, during Fiserv's earnings call for Q2 2024, Hau said that Fiserv's organic revenue "***grew 18% in the quarter***" and that the "***transitory contribution from Argentina was 5 points to our total organic growth in the quarter***," referring to boosts from Argentina's record (but unsustainable) hyperinflationary environment. However, Defendants' statements touting organic revenue growth, while omitting the extent to which Argentina drove that organic revenue growth, were misleading for at least four reasons.

308. First, hyperinflation is **inherently unsustainable** and therefore an unreliable basis for inducing or maintaining long-term growth. Whether through government intervention or changing economic circumstances, hyperinflation cannot last. Accordingly, any growth that hyperinflation drives is temporary. This includes both (i) direct growth from reporting devalued currency as though it had not declined in value by excluding changes in foreign exchange rates, and (ii) indirect growth from Fiserv's cash-advance or "anticipation" business that was exponentially in higher demand in a hyperinflationary environment. By failing to disclose at least Argentina's full contribution to organic growth, Defendants misled investors.

309. Second, unbeknownst to investors, **most** of Fiserv's touted organic revenue growth in 2023 and 2024 was driven by Argentina. In 2023, half of Fiserv's reported 12% organic revenue growth was attributable to Argentina, and in 2024, roughly **two-thirds** of Fiserv's organic revenue growth came from Argentina. Although the market was aware that some portion of Fiserv's organic revenue growth came from Argentina, Defendants concealed the critical fact that Argentina was the single most important driver of Fiserv's organic revenue growth.

310. Third, although Defendants obliquely referred to "transitory factors" from Argentina that contributed to organic revenue growth, these "transitory factors" far undercounted Argentina's actual contribution. For example, during the Class Period, Fiserv claimed that

"transitory factors" in Argentina contributed 5% to the entire Company's organic revenue growth in 2024, but that organic revenue growth was still 11% without those transitory factors. However, this ignored that virtually all of Argentina's 10% contribution to organic revenue growth in 2024 was unsustainable—as Lyons admitted at the end of the Class Period, when he called Argentina's **entire** contribution mere "noise."[26]

311. Fourth, Defendants **admitted** at the end of the Class Period that presenting Fiserv as a double-digit organic growth company, without disclosing Argentina's contributions, was false and misleading. On October 29, 2025, Lyons admitted that Fiserv had benefitted from "noise from Argentina" and needed to "clarif[y] our growth numbers" to reflect the full extent of Argentina's contribution. He then disclosed that the "noise" from Argentinian hyperinflation had been pushing Fiserv's organic growth numbers into the double-digits, and that without Argentina (which ceased its outsized contributions), Fiserv was a "mid-single-digit growth company as we are today[.]"

312. Accordingly, although investors were aware that the hyperinflationary crisis in Argentina **aided** Fiserv's growth in some way, Defendants deceptively concealed that Argentina was the **primary driver** of the entire Company's organic revenue growth. Without knowing the true extent of Fiserv's exposure to Argentina, Defendants lulled investors into the false belief that Fiserv's organic growth was fueled by growth in stable, sustainable markets, rather than inherently unsustainable hyperinflation in Argentina.

[26] At various points, Defendants suggested that by "transitory factors," they were referring to the "excess inflation and interest" Argentina was experiencing in 2023 and 2024 compared to 2018-2022. But Argentina was still experiencing hyperinflation as early as 2019, so using 2018-2022 as the period of "normal" inflation made 2023 and 2024 appear much less hyperinflationary than they actually were—which would also be materially misleading. Similarly, what Fiserv called transitory factors apparently included certain effects of hyperinflation, like increased interest and inflation, while excluding others, like increased anticipation (cash advance) sales.

313. For instance, on July 24, 2024, Barclays Research highlighted that "investors will be satisfied with FI's Q2 results given that top-line guidance was maintained (**with even less of a benefit from Argentina**)." Similarly, Raymond James echoed that "the excess inflation/interest tailwind included in organic growth was lowered by **300 bp (now 4% from 7%)**, implying other areas outside of Argentina are likely performing better than expected."

314. In reality, as Defendants revealed at the end of the Class Period, Argentina's true contribution was far greater than represented and, without Defendants' padding, Fiserv's organic revenue growth had been in the single digits.

### 3. Defendants Touted Booming Demand and Excellent Client Service in Financial Solutions while Losing Customers in Droves

315. When it came to Financial Solutions, Defendants' Class Period misstatements led investors to believe that Fiserv's historically stable segment—which generated consistent, recurring revenue from its largest institutional clients—remained unchanged. In truth, Fiserv had implemented drastic cost-cutting measures, including starving technology essential to its business, to fuel the appearance of growth.

316. In doing so, Fiserv's client relationships suffered and clients either fled or sought steep discounts in droves. Defendants concealed these problems and their impact on Financial Solutions, as well as the Company's difficulty in generating new business and recouping dwindling revenue on expiring licensing—or subscription—deals.

317. For example, on July 24, 2024, Defendants touted "***large demand for our services out of financial institutions***," claiming that Fiserv was "***winning in the marketplace***." And they attributed this "***tremendous***" and "***strong***" demand to Fiserv's "***relationship management model***" with large institutional clients in Financial Solutions.

318. Analysts responded to Defendants' false reassurances with optimism. For instance, on July 25, 2024, Northcoast Research noted that "**FI indicated that demand for their solutions remained solid**." And Morgan Stanley concluded that "We see the Financial Solutions segment as a resilient and highly recurring revenue business and expect[ed] it can keep growing in the medium-term target range of 6-8%."

319. As Defendants revealed at the end of the Class Period, however, their statements were belied by the fact that Fiserv's licensing deals were both finite and dwindling, as clients were leaving due to dissatisfaction with Fiserv's poor customer service by way of reduced technology and increased fees—both temporary fixes that diminished the segment's large recurring revenue, on which investors had come to rely. *See* Sections IV.M and VII.D, *infra*.

### J. On April 24, 2025, The Truth Began to Emerge as Fiserv Reported Poor Financials and Offered False and Misleading Reassurances to Investors

320. Inevitably, Defendants ran out of runway for their fraudulent scheme as their short-term revenue grabs dried up. As a result, Defendants began to trickle out partial disclosures regarding Fiserv's declining performance and reliance on short-term initiatives, while maintaining a misleadingly upbeat tone to keep concerns at bay for as long as possible.

321. First, on April 24, 2025, Defendants disclosed that Clover's GPV growth had decelerated from 14% to 8%, attributing the slowdown to "a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 2024." In other words, Defendants revealed that a short-term lever—the Gateway Conversion—had boosted GPV in Q1 2024, and Fiserv was unable to replicate that boost in 2025. At the same time, Merchant Solutions posted single-digit organic revenue growth of 8% for the quarter, which was well below analysts' expectations of 12%.

322. The market reacted negatively, and on April 24, 2025, Fiserv's stock price dropped by **18.5%**, a reduction of $40.20 per share, bringing the share price down to $176.90 at closing. Analysts were flummoxed. Goldman Sachs "believe[d] that the contribution of a late 2023 gateway conversion **was larger than previously known**," indicating that the public did not understand the degree to which the Gateway Conversion boosted Clover's results. And J.P. Morgan Research noted, on April 25, 2025, that the unexpected Clover GPV deceleration would "**rais[e] concerns about sustainability of premium growth**."

323. However, Defendants continued to mislead investors, with Hau reporting that "we continue to see ***Merchant Solutions organic revenue growth of 12% to 15% in 2025, driven in large part by Clover and its international expansion efforts, new product development and increase in VAS penetration . . . with its expanding demand and VAS capability***." That statement was false and misleading because Fiserv's organic revenue growth figures were still boosted by temporary drivers from Clover and its unwanted VAS, as well as Argentinian hyperinflation.

324. As intended, investors and analysts expressed support for management, with Wells Fargo telling investors it saw "little risk to total Co. guidance as [Fiserv's] 'virtuous cycle' is evident in 1Q results," adding: "**We continue to have confidence in** [Fiserv's] **ability to achieve its MT** [Midterm] **targets** and believe Clover meeting said targets is not in buyside expects."

### K. On May 15, 2025, Defendants Revealed Continued Clover GPV Declines, while Continuing to Mislead Investors

325. On May 15, 2025, Defendants revealed further troubling information at the J.P. Morgan Global Technology, Media and Communications Conference, admitting that customers were leaving Fiserv in the wake of the forced Gateway Conversion and that those losses would continue to depress Clover's GPV growth throughout 2025. Even then, however, Defendants

sought to manage the fallout by misleadingly reassuring the market just enough to buy themselves more time.

326. During the conference, Hau announced that the Company's GPV growth for Q2 2025 would "be generally similar to first quarter in terms of the reported growth rate from a volume standpoint" or remain at 8% because "gateway [conversion] headwind actually [would] increas[e] a bit in the second quarter." Moreover, Hau flatly contradicted Bisignano's April 23, 2024 representations that the conversion was "***completed, migrated***" and "***clos[ed]***," explaining that because Fiserv was "**converting that gateway for about a year**" and the Gateway Conversion "was ramping through the first quarter [2024]," "Q2 is when you have the full quarter impact of what was going on in Q1." Hau stated that "we expect that to subside going forward" in "Q3 and Q4."

327. On this news, Fiserv's stock price dropped by **16.2%**, a reduction of $30.73 per share, bringing the share price down to $159.13 at closing. Analysts were caught off guard. Goldman Sachs noted that "**the main driver of the decel[eration] in Clover was a gateway conversion in the prior year** that saw very significant churn subsequent to the conversion." Likewise, Autonomous Research noted, "[t]his was surprising given many (including us) had concluded at a sell-side dinner just this past Monday that the company was guiding to an acceleration in Clover GPV growth in 2Q vs. 1Q."

328. Notwithstanding his partial disclosure of the truth about the Gateway Conversion, Hau continued to mislead investors on May 15, 2025, trumpeting Clover's purportedly sustainable growth, stating that the headwind from the Gateway Conversion would "***subside going forward . . . Q3 and Q4.***" However, he purposely omitted the material fact that Clover's growth was driven by temporary fees and unwanted VAS that customers were rejecting in droves.

329. Analysts were encouraged by Defendants' reassurance. On May 15, 2025, Mizuho Securities said it would "stay positive" because "Clover revenue at +27% is still impressive despite only +8 volume growth amid growing VAS penetration." Yet analysts also remained unaware that Fiserv was still receiving temporary revenue boosts from forced Gateway Conversion, short-term drivers, and the unsustainable Argentina business. For example, on the same day, Bernstein Research said it "believe[d] 2025 revenue targets are achievable."

### L. On July 23, 2025, Defendants Disclosed Deteriorating Organic Revenue and GPV Growth, while Continuing to Mislead Investors about Fiserv's Outlook

330. On July 23, 2025, Defendants revealed more negative information in connection with Fiserv's Q2 2025 financial results. Specifically, Fiserv cut its full-year organic revenue growth outlook by approximately 10%, citing (i) longer-than-expected launches of new products and strategic initiatives, and (ii) economic conditions that differed from the assumptions embedded in the Company's plan. At the same time, as hyperinflation in Argentina began to subside, Merchant Solutions' organic revenue growth fell to 9%, significantly below analysts' expectations of 12%. Clover's GPV growth stayed flat at 8% due to "gateway [conversion] impact" with continued headwind "**dependent upon retention of the converted merchant base**."

331. On this news, Fiserv's stock price dropped by **13.9%**, a reduction of $22.98 per share, bringing the share price down to $143.00 at closing. Analysts were shocked by the Gateway Conversion's continued headwinds. For instance, Goldman Sachs reported: "[i]nvestor feedback on the revenue side is increasingly focused on the risk that **backbook conversion in the non-Clover SMB book has been supporting the Clover results much more than expected**."

332. Likewise, Truist Securities expressed that "**[t]his gateway conversion effectively overstated Clover's volume growth in 2024 while it is a headwind to growth currently**." Bernstein Research also pointed out that "[t]he **material negative impact from Argentina likely**

**contributed to the revenue & margin miss this quarter**." However, Fiserv had not revealed the full extent to which these (and other) temporary factors were driving its performance.

333. Notwithstanding these disclosures, also on July 23, 2025, Defendants continued to mislead investors, with Lyons touting that Fiserv "***refined [its] full year organic revenue growth guidance to approximately 10%***," while still failing to reveal that the guidance remained inflated by unsustainable revenue from Argentina and other short-term drivers. Lyons also claimed that "pipelines around the products that we're coming to market with are very strong, the clients want them." That day, J.P. Morgan Research echoed Defendants' optimism, citing "**the downgrade as a function of 'timing, not quality.'**"

334. Unbeknownst to investors, and as Defendants would soon reveal in late-October 2025, Lyons' statement was materially false and misleading because Defendants did not fully disclose the known impact of Fiserv's reliance on short-term revenue boosters, including the dramatic and adverse impact they had on the Company's outlook and annualized revenue.

335. By then, Gibbons was out of his management position. On August 25, 2025, Fiserv announced a leadership change, transitioning Gibbons away from the Financial Institutions Group to a Senior Advisor role to last until February 28, 2026. In March 2026, only one month after his Senior Advisor role ended, Gibbons stepped into a new role as Chief of Staff for Bisignano at the IRS (a position that Bisignano assumed while acting as Commissioner of the SSA).

### M. On October 29, 2025, Defendants Revealed Fiserv's Need to "Reset" Financially to Correct Its Heavy Reliance on Short-Term Revenue Drivers

336. On October 29, 2025, before the market opened, Defendants shocked investors by announcing Fiserv's need to take a wholesale financial "reset," together with restructuring management, replacing Hau, and transferring Fiserv's stock listing to the NASDAQ. Defendants

described these drastic measures as "a critical and necessary reset and a revitalizing moment for the company." In response, Fiserv's stock declined **44%** in one day.

337. As Lyons explained, the need to "reset" was "driven by a combination of four factors, including: [1] slowing cyclical growth in Argentina, [2] the recalibration of optimistic growth assumptions in the original guidance, [3] the impacts of certain deferred investments and [4] the deprioritization of short-term revenue and expense initiatives." Defendants' revelations reflected the contours of their fraudulent scheme.

338. First, Defendants acknowledged that **hyperinflation in Argentina drove organic revenue growth**. Specifically, Lyons disclosed that "Argentina contributed over 5 percentage points to our 12% organic growth rate in 2023 and roughly 10 percentage points to our 16% organic growth in 2024." In fact, Lyons admitted that Argentina's contribution to the Company's double-digit growth rate was just "**noise**," and Fiserv was, in truth, "a mid-single-digit growth company," in "both 2023 and 2024."

339. Second, Defendants acknowledged that Fiserv's previous guidance was based on unrealistic assumptions, "all of which would have been objectively difficult to achieve even with the right investment and strong execution." Lyons' statements regarding Fiserv's unrealistic and objectively unattainable guidance confirmed that management misled the market about Fiserv's financial and operational conditions and prospects throughout the Class Period.

340. Third, Defendants admitted that "**Fiserv's recent results have increasingly relied on short-term initiatives**." As Lyons explained, these short-term initiatives caused Fiserv to "place too much emphasis on pursuing in-quarter results as opposed to building long-term [client] relationships" by prioritizing recurring revenue that would benefit the Company in the long term.

This required Fiserv to change course, "deprioritize" short-term initiatives, and implement "**the elimination of certain fees in Q4 that were initiated a year ago**."

341. Fourth, Defendants admitted that the Company failed to invest in key initiatives and instead "defer[red] certain investments and cut certain costs," which "**improved margins in the short-term, but are now limiting our ability to serve clients . . . and grow revenue**." As Lyons conceded, Fiserv essentially abdicated its responsibility to customers by elevating short-term gain above those clients' interests, which ultimately created an unsustainable business that exploited clients to boost short-term revenue. As he admitted, "we found that our challenges **are largely driven by our own doing** . . . ."

342. Additionally, Lyons recognized the need for Fiserv to increase its transparency with investors and analysts. Acknowledging that "**we need to change the way we forecast and communicate about our business and engage with the analysts and investors**," Lyons said that moving forward, Fiserv's publicly disclosed results, guidance, and outlook would reflect "current conditions in Argentina, the recalibration of assumptions embedded in our original guidance, all necessary investments and the deprioritization of short-term initiatives." In other words, none of these factors had been truthfully communicated to investors during the Class Period.

343. The financial reset came with a shakeup in Fiserv's senior leadership. Specifically, Hau transitioned from CFO to senior advisor and Kevin Warren stepped down as Chair of the Audit Committee, due to Lyons's purported "**dissatisfaction with the way we do the process**."

344. On this final revelation, Fiserv's stock price dropped by **44%**, a reduction of $55.57 per share, bringing the share price down to $70.60 at closing. As investors continued to digest Defendants' shocking revelation about the Company's abysmal financial conditions, on October 30, 2025, Fiserv's stock price continued to decline 7.66% and closed at $65.19 per share.

345. Analysts issued sharply worded reports in response. For example, in a report titled "**Holy Reset**," Raymond James remarked that "while a cut to the 2025 organic growth outlook was largely expected, **the magnitude was significantly greater than even some of the most bearish expectations**." Likewise, Bernstein Research deemed its downgrade of Fiserv on October 30, 2025 "[t]he **most painful ratings change we have had to do in our career**," noting it "**lost confidence into the company's visibility into its financial metrics**."

346. Understandably, analysts faulted Fiserv leadership for concealing the Company's reliance on short-term initiatives. For example, Stephens characterized the October 29, 2025 revelations as "Peeling Off the Band-Aid, Exposing a Deeper Wound," remarking that the "reset reflects a prior emphasis on short-term revenue and a re-evaluation of culture and operations, which were deemed unsatisfactory by new mgmt for the long-term viability of the business." Stephens described Fiserv's short-term initiatives as "so **vast and embedded throughout the whole company**, it was difficult for management to pinpoint any specific project." As a result, the "**ST** [short-term] **initiatives were inflating the true underlying core growth of both business lines and have become unsustainable**."

347. J.P. Morgan Research cited specific examples of "short-term levers used to make quarters" at Fiserv, including "punitive fees, contract monetization, portfolio/channel re-balancing (e.g. gateway conversion), episodic sales (hardware, licenses), channel stuffing, etc., which in isolation are fine but become problematic when regularly leveraged and necessary to make numbers." Similarly, on November 2, 2025, Citi concluded that "short term initiatives on the Clover front exaggerated both revenue growth (hardware and data sales) as well as volume growth (gateway conversion in 2024)." As these examples demonstrate, analysts struggled to reconcile

Defendants' end-of-Class Period disclosures with the rosy picture painted—of sustainable revenue and growth—at the beginning of and throughout the Class Period.

348. Analysts were also baffled by Financial Solutions' growth shortfall. Bernstein Research highlighted Fiserv's "abrupt" miss by "a steep 9%" in its Financial Solutions segment as the "most shocking aspect of the quarter." Trying to understand Defendants' messaging, Bernstein noted "surprise[] by how these changes happened so suddenly (and 1 month into the quarter)."

349. Autonomous Research noted that Fiserv's "competitive positioning in Financial Solutions leaves something to be desired after **admitting to overcharging its clients**." And BTIG stated that Fiserv "**has lost its prestigious 'high quality' label**, as its 39-year streak of double-digit EPS growth been abruptly upended."

350. On the October 29, 2025 earnings call, Lyons also announced the launch of the "One Fiserv" plan, noting "[w]e are pursuing these opportunities and other performance-enhancing initiatives under **a new action plan called One Fiserv**." The plan purportedly encompassed five pillars, notably including "operating with a client-first mindset" and "employing disciplined capital allocation for the long-term," which serve as further corrective action by the Company in the wake of Defendants' fraudulent scheme.

351. All told, Defendants' fraudulent scheme and misstatements eliminated **73%** of Fiserv's shareholder value and roughly **$92 billion** in market capitalization during the Class Period.

## V. POST-CLASS PERIOD EVENTS

352. Following the Class Period, Defendants released additional information revealing stunning performance declines in the Merchant Solutions and Financial Solutions segments as new developments and scrutiny emerged that exposed the harm resulting from the Class Period scheme. This information shed light on the causes identified in Defendants' October 29, 2025 disclosure.

353. Critically, for example, Defendants' disclosures raised increased scrutiny from the U.S. government, which expressed concern with the timing and magnitude of Fiserv's financial "reset" and the suspiciously timed insider benefits that flowed to Bisignano while the Company's precarious financial and operational condition was concealed from the investing public. According to its 2025 Form 10-K, in November 2025, Fiserv began responding to requests for information from SEC's Enforcement Division and the U.S. Attorney's Office for the Southern District of New York regarding investigations into the Company's 2025 earnings guidance.

354. On November 12, 2025, at the KBW Fintech Payments Conference, Lyons all but admitted that Defendants deceptively reported organic growth during the Class Period by including the outsized impact of hyperinflation in Argentina, which undermined the metric's reliability:

> I think the clearest way to talk about it or think about it is **the biggest factor in changing from organic growth of double digits** the last couple of years back to more traditional areas of organic growth for Fiserv **was Argentina**.
>
> * * *
>
> It's simply in **how that business got reported in organic growth versus adjusted growth. And adjusted growth took a lot of that noise out**. **Organic growth, which the guidance was off of, obviously, brought in the full influence of that.**

355. The timing and magnitude of Fiserv's financial reset was so severe that it spurred Congressional investigations. On November 6, 2025, Senators Ron Wyden and Elizabeth Warren jointly issued a letter to Lyons demanding information surrounding "the details of [Bisignano's] financial projections for Fiserv's performance, which [Lyons] indicated in an investor call 'would have been objectively difficult to achieve even with the right investment and strong execution.'"

356. Senators Wyden and Warren also raised questions with Fiserv's announcements on the October 29, 2025 earnings call, inquiring about whether Fiserv's comprehensive review had revealed the reason behind "Fiserv issu[ing] such misleading guidance" on July 23, 2025.

357. Similarly, on November 14, 2025, in a joint letter addressed to the Chairman of the SEC, Paul Atkins, senators called for an SEC investigation into "the circumstances surrounding the financial reporting of Fiserv, Inc., during the tenure of its former CEO, Frank Bisignano, and the timing of his required stock divestiture." The letter continues:

> The dramatic fall in Fiserv's stock price following the withdrawal of guidance set during Mr. Bisignano's tenure fuels concerns about his management and whether he misled investors and the public, **warranting an investigation into whether the company's prior financial disclosures met the rigorous, truthful, and complete standards required by the SEC, ensuring fairness to all investors**.

358. The letter also pointed out that the timing of Bisignano's "**multimillion-dollar tax-advantaged stock divesture prior to the stock decline**"—which saved him approximately $354 million—"**should invite scrutiny about whether he knew about Fiserv's impending stock crash**" when unloading his interests in the Company (while in possession of material nonpublic information).

359. While Defendant Bisignano was spared from the massive stock drop, investors were unfortunately left holding the bag. Renaissance Investment Management noted in its Q4 2025 investor letter that Fiserv "was the largest detractor from our performance," explaining that "the new management team disclosed that potential revenue recognition irregularities had been masking the true growth of the company, implying that the underlying growth was much lower."

360. On February 10, 2026, Fiserv released its results for Q4 and full year 2025. Fiserv reported quarterly organic revenue growth of **0%** for the whole Company, and lowered Clover revenue guidance from the mid double-digits to the low double-digits for 2026. In response, on the same day, Jefferies Research explained that the lowered Clover revenue guidance was "tied to lowered assumption for anticipation revenue in Argentina due to the moderation in inflation and lower int. [interest] rates." In other words, these disclosures further confirmed that hyperinflation in Argentina was also propping up Clover revenue to an unsustainable level on a temporary basis.

361. Then, on May 14, 2026, during Fiserv's Investor Day, Defendants acknowledged that their prior misconduct caused Financial Solutions' unexpected collapse. In a report on the same day, RBC Capital Markets bluntly underscored this point, noting that "the CEO [Lyons] . . . fully acknowledge[d] [that] prior '**bad behavior**' resulted in annual Core revenue attrition as a % of Financial Solutions of ~1.5% between FY23-FY25."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[27]

362. As alleged herein, in addition to engaging in a deceptive scheme and course of business conduct, Defendants made numerous materially false and misleading public statements and omissions throughout the Class Period, including in investor earnings calls, press releases, and SEC filings. Those materially false and misleading statements and omissions concerned Fiserv's growth, including, for example, the purported strength, stability, and sources of success related to: (i) Fiserv's flagship product in its Merchant Solutions segment, Clover; (ii) its double-digit organic revenue growth; and (iii) the Financial Solutions segment.

363. As alleged herein, these statements artificially inflated or maintained the price of Fiserv common stock and operated as a fraud or deceit on all persons or entities that purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, and thereby put those subjects in play, Defendants had a duty to fully, completely, and truthfully disclose all material facts and information necessary to provide an accurate portrayal of those issues. As described below, Defendants created an impression of a state of affairs at Fiserv that differed in a material way from the one that actually existed. To the

[27] Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly or recklessly materially false and misleading, affirmatively or by omission. As alleged herein, such statements artificially inflated or maintained the price of Fiserv's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

extent any of Defendants' statements could reasonably be construed as expressions of opinion, they were false and misleading because they lacked a reasonable basis and Defendants knew that Fiserv's growth occurred via short-term initiatives that were unsustainable in nature.

### A. February 6, 2024 – Q4 2023 and Full-Year Financial Results

364. The Class Period begins on February 6, 2024. That day, Fiserv issued a press release reporting its Q4 and full year 2023 results, announcing that "[*o*]***rganic revenue growth was 12% in the fourth quarter of 2023***," and "***12% for the full year 2023***."

365. During Fiserv's earnings call on the same date, Bisignano continued to tout Fiserv's organic revenue growth, describing it as a driver of the Company's outlook, stating "[f]or 2023, we started with organic revenue growth guidance of 7% to 9% ***and delivered 12%***." Hau later emphasized this point, stating that: "[f]or the full year, ***total company organic revenue also grew 12%*** ahead of the guidance we provided in October and November. This performance was led by the Merchant Acceptance segment ***which grew 19%***." Hau added that the Merchant Acceptance number "***includes an 8-point benefit to the full-year organic growth from the transitory revenue*** driven by above average interest and inflation in Argentina."

366. Defendants' statements touting Fiserv's organic revenue growth were materially false and misleading because they concealed the extent to which Argentina's hyperinflationary environment was driving organic revenue growth. Indeed, the **majority** of the reported organic revenue growth was driven by Defendants' exploitation of Argentinian hyperinflation. As Defendants revealed at the end of the Class Period, without the undisclosed boost from Argentina, Fiserv's organic revenue growth in 2023 was in the single digits (6%). Fiserv's failure to disclose Argentina's full contribution to organic revenue growth thus rendered Defendants' statements materially false and misleading.

367. As explained in Section IV.F, *supra*, because hyperinflation is **inherently unsustainable** and cannot last, any growth that hyperinflation drives is also unsustainable. Yet, **most** of Fiserv's reported organic revenue growth in 2023 and 2024 came from Argentina, as detailed in a chart released by Fiserv in connection with its October 29, 2025 disclosures and reproduced in ¶234. Specifically, in 2023, half of Fiserv's 12% organic revenue growth came from Argentina, and in 2024, roughly **two-thirds** came from Argentina. Moreover, Argentina's contribution was not true growth, as Lyons admitted at the end of the Class Period when he revealed that **all** of Argentina's contribution was "noise," and that Fiserv needed to "clarif[y] our growth numbers" to allow investors to better understand Argentina's impact.

368. Hau's statements in ¶365 were also materially false and misleading because he claimed that only 8% of Merchant Solutions' organic revenue growth was from "transitory revenue" in Argentina, which conveyed that organic revenue growth was 11% if such "transitory revenue" from Argentina was excluded. In truth, if Fiserv had excluded Argentina's transient hyperinflationary environment, Fiserv's organic growth rate in Merchant Solutions had been and would continue to be in the single digits. *See* Section IV.F. To make statements about organic growth not misleading, Defendants were required to disclose the full magnitude of Argentina's contributions to Fiserv's organic growth rate, as opposed to arbitrary "transient benefits," which did not accurately reflect the degree to which Argentina was, in fact, driving Fiserv's growth rate.

369. Indeed, as set forth in Section IV.F.4, *supra*, CW accounts corroborate the fact that Defendants privately saw Argentina's hyperinflationary environment during the Class Period as a fleeting opportunity to boost revenue—prompting Defendants to push products designed to exploit those temporary conditions for short-term gains.

370. CW-1 noted that the Financial Institutions Group CFO explained to her that Hau projected that hyperinflation in Argentina could double Clover revenue in LATAM and drive a 40% uptick in Clover earnings in LATAM. CW-1 added that the Financial Institutions Group CFO stated that Hau believed that the hyperinflation in Argentina provided a great opportunity for Fiserv to enter the LATAM market and that it would lead to ongoing and continued revenue for the Company.

371. Moreover, CW-4 explained that, because of inflation, within Argentina, there appeared to be a lot of growth, but it was not real growth. CW-4 elaborated that Fiserv had created a product offering that exploited Argentina's high inflation; if inflation dropped, the revenue dropped. She described it as a factoring product which offered short-term loans or capital to merchants and recalled that the name of the product is Anticipation. She reiterated that Fiserv exploited the opportunity created by high inflation.

372. Also, during Fiserv's February 6, 2024 earnings call, Defendants misrepresented the source of Clover's growth. Hau claimed that Clover's revenue growth was outpacing GPV growth due to sales and mix, asserting "***[f]or the full year, Clover revenue was up 25%. The spread between revenue and volume growth comes from higher penetration of value-added solutions, channel mix shift and some pricing***."

373. Hau's statements in ¶372 were materially false and misleading because they misrepresented the nature and extent of Clover's revenue drivers. In particular, Hau's statements omitted critical information regarding the fact that Fiserv was growing Clover's revenue through a battery of short-term, deceptive cash grabs—including hidden charges, mandated fees, and the forced Gateway Conversion. By failing to disclose the Company's reliance on these tactics and the extent to which they were driving Clover's purported success, Hau's statement that Clover's

growth was due to Fiserv's "***higher penetration of value-added solutions***," or "***channel mix shift***" created a misleading impression of the sources underpinning Clover's revenue. In truth, Fiserv was achieving this "***higher penetration***" of VAS through undisclosed, short-term initiatives that were alienating and driving away customers.

374. Indeed, CW accounts confirm that during the Class Period, Defendants used the forced Gateway Conversion to temporarily and unsustainably boost Clover revenue. *See* Sections IV.E.2-3, *supra*.

375. For example, CW-6 described a deliberate corporate strategy in which existing Payeezy customers were reclassified as "new" Clover clients, creating the false appearance of organic growth. Additionally, CW-6 recalled that the sales managers initially instructed salespeople to convert Payeezy customers to Clover during monthly sales calls in 2024. CW-6 elaborated that, during the same time period as the conversions, the sales staff were forced to put software programs for Clover Online on every single account that they signed.

376. Similarly, CW accounts confirm that after these customers were forced to use Clover, Defendants imposed fee increases and hidden charges on them—for services that they did not need or want—which resulted in severe client attrition. *See* Sections IV.D-E, *supra*.

377. For example, CW-7 stated that she was responsible for determining Net Promoter Scores (NPS) during her tenure. CW-7 explained that NPS is a market research metric that is determined by asking for and receiving feedback from departed customers. CW-7 detailed that in 2024 and 2025, she received feedback from customers that they left Fiserv due to increased fees and additional unannounced charges. CW-7 noted that she reported NPS and customer attrition in leadership meetings in 2024 and 2025 and that this information made its way to the C-Suite.

378. Moreover, CW-3 detailed that Fiserv maintained a list of between 50,000 and 80,000 Clover and CardConnect accounts that were being charged excessive fees, which was referred to internally as the "Magic List." Additionally, CW-3 noted that she and members of her team referred to this list as the "Price Gouging List." CW-3 explained that when Fiserv needed to generate revenue in order to hit certain targets, she was instructed to increase fees for the accounts on the Magic List in order to generate the required revenue.

379. Furthermore, Hau's statements in ¶372 were materially false and misleading because he omitted that unsustainable hyperinflation in Argentina was also driving Clover's revenue growth. Specifically, hyperinflation resulted in higher sales for Fiserv's Anticipation business, which was a major source of Clover's organic revenue growth. However, this revenue growth was inherently temporary: once hyperinflation ceased, so would Clover's increased organic revenue from Anticipation.

380. Indeed, Defendants admitted in an earnings callback after the Class Period on February 10, 2026 that Clover's revenue outlook was lowered because decreased inflation in Argentina had cut Anticipation revenue. ¶360. This disclosure confirmed that hyperinflation in Argentina had propped up Anticipation revenue—and, in turn, Clover revenue—to an unsustainable level. *See* Sections IV.D-F, *supra*.

**B. <u>April 23, 2024 – Q1 2024 Financial Results</u>**

381. On April 23, 2024, Fiserv issued a press release announcing its Q1 2024 results, reporting ***"[o]rganic revenue growth was 20% in the first quarter of 2024, led by 36% growth in the Merchant Solutions segment*** and 5% growth in the Financial Solutions segment." On an earnings call held that same day, Bisignano boasted of Fiserv's supposed massive organic revenue boosts, claiming "***[w]e had organic revenue growth of 20% in the first quarter***." On that same

call, Hau claimed that the Company had observed "***particular ongoing strength in Merchant Solutions organic revenue, which was up 36%***."

382. Defendants' statements in ¶¶381 were materially false and misleading for the same reasons set forth in ¶¶366-371. Specifically, Defendants misled investors by touting the Company's organic revenue growth while concealing that most of that growth came from an unsustainable hyperinflationary environment in Argentina. Without the undisclosed temporary contributions from Fiserv's Argentina business, which was inflated by currency fluctuations and the hyperinflation-fueled Anticipation business, the Company's true organic growth rate for Merchant Solutions and the entire Company was in the single digits. *See* Section IV.F, *supra*.

383. In an accompanying April 23, 2024 investor presentation, Fiserv also highlighted "***30% Clover revenue growth***, with VAS penetration of 20%" and "***$274 billion Clover annualized GPV, up 19%***." Similarly, on Fiserv's earnings call, Hau stated that "***Clover revenue grew 30% in the first quarter and annualized payment volume growth of 19%. The spread between revenue and volume growth reflects a higher penetration of value-added solutions, continued channel mix shift, and some pricing***."

384. Defendants' statements in ¶383 concerning Clover's GPV growth, Clover's revenue growth, and Clover's "spread" were materially false and misleading for several reasons.

385. First, Fiserv's reported GPV for Clover failed to disclose that those figures were artificially inflated by temporary volume bursts due to the forced Gateway Conversion. Because of this, the increased payment volumes from those converted merchant customers did not reflect "true" growth. Specifically, these were not "new" customers that had chosen Clover, and Fiserv's forcibly converted merchant customers were likely to "churn" or take their business away from

Fiserv because Fiserv was inundating them with fees for products and services that they did not want or need.

386. Therefore, rather than 19%, an accurate GPV growth figure that excluded the Gateway Conversion would actually be 16-17%. *See* ¶186 (chart reflecting GPV growth excluding Gateway Conversion). The misleading nature of Defendants' statements is also clear from Fiserv's tacit admission (by later excluding the Gateway Conversion from Fiserv's GPV growth to provide a more accurate picture) that the Gateway Conversion had artificially inflated growth numbers during the Class Period.

387. CW accounts confirm that the forced Gateway Conversion was the subject of severe customer backlash, as it allowed Fiserv to pile on adhesive fees and unwanted services, which ultimately drove merchant customers away from Fiserv altogether. *See* Sections IV.D-E, *supra*.

388. For example, CW-6 said that because Fiserv had touted Clover to Wall Street, the sales force was basically told that they could no longer offer Payeezy and that every existing customer would be forced to migrate over to Clover. CW-6 explained that Fiserv's upper management rammed it down everyone's throat because nobody was choosing it. CW-6 explained that customers were locked into a monthly fee after they were converted from Payeezy to Clover. CW-6 said that Clover's growth was simply because the customers had no choice.

389. Second, Defendants' statements touting Clover's revenue numbers were materially false and misleading because Defendants omitted that Clover revenue was inflated by temporary cash grabs (including hidden charges, mandated fees, and a forced Gateway Conversion) and that unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

390. Third, attributing Clover's "spread"—or the extent to which revenue was outpacing GPV growth—to growth in VAS was materially false and misleading. In truth, Fiserv was growing Clover's revenue through a battery of short-term, undisclosed temporary initiatives (including hidden charges, mandated fees, and the forced Gateway Conversion) and the extent of Defendants' reliance on this was undisclosed and exploited to create and maintain the appearance of solid, sustained growth. *See* ¶¶369-376, *supra*.

391. During Fiserv's April 23, 2024 earnings call for Q1 2024, an analyst from Mizuho asked for "context on the conversion to Clover about roughly timing and contribution and are there any other conversions that we should be expecting." Bisignano represented that the conversion was "completed, migrated," stating in full:

> The way we think about PayEezy, it was a processing system that we retired and then built out both Commerce Hub and brought some of that volume, which already existed through Clover to the future new merchants. ***That's completed, migrated***. A multiyear project that we built out in a way that allowed us to build out Commerce Hub, that allowed us to deliver VAS into Commerce Hub, and also have PayEezy operating within our SMB base. ***So, we feel great about closing the books on that from a conversion standpoint***.

392. Bisignano's statements in ¶391 were materially false and misleading for the same reasons as set forth in Sections IV.E.2-3, *supra*. Specifically, Bisignano's statements characterizing the Gateway Conversion as "***completed***" and "***migrated***," and that Fiserv was "***closing the books on that from a conversion standpoint***," together misleadingly induced investors to believe that any boost in volume from the conversion had already occurred and remaining growth would entirely reflect volume from new customers. In truth, as Defendants admitted at the end of the Class Period, Fiserv had used the Gateway Conversion to boost GPV through at least the end of 2024. *See* Sections IV.E.2-3, *supra*; ¶¶302-303.

393. Indeed, Hau admitted in May 2025 that Fiserv had continued to "**convert[] that gateway for about a year**" as of Q1 2025, and increased volumes from the Gateway Conversion

had occurred at least through Q3 2024—well after Bisignano had claimed the Gateway Conversion was "***completed***."

394. Additionally, CW accounts support that the Gateway Conversion was not "***completed***" by April 2024, as it dragged on for up to two years in some cases due to customer resistance and technical problems. *See* Sections IV.D-E, *supra*. For example, CW-4 noted that the conversion process dragged on for a long time and a lot of customers were dissatisfied with the process. She explained that the migration to Clover took a long time, from eighteen months to two years—during which some merchants were successfully converted while others took longer—because some customers resisted the conversion and others had technical difficulties.

395. The Gateway Conversion started in late 2023. So, if conversions were continuing for two years, that meant that conversions were still occurring well after April 2024—consistent with Hau's May 2025 concessions, Lyons' October 2025 admissions, and the CW accounts.

**C. <u>July 24, 2024 – Q2 2024 Financial Results</u>**

396. On July 24, 2024, Fiserv announced financial results for Q2 2024, claiming in the accompanying press release it had achieved "***[o]rganic revenue growth of 18% in the quarter and 19% year to date***." The same day, Fiserv hosted an earnings call in which Hau discussed the Company's organic revenue growth and the contributions from Argentina, stating:

> ***[Total Company] Organic revenue grew 18% in the quarter with strength in both segments. The transitory contribution from Argentina was 5 points to our total organic growth in the quarter,*** down from 7 points in Q1. In the first six months of the year, organic revenue grew 19%. . . . Turning to performance by segment, starting on Slide 5***, organic revenue growth in the Merchant Solutions segment was 28% in the quarter and 32% year to date. For the quarter, this includes a 10 point benefit from above average interest and inflation in Argentina. Without this transitory benefit, organic growth would have been 18%.***

397. Defendants' statements in ¶¶396 were materially false and misleading for the same reasons set forth in ¶¶366-371. Indeed, touting the Company's organic revenue growth in the prior

quarter without disclosing that the vast majority of that revenue came from an inherently unsustainable hyperinflationary environment in Argentina was misleading. Moreover, Defendants omitted that by excluding temporary contributions from the Argentina business, the Company's true organic growth rate for both Merchant Solutions and the entire Company was in the single digits. *See* Section IV.F, *supra*.

398. Hau's statement in ¶396 was also materially false and misleading because he claimed that if "***transitory factors***" from Argentina were excluded, the Company's organic revenue was still in the high-teens. In truth, as Lyons explained at the end of the Class Period, a "sustainable" organic revenue growth rate was the same level the Company had actually achieved for the last several years independent of "noise" from Argentina—mid-single digits. *See* Section IV.F, *supra*.

399. Hau then informed investors that "***Clover revenue grew 28% in the second quarter on an annualized payment volume growth of 17%. The spread between revenue and volume growth continues to reflect a higher penetration of value-added solutions, continued channel mix shift, and value-based pricing***."

400. Hau's statements in ¶399 were materially false and misleading concerning the GPV, or payment volume growth, because growth was artificially inflated by including payment volumes from merchants who Defendants had forcibly migrated to Clover in the Gateway Conversion. *See* ¶¶384-388. In truth, a normalized GPV growth rate that excluded the one-time Gateway Conversion effect was actually 13-14%. *See* ¶186.

401. Hau's statements concerning Clover's revenue growth and the reasons driving the "spread" were also false and misleading for the same reasons described in ¶¶373-380. Specifically, Hau omitted that: (i) Clover revenue was inflated by temporary cash grabs, including hidden

charges, mandated fees, and a forced Gateway Conversion; and (ii) unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

402. Similarly, Hau's statement attributing the "spread," or the extent to which revenue was outpacing GPV growth, to "value-based pricing" and a "higher penetration of value-added services," was materially false and misleading because it omitted the true, unsustainable cause of the revenue growth: adhesive, unwanted, and in many cases, unknown, fees. *See* ¶¶373-380, *supra*.

403. During the same earnings call, Hau also discussed what Fiserv needed to do to achieve the projected total Company organic growth, noting:

> Our previous expectation for the full year was that that would provide a 14 point benefit to Merchant Solutions, now a 9 point benefit. ***And yet, we're maintaining our full year outlook, and that's the strength of things like Clover selling very well***, ***value-added solutions both in our Small Business and in our Enterprise business***. CommerceHub continues to see good uptake from our large enterprise clients.

404. Hau's statement in ¶403 was materially false and misleading because it misled investors into believing Hau observed then-existing facts supporting Fiserv's outlook, including "***the strength of things like Clover selling very well***" and "***value-added solutions***." In truth, Merchant Solutions' massive 30%+ organic revenue growth came almost entirely from hyperinflation in Argentina—and even excluding Argentina, Fiserv's revenue growth was propped up by rampant, undisclosed, and unsustainable short-term initiatives. *See* Section IV.F, *supra*.

405. On that same call, Defendant Bisignano falsely claimed that Financial Solutions was observing client growth and high client demand. In response to an analyst's question about Financial Solutions, Bisignano touted Fiserv's existing demand and customer success, claiming:

> ***We see large demand for our services out of the financial institutions. And that's beyond this merchant and CFC capability, which both have tremendous OI demand. It goes to XD, which is winning in the marketplace.*** You heard us talk about ***our Finxact wins***. ***Our clients are growing, and you can look at things that***

> ***we've done on Finxact with, one, which has been a tremendous opportunity***. I do think – and you could point to recent surveys published – that we've differentiated ourselves in the service area from where we might have been a couple years ago with the delivery of a commitment tracker which allows us and our clients to have 100% synchronization on our commitments and our delivery rate. I think those have really, really distinguished ourselves. ***Our relationship management model is making a difference and will continue. Demand is strong.*** So, I think it's all those variables that gives us confidence about our ability to be the grower that we talked about to you back on I-Day.

406. Bisignano's statements in ¶405 were materially false and misleading for several reasons. First, he touted Fiserv's "***large demand***" from financial institutions and said that "***demand is strong***," when in fact demand was demonstrably plummeting in 2023 and 2024 as Fiserv's financial institutions clients became increasingly dissatisfied with Fiserv's products, technology, and service as a result of severe cost-cutting. Similarly, it was false and misleading for Bisignano to claim that financial institutional clients were "***growing***" when in fact Fiserv was losing financial institutional clients, not gaining them—as shown by the Financial Solutions segment fielding contract discounts and threats of non-renewals. *See* Section IV.G, *supra*.

407. Second, Bisignano's statements attributing Fiserv's purported success and high demand to its "***relationship management model***" with clients were false and misleading because Defendants' extreme cost-cutting led to a lack of technology modernization, delayed product rollout, and increased client dissatisfaction and the dissolution of client relationships. In reality, demand was plummeting and customers were leaving in droves. *See* Section IV.G, *supra*.

408. Indeed, CW accounts detail that by early 2024, there was a mass exodus of clients from Fiserv, combined with increasing trends of steeply discounted contract renewal rates in response to Fiserv's excessive pricing, poor technology, and dismal customer service. *See* Section IV.G, *supra*.

409. For example, CW-2 stated that the Company's Financial Solutions segment began to diminish in 2023 and 2024. CW-2 detailed the following events that diminished the financial

solutions segment: (i) Fiserv defunded its Financial Solutions, which caused its products to be less competitive; (ii) Financial Solutions laid off experienced and knowledgeable employees to cut costs; (iii) and Fiserv's bank and credit union clients hired consultants to drive their renewal contract prices down. According to CW-2, Fiserv also attempted to backfill that lost revenue with short-term product sales.

410. According to CW-2**,** the loss of clients beginning in 2024 led to a decline in issuing and licensing revenue. CW-2 explained that the loss of licensing revenue was more impactful than the loss of issuing revenue. CW-2 added that licensing revenue was worth millions of dollars to Fiserv.

411. Likewise, CW-5 recalled that in approximately 2021, core processing customers began leaving Fiserv or threatened to leave Fiserv. CW-5 noted that this trend got worse and peaked in 2023, 2024 and 2025.

412. Moreover, CW-1 detailed that in 2024, Fiserv lost approximately 100 of its 2,500 Financial Institutions Group customers to competitors.

413. Bisignano's statements were also false and misleading because they touted the success of specific Financial Solutions products, such as "***XD . . . winning in the marketplace***" and "***Finxact wins***" and "***tremendous opportunit[ies]***," when both products' deficiencies were widely known within the organization's leadership and the subject of client dissatisfaction. *See* Section IV.G, *supra*.

414. For example, CW-2 stated that the launch of XD was very delayed and the bank customers subsequently became more disgruntled about XD. CW-2 noted that Fiserv's C-Suite was aware that there was a huge deficiency in XD. CW-2 noted that there were a lot of meetings related to XD because it was one of Fiserv's biggest deficiencies in the marketplace. Additionally,

CW-2 noted that XD generated a very limited amount of revenue for Fiserv in 2023 and 2024 and customers had to go live with Fiserv's outdated digital platform instead.

415. Likewise, according to CW-2, Finxact, a platform acquired by Fiserv for $650 million, was supposed to be the be-all and end-all platform for specialty banks. However, CW-2 explained that Finxact was not ready for broad distribution and did not generate a lot of revenue for Fiserv during her tenure, which concluded in October 2024.

### D. October 22, 2024 – Q3 2024 Financial Results

416. On October 22, 2024, Fiserv issued a press release announcing its results for Q3 2024, reporting "***[o]rganic revenue growth of 15% in the quarter and 17% year to date***." In the earnings call later that day, Hau highlighted that

> ***Organic revenue grew 15% in the quarter, driven by strength in both segments. The transitory contribution from excess inflation in Argentina was 3 points to our total organic growth in the quarter***, down from 5 points in Q2. . . . ***Organic revenue growth in the Merchant Solutions segment was 24% in the quarter and 29% year-to-date***. ***This includes a 6-point benefit from above-average inflation in Argentina in the quarter and a 10-point benefit year-to-date***.

417. Defendants' statements in ¶416 were materially false and misleading for the same reasons set forth in ¶¶366-371: Defendants touted organic revenue growth without disclosing that the vast majority of that revenue came from an inherently unsustainable hyperinflationary environment in Argentina. By excluding temporary contributions from Fiserv's Argentina business, the Company's true organic growth rate was in the single digits. *See* Section IV.F, *supra*.

418. Hau also discussed Clover's growth on that call, stating: "***Clover revenue grew 28% in the third quarter on an annualized payment volume growth of 15%*** . . . [W]e remain on track to achieve our 2026 Clover targets of $4.5 billion in revenue and VAS penetration of 27%."

419. Hau's statements in ¶418 touting a volume growth rate of 15% were materially false and misleading for the same reasons described in ¶¶384-388. Specifically, Fiserv's GPV number

was artificially inflated because it included merchants that were forcibly migrated because of the Gateway Conversion. In truth, a normalized GPV growth that excluded the one-time Gateway Conversion effect was 11-12%. ¶186.

420. Furthermore, Hau's statement touting Clover's revenue growth was materially false and misleading for the same reasons described in ¶¶373-380. Specifically, Defendants failed to disclose that Clover revenue was inflated by temporary cash grabs, including hidden charges, mandated fees, and a forced Gateway Conversion; and that unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

421. In the question-and-answer portion of the Q3 2024 call, an analyst from Robert W. Baird & Co. asked Hau about Merchant Business growth rates potentially slowing, questioning "what's happening outside of Clover? And then . . . should we expect that to reaccelerate going forward?" Rather than disclose the full extent to which Argentina drove growth, Hau minimized it, stating:

> ***Obviously, Argentina tailwind has eased quite meaningfully since last year, beginning of this year even where we saw in first quarter, 15% benefit to the Merchant segment, easing down in second quarter to 10%, now down to 6%.*** And that impacts both – actually all three of our segments, but certainly a good portion of, SMB revenue.

422. Hau's statement in ¶421 was materially false and misleading because he claimed the "***Argentina tailwind***," or the amount that Argentina benefitted Merchant Solutions, was between 6%-15% in Q1-Q3 2024. In truth, Argentina had contributed an average of 19% growth to Merchant Solutions in 2024—far greater than what Hau disclosed. *See* ¶¶235-236, *supra*.

**E. <u>February 5, 2025 – Q4 2024 and Full Year Financial Results</u>**

423. On February 5, 2025, Fiserv issued a press release announcing its results for Q4 and full year 2024. In the release, Fiserv touted "***[o]rganic revenue growth of 13% in the quarter***

***and 16% for the full year***"—a representation that Fiserv also made in an investor presentation that same day.

424. On an earnings call that same day, Bisignano similarly addressed Fiserv's organic revenue growth and financial health:

> ***Total company organic revenue growth was 16% [in 2024] . . . . If we exclude transitory factors from Argentina, total company organic revenue growth in 2024 was 11%, a healthy and sustainable level.***

425. Defendants' statements in ¶¶423-424 were materially false and misleading for the same reasons set forth in ¶¶366-371; specifically, it was materially false and misleading to tout the Company's organic revenue growth without disclosing that the vast majority of that revenue came from an inherently unsustainable hyperinflationary environment in Argentina. Furthermore, Defendants omitted that by excluding temporary contributions from Fiserv's Argentina business, the Company's true organic growth rate was in the single digits. *See* Section IV.F, *supra*.

426. Bisignano's statement in ¶424 was further materially false and misleading because he claimed that if "***transitory factors***" from Argentina were excluded, the Company's organic revenue was "***11%, a healthy and sustainable level***." In truth, as Lyons explained at the end of the Class Period, a "sustainable" organic revenue growth rate was the same level the Company had actually achieved for the last several years independent of "noise" from Argentina—mid-single digits. *See* Section IV.F, *supra*. It was further misleading to claim Fiserv's organic revenue growth was "healthy" and "sustainable" when it was in truth propped up by rampant, undisclosed, and unsustainable short-term initiatives. *See* Sections IV.C-D, *supra*.

427. On that same call, Hau claimed Clover was experiencing sustained financial success, stating "***Clover revenue grew 29% in both the quarter and full year on Q4 annualized payment volume growth of 14%. This spread reflects growth in value-added solutions, some targeted value-based pricing actions and strong hardware sales.***"

428. Hau's statements in ¶427 were materially false and misleading concerning the GPV, or payment volume growth. Specifically, the payment volume growth number was artificially inflated because it included merchants who had been forcibly migrated because of the Gateway Conversion. *See* ¶¶384-388. In truth, a normalized GPV growth rate that excluded the one-time Gateway Conversion effect was actually 11-12%. *See* ¶186.

429. Hau's statements concerning Clover's revenue growth were false and misleading for the same reasons described in ¶¶373-380. Specifically, Hau omitted that Clover revenue was inflated by temporary cash grabs, including hidden charges, mandated fees, and a forced Gateway Conversion; and that unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

430. Similarly, Hau's statement attributing the "spread," or the extent to which revenue was outpacing GPV growth, to "***value-based pricing***" and "***strong hardware sales***," was materially false and misleading in the absence of disclosure of the true, unsustainable cause of the revenue growth: adhesive, unwanted, and in many cases, unknown, fees, as well as unsustainable hyperinflation in Argentina. *See* ¶¶373-380, *supra*.

**F. <u>March 11, 2025 – Wolfe Research FinTech Forum</u>**

431. On March 11, 2025, Hau participated in the Wolfe Research FinTech Forum. During the forum, Hau stated:

> First Data was kind of a mid-single, high single digits, 6%, 8% grower. We put those two together and ***we managed an 11%, 12% organic growth last year, actually on a normalized basis. If you adjust for the transitory nature of the Argentina lift in inflation and interest, even dialing that out, we had 16% growth.*** So pretty significant acceleration of growth. ***And that's a testament to the investments in new products and solutions that we're making. It's our focus on our client relationships and client service***.

432. Hau's statements in ¶431 were materially false and misleading for the same reasons set forth in ¶¶366-371; specifically, it was false and misleading to tout the Company's organic

revenue growth without disclosing that the vast majority of that revenue came from an inherently unsustainable hyperinflationary environment in Argentina. It was similarly misleading to claim Fiserv's organic revenue growth was attributable to "***new products***," "***client relations***," and "***client services***" when that growth was attributable to hyperinflation in Argentina, as well as propped up by rampant, undisclosed, and unsustainable short-term initiatives. *See* Section IV.F, *supra*.

433. It was also false and misleading for Hau to claim that Fiserv was growing by 11% or 12% on a ***normalized*** basis in 2024, independent of the "***transitory nature of the Argentina lift***." In truth, Fiserv was growing a mere 6% without the transient benefit of Argentina. Indeed, Lyons admitted at the end of the Class Period that the Company was a "mid-single-digit growth company" without the transient benefit from Argentina. *See* Section IV.F, *supra*.

### G. April 24, 2025 – Q1 2025 Financial Results

434. On April 24, 2025, Fiserv reported its Q1 2025 financial results and Defendants shocked the market by disclosing annualized GPV growth of 8%, due to "a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 2024." Further, Defendants disclosed that Merchant Solutions' year-over-year organic revenue growth was also 8%, below analysts' expectation of 12%.

435. Nonetheless, Defendants continued to falsely represent that Clover was exhibiting strong growth. On the earnings call, Hau claimed that "[f]or ***Clover, revenue grew 27% in the first quarter*** and annualized payment volume growth of 8% . . . ." Hau added ***"[t]here are several reasons for the spread between revenue and volume growth including a two-point gain sequentially in the penetration rate of Clover value-added services to 24%. Roughly one-third of the spread came from strong Clover hardware sales.***"

436. Hau's statements in ¶435 touting Clover's revenue growth were materially false and misleading for the same reasons set forth in ¶¶373-380. Specifically, Hau omitted that Clover

revenue was inflated by temporary cash grabs, including hidden charges, mandated fees, and a forced Gateway Conversion; and that unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

437. Similarly, attributing the "spread," or the extent to which revenue was outpacing GPV growth, to "strong hardware sales" and a gain "in the penetration rate of Clover value-added services," was false and misleading because it omitted the true, unsustainable cause of the revenue growth: temporary cash grabs, including hidden charges, mandated fees, and a forced Gateway Conversion.

438. On the same call, Hau stated: "***we continue to see Merchant Solutions organic revenue growth of 12% to 15% in 2025, driven in large part by Clover and its international expansion efforts, new product development and increase in VAS penetration, as well as Commerce Hub with its expanding demand and VAS capability***."

439. Hau's statement in ¶438 claiming Fiserv "***continue[s] to see***" organic revenue growth of "***12% to 15%***" in Merchant Solutions was materially false and misleading for the same reasons set forth in ¶¶366-371: touting the Company's organic revenue growth in the prior quarter without disclosing that the vast majority of that revenue came from an inherently unsustainable hyperinflationary environment in Argentina. In reality, excluding temporary contributions from the Argentina business meant that the Company's true organic growth rate in both Merchant Solutions and in the entire company was in the single digits. *See* Section IV.F, *supra*.

440. Additionally, Hau's statements in ¶438, claiming that Fiserv's organic revenue growth was "***driven in large part by Clover and its international expansion efforts***," as well as "***increase in VAS penetration***," were false and misleading for an additional reason: hyperinflation-fueled sales from Argentina were the primary driver of Merchant Solutions' organic revenue

growth, not VAS penetration. *See* Section IV.F, *supra*. And to the extent Clover's revenue was contributing to Merchant Solutions' organic revenue growth, Clover was also fueled by hyperinflation in Argentina—particularly the Anticipation business. *See* ¶¶373-380. Failing to disclose those critical facts made these statements materially misleading.

### H. <u>May 15, 2025 – J.P. Morgan Global Technology, Media and Communications Conference</u>

441. On May 15, 2025, Hau participated in the J.P. Morgan Global Technology, Media and Communications Conference. Again, Hau disclosed some aspects of the fraudulent scheme perpetrated during the Class Period, admitting that GPV growth would remain at 8% for Q2 2025. However, Hau falsely assured investors that the volume growth issues were about to subside.

442. An analyst asked Hau about investors' reaction to Fiserv's reports of decelerating volume growth. Hau responded:

> [W]e reported an 8% Clover volume growth, which was slower than what we reported last year. . . . But given the lots of discussion and questions around it, we expect second quarter to be generally similar to first quarter in terms of the reported growth rate from a volume standpoint. ***We do see that gateway headwind actually increasing a bit in the second quarter*** . . . but ***it was ramping through the first quarter. So Q2 is when you have the full quarter impact of what was going on in Q1. And then we expect that to subside going forward, Q2 – excuse me, Q3 and Q4***.

443. Hau's statements in ¶442 were materially false and misleading for the same reasons set forth in ¶¶392-394: Hau knew that the headwind from the Gateway Conversion would not subside in Q3 and Q4. As explained in ¶¶392-394, Defendants knew, but failed to disclose, that the Gateway Conversion had temporarily boosted GPV above normal levels **throughout** 2024, including in Q3 and Q4 2024. This meant that year-over-year headwinds would depress GPV growth **throughout** 2025, including in Q3 and Q4 2025. *See* Sections IV.E.2-3; ¶¶302-303, *supra*.

## I. July 23, 2025 – Q2 2025 Financial Results

444. On July 23, 2025, Defendants issued materially false and misleading statements in Fiserv's Q2 2025 press release and conference call. In the press release, Defendants reassured shareholders of continued growth, noting "***Fiserv refine[d] [its] organic revenue growth outlook to approximately 10%*** and adjusted earnings per share of $10.15 to $10.30, representing growth of 15% to 17%, for 2025." The press release quoted Defendant Lyons, who referenced: (i) Fiserv's purported "8% organic revenue growth," which he said "***demonstrated the power of our diverse business serving both merchants and financial institutions***"; and (ii) "***key strategic initiatives focused on client-centric innovation, deepening client relationships, and operational efficiency, to drive strong and durable performance***."

445. Lyons' statements on organic revenue growth were materially false and misleading because that growth stemmed not from an increase in natural, organic business, but a systematic business practice of forcing existing customers from the "back book" to transition to Clover through the Gateway Conversion and piling on adhesive, unwanted, and unknown fees. This practice did not reflect the power of Fiserv's "***diverse business***" as represented, but the opposite: a contrived method of inflating growth metrics and revenue that was inherently unsustainable and, consequently, capable of inducing only short-term revenue gains.

446. Additionally, Lyons's statements that Fiserv's "***strong and durable performance***" was driven by "***key strategic initiatives***" that advanced customers' interests and resulted in "***deepening client relationships***" and "***operational efficiency***" were also materially false and misleading because the Company's business practice of forcing customers to adopt Clover through the Gateway Conversion and then increasing unwanted and unneeded fees—concealed under the guise of "***key strategic initiatives***" designed to promote "***client relationships***"—was short term in nature and resulting in sweeping client attrition. In sum, Defendants' manufactured façade growth

was predicated on creating the illusion of revenue gains based on an undisclosed business practice that was incompatible with, and indeed anathema to, such lofty ideals.

447. During the earnings call that day, Hau spoke broadly about Fiserv's results, stating:

> ***[W]e expect both segments to grow toward the low end of their guidance ranges for organic revenue growth, with Merchant Solutions towards the low end of the 12% to 15% organic revenue growth outlook for the year, and Financial Solutions organic revenue growth at the low end of the 6% to 8% range. The net effect will be expected total company organic revenue growth of approximately 10% at the bottom end of our original guidance of 10% to 12%.***

448. Defendants' statements in ¶447 were materially false and misleading for the same reasons set forth in ¶¶366-371. Specifically, representing that updated guidance would remain in the double digits was materially false and misleading because Defendants knew that achieving double-digit revenue growth was impossible without the aid of Argentina's hyperinflationary environment, which had largely cooled, and that revenue from the forced Gateway Conversion and Defendants' battery of undisclosed, short-term revenue initiatives had artificially inflated the Company's growth and were also subsiding.

449. Defendant Hau further claimed that Clover revenue growth remained strong, asserting that "***Clover revenue grew 30% in the second quarter*** on annualized reported payment volume growth of 8%."

450. Hau's statement touting Clover's revenue numbers was materially false and misleading for the same reasons described in ¶¶373-380: he failed to disclose that Clover revenue was inflated by temporary cash grabs, including hidden charges, mandated fees, and a forced Gateway Conversion; and that unsustainable hyperinflation in Argentina was driving Clover's revenue growth. *See* ¶¶373-380, *supra*.

## VII. LOSS CAUSATION/ECONOMIC LOSS

451. Defendants' scheme, misstatements, and omissions alleged herein directly and proximately caused economic loss (i.e., damages) suffered by Plaintiffs and the Class in violation of the federal securities laws. Throughout the Class Period, Defendants made materially false and misleading statements, half-truths, and omissions, and engaged in a scheme to defraud investors. That scheme and those misstatements and omissions artificially inflated and/or artificially maintained the price of Fiserv common stock and operated as a fraud and deceit on the Class.

452. During the Class Period, Plaintiffs and the Class relied on the integrity of the market when purchasing Fiserv stock at artificially inflated and/or artificially maintained prices, with Fiserv's stock reaching as high as $237.79 per share on March 3, 2025, and were damaged thereby when the stock price declined after the truth was publicly revealed and/or the risks concealed by Defendants' scheme, misrepresentations and omissions materialized. The market for Fiserv common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 3,436,407 shares during the Class Period.

453. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred billions of dollars in losses. The stock price declines during this period, including the declines summarized below, were directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' fraudulent scheme and material misrepresentations or omissions. Each decline was a direct or proximate result of Defendants' fraudulent scheme, misrepresentations and/or omissions being revealed to investors and the market.

454. The timing and magnitude of the declines in Fiserv common stock evidence the impact that Defendants' scheme and statements had on the Company's stock price during the Class

Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

455. Specifically, Defendants made false and misleading statements and omissions about the cause and extent to which Fiserv relied on short-term initiatives to misleadingly convey success regarding (i) Clover's growth and the drivers thereof, (ii) double-digit organic revenue growth, and (iii) the stability of and demand for its Financial Solutions segment. When the prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Fiserv stock dropped significantly.

456. As described below, Fiserv's scheme, misrepresentations, and omissions were revealed to the market through a series of four corrective disclosures and/or materializations of concealed risk from April 24, 2025 through October 29, 2025, inclusive. It was not until the final corrective disclosure and/or materialization of concealed risk on October 29, 2025 that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Fiserv's stock price attributable to the fraud. Before then, Defendants issued a series of statements that maintained some aspect of the artificial inflation, even as other aspects of the inflation dissipated as aspects of Defendants' scheme, misrepresentations, and omissions were partially revealed.

### A. April 24, 2025 – First Partial Corrective Disclosure/Materialization of the Risk

457. On April 24, 2025, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period were partially revealed and/or partially materialized when Fiserv announced its financial results for Q1 2025.

458. Defendants disclosed annualized GPV growth of 8%, down from its 2024 GPV growth rates of 14% to 19%, and partly attributed the "softer volume growth" to "a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 2024." Further, Defendants disclosed that Merchant Solutions' year-over-year organic revenue growth was also 8%, below analysts' expectation of 12%.

459. Defendants' April 24, 2025 disclosure concerning the Company's slowing GPV growth was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' scheme, misrepresentations, and/or omissions concerning the true driver of the Company's organic revenue growth and the growth in its Merchant Solutions segment.

460. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Fiserv's stock price dropped by $40.20 per share, or 18.5%, from a closing price of $217.10 on April 23, 2025, to a closing price of $176.90 on April 24, 2025.

461. The market quickly linked the stock price decline to Defendants' disclosure concerning Fiserv's volume deceleration. For example, on the same day, Goldman Sachs noted: "Shares underperformed significantly (-18.5% v S&P 500 +2.0%), which we would largely attribute to a much larger than anticipated deceleration in Clover volumes, which grew 8% in the quarter, down from 14% in 4Q." Specifically, Goldman Sachs noted: "[T]he contribution of a late 2023 gateway conversion was larger than previously known, and the lapping of that backbook conversion onto Clover likely led to a large part of the stepdown."[28]

---

[28] "Lapping" is an important concept applicable to year-over-year growth metrics. For growth to occur from one year to the next, performance in a given year must surpass or "lap" the preceding year's performance. Accordingly, if one year's performance is artificially increased by an event that does not repeat, the next year's growth rate will be significantly less by comparison.

462. Similarly, on April 25, 2025, JP Morgan noted, "However, 1Q saw FI's growth engine Clover sputter with a notable deceleration in GPV. Clover revenue decelerated a reasonable 2ppts but volume slowed a surprising 6ppts, meaning it crossed into the dreaded single-digit zone at +8% (we have global V/MA volume +9% in C1Q) and driving the widest spread between revenue and volume in our model's history**, raising concerns about sustainability of premium growth**."

463. However, Fiserv's stock price remained artificially inflated after this news because Defendants continued to assure the market that despite the growing spread between volume and revenue, the Company could sustain growth through its robust and diverse revenue streams. For instance, Hau stated, "we continue to see ***Merchant Solutions organic revenue growth of 12% to 15% in 2025, driven in large part by Clover and its international expansion efforts, new product development and increase in VAS penetration, as well as Commerce Hub with its expanding demand and VAS capability***."

464. In response to Defendants' assurance, investors reacted with conviction. For instance, on April 24, 2025, Wells Fargo emphasized, "we see little risk to total Co. guidance as FI's 'virtuous cycle' is evident in 1Q results. . . . We continue to have confidence in FI's ability to achieve its MT targets and believe Clover meeting said targets is not in buyside expects (international traction is increasingly important)."

465. Similarly, on April 25, 2025, J.P. Morgan echoed, "Fiserv remains quite unique across the group (particularly as peers consolidate along the two sides of FI's two-sided ecosystem) and we have confidence that its various initiatives across product areas, regions and channels will help accelerate growth through the year including within Clover."

466. But analysts remained unaware of the true extent to which the Company's organic revenue growth relied on hyperinflation in Argentina. For instance, Goldman Sachs wondered, "What % of Clover adjusted revenue is Clover Capital and Latam anticipations and how much did adjusted revenues grow in 2024/1Q25?" and "What % of adjusted revenues (not organic) was Dolar Turista in 2024 and 1Q24?"

**B. May 15, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk**

467. On May 15, 2025, before the market opened, further elements of the relevant truth, and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period, were partially revealed and/or partially materialized when Defendants disclosed continued deterioration in GPV growth during the J.P. Morgan Global Technology, Media and Communications Conference. Specifically, Hau indicated that GPV growth for Q2 2025 would "be generally similar to first quarter in terms of the reported growth rate from a volume standpoint" or remain at 8%.

468. Further, Hau explained that the Gateway Conversion would continue to negatively impact GPV growth, noting "gateway headwind actually increasing a bit in the second quarter." As he stated, this was mainly because Fiserv had been "converting that gateway for about a year. It's probably about two quarters heading into first quarter, got a big chunk in the first quarter and then a little bit more in second and third quarter, but it was ramping through the first quarter. So Q2 is when you have the full quarter impact of what was going on in Q1." However, Hau emphasized that "we expect that to subside going forward, . . . Q3 and Q4."

469. Defendants' May 15, 2025 disclosure concerning the Company's stagnant volume growth was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' scheme, misrepresentations, and/or omissions concerning the full extent to which the Company

relied on short-term revenue initiatives, including (i) the forced Gateway Conversion, (ii) Argentina's hyperinflationary environment, which boosted GPV and revenue growth and effectively concealed the true effects of these unsustainable practices, and (iii) temporary revenue boosts and performance declines in Financial Solutions that also maintained the façade of continued and sustainable growth.

470. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Fiserv's stock price dropped by $30.73 per share, or 16.2%, from a closing price of $189.86 on May 14, 2025 to a closing price of $159.13 on May 15, 2025.

471. As detailed above, that same day, analysts immediately attributed the steep stock price decline to the Company's announcement concerning stalling Q2 2025 GPV growth. For instance, Mizuho Securities noted, "FI [Fiserv] is trading down double-digits (vs. flat SPX) following management's comments at the JPM conference that 2Q Clover GPV will likely grow +8% vs. our/consensus +13%. FI flagged an increasing impact from a gateway conversion as a headwind." Goldman Sachs believed "the main driver of the decel in Clover was a gateway conversion in the prior year that saw very significant churn subsequent to the conversion." And Autonomous Research noted: "This was surprising given many (including us) had concluded at a sell-side dinner just this past Monday that the company was guiding to an acceleration in Clover GPV growth in 2Q vs. 1Q."

472. Still, the Company's stock price remained artificially inflated even after this news because Defendants had not disclosed to investors the full extent to which the Company relied on short-term revenue initiatives. Further, at the investor conference, Hau continued to conceal the

full extent to which the Gateway Conversion had temporarily boosted GPV throughout 2024. *See* Sections IV.E.2-3; ¶¶302-303, *supra*.

473. Despite initially registering surprise at these revelations, analysts were encouraged by Defendants' reassurances. For instance, on May 15, 2025, Mizuho Securities explained that they "stay positive" because "Clover revenue at +27% is still impressive despite only +8 volume growth amid growing VAS penetration [24% in 1Q vs. 22% in 4Q] & hardware sales."

474. Similarly, analysts remained unaware of the additional revenue driven from forced gateway conversion, short-term revenue drivers, or the unsustainable Argentina business. For example, on the same day, Bernstein Research "believe[d] 2025 revenue targets are achievable" because "**[t]he gateway volumes are empty calories**" so the "normalized volumes for Clover in 1H is likely 11-12%." Jefferies also believed that "[g]ateway conversion headwind will begin to ease in 3Q. Other dynamics tied to the gateway conversion: 1) while the merchants contributed to Clover GPV growth in FY24, there was minimal revenue contribution, 2) converted merchants began to naturally attrit beginning in 3Q24, hence the headwind beginning to ease in 3Q25."

### C. July 23, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk

475. On July 23, 2025, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period were further partially revealed and/or partially materialized when Fiserv announced Q2 2025 financial results. Specifically, Fiserv refined its full-year organic revenue growth outlook to approximately 10%, below the Company's previous guidance range of 10% to 12%. Merchant Solutions' organic revenue grew by only 9% in Q2 2025, significantly below analysts' expectations of 12%.

476. During the earnings call on the same day, Defendants explained that they refined organic revenue growth guidance because (i) some of the launches of new products and strategic

initiatives were "taking longer than [the Company] had planned," and (ii) changing macro-economic conditions differed from what the Company had assumed in the plan. Further, for Q2 2025, Merchant Solutions' GPV growth remained flat at 8%. Hau again attributed the stagnant GPV growth to the gateway conversion, explaining that "[t]he gateway impact to reported volume growth was a little over 3 points in Q2 and is expected to decline gradually through the second half and beyond **with the magnitude dependent upon retention of the converted merchant base**."

477. Finally, Hau disclosed that Merchant Solutions' adjusted operating margin declined 200 basis points to 34.6% from the prior year due to "investments in marketing and sales and distribution, the impact of the CCV acquisition and increased investments in new software and hardware."

478. Defendants' July 23, 2025 disclosure concerning stagnant GPV growth, declining organic revenue growth, and the continued negative impact from the Gateway Conversion was the foreseeable consequence of, and within the zone of risk concealed by Defendants' scheme, misrepresentations, and/or omissions concerning the full extent to which the Company continued to rely on (i) the forced Gateway Conversion, (ii) short-term pricing initiatives, and (iii) Argentina's hyperinflationary environment, to boost GPV and revenue growth.

479. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Fiserv's stock price dropped by $22.98 per share, or 13.9%, from a closing price of $165.98 on July 22, 2025 to a closing price of $143.00 on July 23, 2025.

480. Analysts linked the sharp stock price decline to Defendants' announcements concerning Fiserv's worsening financial condition. For instance, on July 23, 2025, Goldman Sachs

noted, "FI shares underperformed significantly (-14%) as continued anemic revenue trends, notably in the non-Clover part of the business, were made worse by a significant margin miss in Merchant, where margins declined >200bps, and led the company to take down their full-year margin guidance . . . ."

481. In turn, Goldman Sachs queried whether the Gateway Conversion could have also contributed to Merchant Solutions' revenue growth in the past quarter, stating: "[i]nvestor feedback on the revenue side is increasingly focused on the risk that backbook conversion in the non-Clover SMB book has been supporting the Clover results much more than expected."

482. Further, on July 28, 2025, Truist Securities echoed the market's concern about the Company's reliance on the Gateway Conversion to juice volume growth, stating: "we believe the '2024 gateway conversion book of business' represented a MSDs percentage of Clover's volume in 1H24 and that has declined to ~3% currently. This gateway conversion effectively overstated Clover's volume growth in 2024 while it is a headwind to growth currently."

483. Still, Fiserv's stock price remained artificially inflated, as Defendants continued to falsely assure investors that despite the alarming growth slowdown, the Company was poised to achieve its target on the heels of (i) strong VAS penetration; (ii) recurring hardware sales; (iii) continued growth in LATAM, including Argentina, independent of its hyperinflation; and (iv) easing negative impact on GPV from Gateway Conversion. For instance, during the same earnings call, Lyons emphasized that Fiserv "***refined [its] full-year organic revenue growth guidance to approximately 10%*** . . . ."

484. As intended, the market believed Defendants' assurances. For instance, on July 23, 2025, J.P. Morgan Research noted that "the company reaffirmed confidence in the strategic and financial merit of these initiatives, characterizing the [forecast] downgrade as a function of 'timing,

not quality.' Management also positioned the guidance revision as a proactive move to increase forecasting precision and transparency heading into year-end."

**D. October 29, 2025 – Final Corrective Disclosure/Materialization of the Risk**

485. On October 29, 2025, before the market opened, the remaining aspects of the relevant truth and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period, were fully revealed and/or materialized when Fiserv announced the Company's 3Q 2025 financial results, which shocked investors.

486. During the earnings call on the same day, Fiserv acknowledged that after an in-depth review by Lyons, Fiserv's management team, and external consultants that roughly began in Q3 2025, the deterioration in the Company's underlying fundamentals required a "reset" to growth and margin targets. In describing Fiserv's "disappointing" results and revised guidance, Lyons noted: "[t]his change is driven by a combination of four factors, including [1] slowing cyclical growth in Argentina, [2] the recalibration of optimistic growth assumptions in the original guidance, [3] the impacts of certain deferred investments and [4] the deprioritization of short-term revenue and expense initiatives."

487. As detailed in Section IV.M, *supra*, during the same earnings call, Defendants provided a detailed breakdown of these contributing factors. For example, Lyons admitted that, "excluding Argentina, the company's overall organic revenue growth rate was in the mid-single-digits in both 2023 and 2024," calling Argentina's contribution to the growth rate simply "noise."

488. In response to the Company's disclosures on October 29, 2025 regarding Argentina, J.P. Morgan reported the next day that "the most concerning revelation of the print was **management's prior lack of transparency around Argentina's outsized contribution and the perceived obfuscation of its importance to overall growth**." The J.P. Morgan analyst went on to detail how "management had not previously disclosed that Argentina was driving such a large

portion of companywide growth, instead referencing adjustments for 'transitory factors from Argentina,' which obscured the true magnitude of the contribution."

489. Defendants further admitted that "Fiserv's recent results have increasingly relied on short-term initiatives," which allowed Defendants to "pursue[] in-quarter results" as opposed to prioritizing recurring revenue to benefit the Company in the long term. In fact, Lyons admitted that these initiatives peaked in Q4 2024, stating: "Q4 of last year sort of peaked in terms of short-term initiatives." Consequently, the Company decided to "deprioritize the short-term revenue and expense initiatives . . . ."

490. Lyons also disclosed that Clover revenue was "expected to be below recent levels at approximately 10%, reflecting the deprioritization of certain short-term revenue initiatives, including the elimination of certain fees in Q4 that were initiated a year ago and are no longer consistent with our business strategy." Lyons emphasized that those short-term initiatives often were incompatible with customers' best interests, which (predictably) resulted in widespread customer dissatisfaction.

491. Finally, Defendants also attributed the financial reset to unsustainable practices, such as deferred investments and cost-cutting measures. Lyons explained that Fiserv failed to properly invest in key initiatives and instead decided to "defer certain investments and cut certain costs," which "improved margins in the short-term, but are now limiting our ability to . . . execute product launches . . . and grow revenue to our full potential."

492. In all, these four factors culminated in a full reset for the Company's financial results. For Q3 2025, Merchant Solutions' organic revenue growth was only 5%, significantly below analysts' expectations of 12%. Financial Solutions' organic revenue growth declined by 3%. The Company's overall adjusted revenue grew by merely 1%. For full year 2025, Clover

revenue would be $3.3 billion, below the previous guidance of $3.5 billion. Defendants also expected the full year adjusted EPS to be $8.50 to $8.60, "representing a modest decline year-on-year." Likewise, for full year 2026, the Company's organic revenue growth would be "in the low single-digits," as opposed to the double-digits growth Defendants had been touting throughout the Class Period.

493. Additionally, in explaining the cause of the revenue decline in Financial Solutions, Defendants identified three problems tied to the Company's short-term initiatives: "lower periodic license revenue," unfavorable "industry dynamics" in digital payments, which led to negative pricing action to "position [Fiserv] competitively for the longer term," and tough comparison to last year's results in issuing.

494. The financial reset also prompted a shake-up in Fiserv's senior management. During the same earnings call, Lyons concluded that "**our challenges are largely driven by our own doing**," referring to the four reasons necessitating the Company's financial "reset." He then explained: "And as I got a more fulsome understanding of those, that **obviously prompted some dissatisfaction with the way we do the process and we've made leadership changes around that** and giving you today what we believe is a solid tangible baseline to grow from." As a result, Lyons announced that Hau would transition from CFO to senior advisor and that Kevin Warren would step down as Chair of the Audit Committee.

495. Defendants' October 29, 2025 disclosure was the foreseeable consequence of, and within the zone of risk concealed by Defendants' scheme, misrepresentations, and/or omissions concerning the nature and extent of the short-term initiatives driving Fiserv's financial performance.

496. As a direct and proximate result of this final corrective disclosure and/or the materialization of foreseeable risks concealed by Defendants' fraud, Fiserv's stock price dropped by $55.57 per share, or approximately 44%, from a closing price of $126.17 on October 28, 2025 to a closing price of $70.60 on October 29, 2025. As investors continued to digest Defendants' shocking revelation about the Company's abysmal financial conditions, on October 30, 2025, Fiserv's stock price declined further by $5.41 per share, or 7.66%, from a closing price of $70.60 on October 29, 2025 to a closing price of $65.19 on October 30, 2025.

497. Analysts quickly connected the stock price decline to Defendants' disclosure. As discussed above, Raymond James, Bernstein Research, and Stephens all expressed concern regarding Fiserv management's lack of candor during the Class Period. Indeed, analysts were shocked by how little they knew about the Company's true financial conditions. For instance, on October 29, 2025, Citi noted: "In the end, FI was seeing inflated revenues and margins from Argentina and short-term hardware/data sales to drive outsized unsustainable growth (margins drop materially in 2H25). The 2025 expectations for top-line growth and margin expansion set by the previous CEO and CFO were unfortunately not realistic."

498. Similarly, Cowen Research found the "level & pace of FI's business slowdown is baffling; lower structural growth messaging, initiation of remediation plan, & leadership shuffling leave us questioning how things changed so quickly." Cowen Research noted the Company's loss of credibility with investors, citing that "the subsequent rebuild of investor sentiment could take even longer given the series of shocks that have played out in 2025."

499. In turn, RBC Capital Markets observed that [t]he **magnitude of the reset speaks to the lack of transparency that the prior strategy/model and management followed** . . . ." And J.P. Morgan Research noted "management had not previously disclosed that Argentina was

driving such a large portion of companywide growth, instead referencing adjustments for 'transitory factors from Argentina,' which obscured the true magnitude of the contribution."

500. Analysts were also baffled by Financial Solutions' growth shortfall, with Bernstein Research "struggling to understand what transpired in the 3rd quarter and how can a business such as Fiserv have such low visibility into near-term trends," as discussed above. *See* Section IV.M, *supra*. On October 30, 2025, Morgan Stanley gave its own take, reporting:

> We think **investors were likely more surprised by the Financial Solutions miss, as most saw this segment as the more stable business** vs. payments. Weakness was impacted by **lower periodic license revenue, repricing in the debit network amid competitive dynamics**, and tough comps, while margins faced pressure from lower high-margin license revenue and ongoing investment into implementation, professional services and technology spend.

501. The media was equally critical of Fiserv's revelations, with an October 30, 2025 *MarketWatch* article expressing serious concerns over management's lack of transparency during the Class Period. The article interpreted Defendants' October 29, 2025 disclosures as admitting that: (i) "[u]nder Bisignano, the Company made forecasts it could not plausibly have achieved"; (ii) "Bisignano relied on short-term cost cutting, to the detriment of the company's long-term health"; and (iii) "Bisignano was chasing short-term quarterly results, not building the business."

502. These revelations exposed the fact that Defendants misled the investing public about Fiserv's business and prospects, while conveniently leveraging short-term gains to create a façade of strong and sustainable growth. It was materially misleading, and therefore actionable, for Defendants to portray Fiserv's business practices in a favorable manner, and to promote the Company's growth metrics and guidance, without revealing business and operational information necessary to negate the misleading impression they conveyed.

## VIII. ADDITIONAL INDICIA OF SCIENTER

503. As alleged, the Individual Defendants acted with scienter in that they knew or recklessly disregarded that their public statements were materially false or misleading when made, knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws, and engaged in a scheme to defraud investors. In addition to the facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. The Individual Defendants' Admissions Support Scienter

504. Before and after the Class Period, the Individual Defendants made critical admissions that further support an inference of scienter.

505. On October 29, 2025, Defendants announced Fiserv's need to take a wholesale financial "reset." *See* Sections IV.M and VII.D, *supra*. Specifically, Lyons expressly mentioned decisions made "**over the last few years**" that "improved margins in the short term, but are now limiting our ability to serve clients . . . . " Lyons also admitted that "**Fiserv's recent results have increasingly relied on short-term initiatives**." These short-term initiatives allowed Defendants to "pursue[] in-quarter results" as opposed to recurring revenue that would benefit the Company in the long term. This required Fiserv to change course and implement "**the elimination of certain fees in Q4 that were initiated a year ago**."

506. Moreover, in response to an analyst's question about whether Fiserv's lowered guidance for Merchant Solutions was "purely tied to reversing the short-term pricing initiatives," Lyons responded that there were "a number of different factors in it, including the fee adjustment, . . . the effect of Argentina . . . and **our view around some certain short-term initiatives that we didn't think was the right one[]** . . . ."

507. Lyons further admitted that the Company failed to properly invest in key initiatives and instead "defer[red] certain investments and cut certain costs," which "**improved margins in the short-term, but are now limiting our ability to . . . grow revenue**." As a result, Lyons announced the launch of the Company's "One Fiserv" plan to overhaul most, if not all, of Fiserv's previous short-term driven initiatives that had been fueling the Company's growth at the expense of long-term sustainability—serving as further corrective action in the wake of Defendants' fraudulent scheme.

508. After the Class Period, at the November 12, 2025 KBW Fintech Payments Conference, Lyons shed light on how Fiserv managed to conceal the Company's outsized reliance on Argentina, explaining:

> **It's simply in how that business got reported in organic growth versus adjusted growth.** And adjusted growth took a lot of that noise out. **Organic growth, which the guidance was off of, obviously, brought in the full influence of that.** So, all that really fundamentally happened in Argentina is there's a structural move down in rates because they've taken a different approach to managing the deficit and the budget.

509. Additionally, on December 1, 2025, at the UBS Global Technology and AI Conference, Defendants clarified that Fiserv's undisclosed reliance on short-term initiatives primarily led to the shocking declines in Financial Solutions and Clover, citing elevated customer pricing and heavy reliance on selling licenses in the banking segment. *See* Section V, *supra*.

### B. The Individual Defendants' Personal Involvement in the Fraud and Admissions Support Scienter

510. The Individual Defendants were personally involved in devising and implementing the fraudulent scheme described herein, including authorizing, issuing, or otherwise disseminating materially false and misleading statements during the Class Period.

511. Bisignano and Hau were Fiserv's CEO and CFO, respectively, until Lyons replaced Bisignano in January 2025 and Hau "resigned," when the Company "reset" financial management,

in October 2025. Thus, for a substantial portion of the Class Period, these Individual Defendants were responsible for overseeing, directing, and otherwise managing Fiserv's business segments.

512. Indeed, as the CW accounts have confirmed, Fiserv's senior management handed down, monitored, and approved various short-term revenue generating initiatives, which was critical in allowing Defendants to influence the investing public's perception of the Company's financial condition and growth. *See* Sections IV.D-G, *supra*.

513. In particular, CW-4 described that, when it came to Fiserv "burning the furniture" to generate revenue, she observed in 2024 that Fiserv held daily meetings or calls to discuss revenue opportunities for Merchant Solutions and how to bring extra revenue to the table, with senior leaders in various divisions, including Jen LaClair, Head of Merchant Solutions, to meet Fiserv's quarterly targets. Additionally, CW-3 stated that current SVP Partner Development Erik Nicholson instructed her to increase fees for CardConnect customers and current Head of ISV (Integrated Software Vendor) Kim Molinaro directed her to increase fees for Clover accounts. According to CW-3, revenue targets were filtered down to Nicholson and Molinaro from Company leadership.

514. Moreover, CW-1 added that the Financial Institutions Group CFO stated that Hau believed that the hyperinflation in Argentina provided a great opportunity for Fiserv to enter the LATAM market and that it would lead to ongoing and continued revenue for the Company.

515. Moreover, CW-2 detailed that if a bank or credit union customer with a total contract value of over $10 million informed Fiserv that it was leaving, this information was disseminated to Fiserv's Deal Review Boards (DRB). CW-2 detailed that Hau's corporate DRB included Hau, Bisignano, Gibbons, current Vice Chairman Chris Foskett, former Head of

Merchant Solutions, Chief Revenue Officer Jennifer LaClair and current Vice Chairman Guy Chiarello. Additionally, CW-2 added that Gibbons approved renewal concessions.

516. The CW accounts also confirmed that Defendants were aware of the cascade of problems, including client dissatisfaction, attrition, and discounting as a result of their short-term initiatives. *See* Sections IV.D-G, *supra*.

517. CW-7 noted that she reported NPS [Net Promoter Scores] and customer attrition in leadership meetings in 2024 and 2025 and that this information made its way to the C-Suite. Moreover, CW-7 detailed that she ran a vintage analysis report in Q1 2025 which revealed that Fiserv did not actually achieve revenue growth in its strategic segment in 2024 but made it appear as if it did because of duplicate accounts. CW-7 noted that she was moved from vintage analysis reports after she brought this up to her superiors.

518. Additionally, CW-2 stated that everything at Fiserv was put into an internal Customer Relationship Management (CRM) database, a Salesforce product referred to internally as "eCRM," and generated out of it. CW-2 added that Fiserv maintained a Loss Client Report, which tracked customer non-renewals, and a Revenue Compression report. CW-2 recalled that the Loss Client Report was circulated monthly to Fiserv's leaders, including CEO Bisignano, CFO Hau, and Head of the Financial Institutions Group Gibbons. Moreover, CW-5 recalled that she viewed and discussed at-risk client reports in meetings with Gibbons.

519. Additionally, when Lyons became CEO, he continued what Bisignano, Hau, and Gibbons started. Lyons confirmed that he examined Fiserv's operations under a microscope when he assumed the role and familiarized himself with every aspect of the Company's operations and initiatives then underway. On July 23, 2025, after announcing that Fiserv "refined our full year organic revenue growth guidance to approximately 10%" and was "maintaining our guidance for

$3.5 billion of Clover revenue this year," Lyons told analysts that revising "the overall organic growth rate" stemmed from studying the Company's operations over the preceding weeks, since taking over the mantle of management from Bisignano:

> I've been in the seat for about 10 weeks now. I've had the opportunity to better understand the key drivers of our business, the status on the strategic initiatives, and then what was embedded in the full-year guidance. And that full year guidance always anticipated a big ramp in growth in the back half of the year based on the rollout of a whole bunch of projects and initiatives. It was a granular list. It's a very strong list that we had the ability to re-underwrite study all of our initiatives and they're great initiatives. It's just a matter of the timing of getting them to market.
>
> So as I said a minute ago, **we're still confident we'll get the full financial and strategic benefits of all those initiatives**, and it's just a matter of timing. And again, we feel very good about it in the pipelines around the products that we're coming to market with are very strong, the clients want them, the technology is good. So, we feel very good about it.

520. For his part, Hau stated: "[we] continue to see good overall revenue growth and that['s] certainly supported by an acceleration of volume. As you know, Clover is a hardware and software solution. It's a business operating system. Volume certainly is an important part of it, but there's lots of revenue in addition to that. And that's where we get into that spread, so to speak, between volume and revenue."

521. These statements confirm that the Individual Defendants were personally involved in developing, vetting, and monitoring the Company's unsustainable short-term initiatives. This is borne out by additional admissions that Defendants made both during and after the Class Period—some involving Lyons, who tried to shift blame to Bisignano for first implementing the sales and financial reporting practices that damaged the Company when the truth emerged about Defendants' scheme.

522. As set forth below, Defendants' other admissions—particularly those from October to December 2025—also support a strong inference of scienter.

### C. The Individual Defendants' Compensation Plans Tied to Fiserv's Misleading Financial Disclosures Support Scienter

523. Bisignano, Hau, and Gibbons were also motivated to misrepresent and conceal the true driver of Fiserv's purportedly sustainable organic revenue growth in Merchant Solutions and Financial Solutions. In fact, they received a substantial number of PSUs tied to the Company's achievement of certain organic revenue growth targets for 2022, 2023, and 2024. *See* Section IV.B, *supra*. Indeed, during all relevant time periods, roughly 90% of Bisignano's, Hau's, and Gibbons' total compensation came from equity awards.

524. Because **more than 90%** of Bisignano's, Hau's, and Gibbons' compensation came from equity awards based on the Company meeting certain financial metrics, they had motive and opportunity to misrepresent and perpetuate a scheme that hid Fiserv's true financial condition. These bonuses were tied to double-digit growth rates, which Fiserv would not have hit but for Defendants' scheme to defraud.

525. Defendants' fraudulent scheme paid off when, during the February 5, 2025 earnings call, Fiserv reported organic revenue growth that barely met the target of 16%. As a result, the 2022 PSUs, whose performance period ended on December 31, 2024, vested at organic revenue growth of 166.9% of the target award level, average adjusted operating income growth of 136.8% of target, average adjusted EPS growth of 144.7% of target. Critically, Defendants' scheme caused Fiserv's stock price to more than double since the grant date, further augmenting their gains under the 2022 incentive plan. As such, **Bisignano, Hau, and Gibbons received 141,625 shares or $29,092,607.50, 35,407 shares or $7,273,305.94, and 14,871 shares or $3,054,800.82, respectively**.[29]

---

[29] Dollar amount calculated using Fiserv's stock price on the day of vesting.

526. Bisignano was further encouraged to commit fraud through the restructuring of his PSU awards in connection with his planned departure. Fiserv changed a policy that evaluated the grant of PSUs over a three-year performance period to provide him with 100% RSUs that were not subject to the performance period. And Fiserv approved waiving holding periods that would otherwise have been applicable to Bisignano's RSUs and shortened each performance period under his 2023 PSUs and 2024 PSUs to end immediately before his confirmation as SSA Commissioner. Fiserv also determined that achievement of organic revenue growth and adjusted EPS performance goals under the PSUs would be based on actual achievement during the full fiscal years, and that achievement of the total shareholder return performance goal under the PSUs would be based on actual achievement through the date prior to the confirmation date.

527. As a result, Fiserv announced in its April 2, 2025 Proxy that Bisignano would earn a prorated portion of his 112,921 unvested 2023 PSUs and 83,899 unvested 2024 PSUs based on the achievement of, among others, organic revenue growth targets for 2023 and 2024.[30] Similarly, he received 174,043 unvested RSUs valued at approximately $37 million as of April 3, 2025, which would become fully vested and tradable upon his resignation as CEO.

### D. Defendants' Misstatements and Responses to Analysts' Questions Throughout the Class Period Support an Inference of Scienter

528. As alleged herein, during the Class Period, Defendants spoke authoritatively and at length—often in response to questions from analysts—about Fiserv's organic revenue growth, Clover's volume and revenue growth, the effect of hyperinflation in Argentina on growth, and its Financial Solutions segment. Defendants' answers confirm that they knew or, at the very least, were deliberately reckless in not knowing, the full extent to which the Company relied on short-

[30] According to Fiserv's April 2, 2026 Proxy, 153,787 2023 PSUs and 57,127 2024 PSUs vested on May 6, 2025.

term initiatives to prop up revenue growth. Indeed, given their repeated statements on key issues of investor and analyst focus, one can readily conclude either that Defendants had access to information regarding the subject of the misstatements, or were recklessly indifferent to the truth or falsity of their statements and never bothered to investigate them.

529. Specifically, during multiple earnings calls and analyst conferences, Defendants touted Fiserv's organic revenue growth. *See* Sections IV.F, IV.I.2, and VI, *supra*. For instance, on the first day of the Class Period, during the Q4 2023 earnings call, Bisignano highlighted, "***[i]n 2023, we continued to demonstrate our leadership as proven by our financial performance: 12% organic revenue growth***[.]" Additionally, during the Q4 2024 earnings call on February 5, 2025, Bisignano told investors, "If we exclude transitory factors from Argentina, ***total company organic revenue growth in 2024 was 11%, a healthy and sustainable level***."

530. Defendants also consistently downplayed the effect of hyperinflation in Argentina, representing that "transitory" factors would not negatively impact long-term financial stability. *See* Sections IV.F, IV.I.2, and VI, *supra*. For instance, during the Wolfe FinTech Forum, held on March 11, 2025, Hau stated: "***we managed an 11%, 12% organic growth last year actually on a normalized basis. If you adjust for the transitory nature of the Argentina lift in inflation and interest, even dialing that out, we had 16% growth. So pretty significant acceleration of growth***[.]"

531. Defendants' repeated assurances about the sustainability of the Company's organic revenue growth and the minimal impact of hyperinflation in Argentina create a strong inference that Defendants made these statements with scienter—that they knew their statements were false or, at a minimum, were severely reckless in not ascertaining the truth about which they spoke so confidently. Moreover, the fact that the misstatements were completely divorced from reality

suggests that Defendants either knew of the fraud or, at a minimum, failed to review or check information that they had a duty to monitor and ignored obvious signs of fraud.

### E. The Suspiciously Timed Departures of Hau and Fiserv's Audit Committee Chair, and the Reassignment of Gibbons, Support Scienter

532. As part of Fiserv's "reset," announced on October 29, 2025, the Company announced that it had appointed Paul Todd as the new CFO effective October 31, 2025—with Hau departing from the role. Fiserv also announced a management restructuring that involved appointing Co-Presidents (one of whom was recruited from outside the Company), Kevin Warren would step down as Chair of the Audit Committee, and the addition of three new Board members. The close proximity of these departures, the restructuring effort, and the financial reset to the exposure of the truth—including Lyons' admissions regarding the Company's true financial and operational issues—supports a strong inference of scienter.

533. These announcements shocked the market. On the October 29, 2025 earnings call, analysts asked: "[H]ow could things change so dramatically in two months . . . why wasn't there like that much visibility into this level of revenue weakness intra quarter?" In response, and partly alluding to the reason for Hau's abrupt transition, Lyons explained: "there were a series of initiatives . . . that were more short term driven in nature, that were a big part of the back half of the year to get to the guidance. And as I got a more fulsome understanding of those, **that obviously prompted some dissatisfaction with the way we do the process and we've made leadership changes around that** . . . ." Thus, if it were not already obvious, Lyons expressly confirmed that Fiserv implemented management changes—including requiring Hau to resign—because of the Company's improper business practices, like the short-term initiatives, during the Class Period.

534. Confirming that Defendants misled the market during the Class Period, Lyons also expressed a "need to change the way we forecast and communicate about our business and engage

with the analysts and investors." Despite his own involvement in withholding material information during the Class Period, Lyons vowed to regain the market's confidence by "more clearly explain[ing] our growth drivers" and "enhanc[ing] the rigor in our forecasting . . . ." These admissions and additional remedial measures bolster the already strong inference of scienter.

535. Additionally, Gibbons transitioned out of his executive management position in the Financial Institutions Group and into a Senior Advisor role when Fiserv announced a leadership change on August 25, 2025. The circumstances and timing of that reassignment likewise support a reasonable inference of scienter when viewed in the context of the allegations set forth herein.

### F. Fiserv's Merchant Solutions and Financial Solutions Segments Were Responsible for All of Fiserv's Business and Potential Revenue

536. The Individual Defendants' knowledge of the true drivers of Fiserv's purportedly sustainable growth in Financial Solutions and Merchant Solutions—including Argentinian hyperinflation, forced Gateway Conversion, and short-term pricing initiatives—can be inferred because the performance of those segments was critical to Fiserv's core operations. Indeed, those two segments comprised Fiserv's **entire** business.

537. According to Fiserv's 2024 Form 10-K, revenue from Merchant Solutions and Financial Solutions represented approximately 47% and 46% of the Company's total revenue in 2024, respectively. Within Merchant Solutions, Clover or the Small Business subsegment accounted for roughly 66% of that segment's total revenue in 2024. Within Financial Solutions, the Digital Payment, Issuing, and Banking sub-segments accounted for approximately 41%, 33%, and 26%, respectively, of that segment's total revenue in 2024. Importantly, revenue from Argentina, along with other international regions, made up about 15% of Fiserv's total revenue.

538. Given the importance of these segments to overall financial growth, the Individual Defendants understood that the underlying financial metrics, such as organic revenue growth and

GPV, were key to demonstrating the Company's purported growth. Indeed, in a February 6, 2024 press release, Bisignano referred to organic revenue growth as a "**key measure[] of our financial performance**." Similarly, analysts labeled Clover, Merchant Solutions, and Financial Solutions as mission critical for Fiserv. *See* Section IV.A, *supra*.

539. As a result, the Individual Defendants closely monitored and maintained a tight grip on every aspect of Fiserv's business, including tracking the financial performance of Merchant Solutions and Financial Solutions, reviewing segment-level data, and, critically, approving the Company's strategic initiatives. For example, during the February 27, 2024 KBW Fintech & Payments Conference, Bisignano indicated that he frequently reviewed an internal system that tracks customer transaction volume, noting "**[w]e have this board in our office that, you know, a pattern recognition front because we've had it there since we built it eight years ago, which shows how many transactions per second and where they're happening**." Such access to specific information and data adds to the inference of scienter.

540. Similarly, during the Q3 2024 earnings call, in response to an analyst question about the Financial Solutions' revenue guidance, Bisignano stated, "[t]hen you look at this SMB bundle, which **I am being deep in every other week reviews for over a year**, so my conviction on the depth of that pipeline . . . will be within the numbers."

541. In fact, two months before the April 25, 2025 disclosure, the Individual Defendants were actively reviewing the Company's financial condition. During the Q4 2024 earnings call on February 5, 2025, Bisignano said, "[a]nd sometimes you heard him, Mike [Lyons], his own words and when **he sat in an all-day management meeting on the 1st – on last Monday, and we go through the business plans and look at the opportunities, and that's why we're able to post the numbers we post**."

542. Similarly, leading up to the shocking financial reset announced in October 2025, Defendants had been closely evaluating Fiserv's different strategic initiatives that were critical to driving the Company's continued growth. For instance, during the July 23, 2025 earnings call, Lyons admitted that "all of those initiatives, as I said, **we've had a great chance to re-underwrite them, restudy them**, and they're good."

543. Additionally, in SEC filings throughout the Class Period, Defendants indicated that they and other members of senior management actively and closely monitored Fiserv's operations, representing, for example: (i) "We actively monitor and manage our business in response to these unpredictable geopolitical and market conditions, as they may adversely impact our operations and financial results"; (ii) "Our senior management actively monitors certain market risks to which we are exposed, primarily from fluctuations in interest rates and foreign currency exchange rates"; and (iii) "We continually evaluate the accounting policies and estimates that we use to prepare our consolidated financial statements . . . and base our estimates on historical experience and assumptions that we believe are reasonable in light of current circumstances."

544. Accordingly, the Individual Defendants' knowledge or reckless disregard of the true drivers of Fiserv's purportedly sustainable growth may be readily inferred.

**G. The Individual Defendants' Suspiciously Timed Stock Sales Support Scienter**

545. Throughout the Class Period, Bisignano and Gibbons financially benefitted by selling Fiserv stock at prices artificially inflated by Defendants' fraud. Those stock sales were highly suspicious for several reasons, including their timing, amount, and dramatic inconsistency with prior trading practices. As a result of their Class Period trades, they profited from the artificial inflation embedded in the trading price of Fiserv stock caused by Defendants' false and misleading statements and omissions and fraudulent scheme and course of conduct.

546. To evaluate insider selling activity, Counsel used publicly available trading data and information that officers and directors are required to report to the SEC, including Forms 4 and Forms 144.[31] Counsel analyzed trading by Bisignano and Gibbons during the Class Period and the equal-length period immediately preceding the Class Period beginning on May 16, 2022 and ending on February 5, 2024 (the "Control Period"). These analyses confirm that many of Bisignano and Gibbons' Class Period sales were extremely large, highly unusual, and suspicious.

547. During the Control Period, Bisignano did not sell any shares of Fiserv common stock. During the Class Period, on September 20, 2024, immediately after the end of the 90-day restriction period under his June 21, 2024 10b5-1 trading plan, Bisignano sold 145,000 shares of Fiserv common stock for proceeds of $25,718,035.88 at an average price of $177.47 per share.

548. On December 5, 2024, Fiserv held an investor meeting to announce then President-Elect Trump's intent to nominate Bisignano as Commissioner of the SSA. During the meeting, when asked to comment on his holdings in Fiserv, Bisignano reiterated his commitment to "driving shareholder value" and asserted that "**I'm not thinking of divesting the stock**." Critically, he then emphasized: "**You see how much stock I've sold over 13 – 11 years. I had 4% sold one time over 11 years**." But investors would soon learn that Bisignano began divesting his shares in a calculated fashion.

549. On February 24, 2025, Bisignano submitted a so-called ethics agreement—which he prepared—in connection with his confirmation as SSA Commissioner. In the letter, he agreed

[31] An SEC Form 144 is a notice of proposed stock sales filed with the SEC to reflect planned transactions by affiliates of the issuer and restricted stockholders. The form must be filed if the sale exceeds 5,000 shares or involves total sales of over $50,000 in a three-month period, and must be filed where the securities are held by affiliates (officers, directors, or those who can control or are under the control of the issuer), as well as those owning 10% or more of the issuer's stock and those who plan to sell restricted or otherwise unregistered securities.

to divest his financial interests in Fiserv, including vested and unvested equity awards and common stock, within 120 days after confirmation.

550. On May 6, 2025, Bisignano was confirmed as the SSA Commissioner, which required him to divest his Fiserv holdings before September 3, 2025. Bisignano had significant discretion over the size and timing of his divestment, as evidenced by his transactions below.[32] On May 25, 2025, he resigned his position as Fiserv CEO to join the SSA. Prior to his resignation, Bisignano could have entered into another 10b5-1 plan or a blind trust to effectuate his later sales. He chose not to do so.

551. Instead, beginning on May 16, 2025 and ending on August 1, 2025, Bisignano, his spouse, Tracy S. Bisignano, and his trusts made discretionary trades during the Class Period, in the amount of $683,736,397, while in possession of material nonpublic information:[33]

552. Even if Bisignano intended to divest his, his spouse's, and his trusts' holdings in connection with his appointment as Commissioner, the well-timed manner in which he did so was highly suspicious.

---

[32] The relevant part of the ethics agreement states:

> Following my resignation from Fiserv but prior to assuming the duties of the position of Commissioner, Fiserv will vest the restricted stock and a portion of the Performance Equity Grant in proportion with the amount of time l worked at Fiserv during the three-year performance period by paying them out in common stock, in accordance with the terms set by the Talent and Compensation Committee of Fiserv's Board of Directors, or I will forfeit them. **As soon as practicable, but not later than 120 days after my confirmation, I and trusts to which I have a financial interest will divest the common stock, and all of my vested stock options in Fiserv. If I divest the stock options by exercising them, I will divest the resulting stock as soon as practicable but no later than 120 days after my confirmation**.

[33] By resigning as an executive, Bisignano was no longer required to file Forms 4 in connection with his sales of Fiserv securities, but was required to file Forms 144 reporting those sales.

553. Indeed, Bisignano served as CEO for the majority of that time period, and he was privy to material nonpublic information, including information concerning Fiserv's reliance on (i) the forced Gateway Conversion, (ii) Argentina's hyperinflationary environment to boost its GPV and revenue growth, thus effectively concealing the true effect that these unsustainable practices had on Fiserv, and (iii) temporary revenue boosts in Financial Solutions. *See* Sections IV.B-H, *supra*.

554. As such, Bisignano carefully structured his transactions to complete **99.9%** of his divestment (including 98.8% of his personal holdings) before Fiserv's scheduled July 23, 2025 disclosure of its Q2 2025 financial results. Between May 16, 2025 and July 22, 2025, Bisignano, his spouse, and trusts owned by or affiliated with him sold 4,154,132 shares for proceeds of $683,689,109.

555. Most suspiciously, on July 21 and 22, 2025, Bisignano sold 861,545 shares of his Fiserv common stock for proceeds of $142,548,771—one and two days before the July 23, 2025 corrective disclosure that caused the stock price to decline by approximately 13.9%. Indeed, the release of the Company's financial results on July 23, 2025 was long scheduled, and thus, Bisignano knew much of the information that was set to be released on that date.

556. By contrast, after the July 23, 2025 corrective disclosure, Bisignano sold only 348 shares on August 1, 2025 for proceeds of $47,289. This rendered his earlier sales highly suspicious.

557. Further, as discussed herein, Bisignano's suspicious trading triggered investigation from the ranking members of Congress, as well as intense scrutiny from the media. *See* Section V, *supra*. The totality of these circumstances render these sales highly suspicious in nature.

558. Additionally, Gibbons' stock sales were suspicious.[34] On June 10, 2024, Gibbons sold 2,800 shares at a price of $148.76 per share for proceeds of $416,528. On August 21, 2024, Gibbons sold 18,890 shares at an average price of $168.21 per share for proceeds of $3,177,486.90. At the time, this represented 40% of his ownership of Fiserv common stock, bringing his holdings down from 47,213 to 28,323 shares. Then, on March 3, 2025, Gibbons sold 13,560 shares at an average price of $238.15 per share for proceeds of $3,229,314. At the time, this represented 33% of his ownership of common stock, bringing it down from 41,162 to 27,602 shares. None of Gibbons' Class Period sales were made pursuant to a Rule 10b5-1 trading plan.

559. In sum, the Class Period trading of Defendants Bisignano and Gibbons was highly unusual in nature. The lack of trading plans for the majority of the Class Period sales, combined with their timing and departure from Control Period sales, strongly supports an inference that the sales were both unusual and suspicious.

**H. Defendants' SOX Certifications Support Scienter**

560. During the Class Period, Bisignano, Hau, and Lyons signed SOX Certifications under SOX Sections 302 and 906 that were attached to each of the Company's Forms 10-K and 10-Q, which contained materially false and misleading statements and financials, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud.

561. The SOX Certifications under Section 302 stated that Bisignano, Hau, and Lyons were "responsible for establishing and maintaining disclosure controls and procedures" and had evaluated and presented "the effectiveness of [Fiserv's] disclosure controls and procedures." They also attested that "th[e] [respective] report does not contain any untrue statement of a material fact

---

[34] Gibbons first began reporting his stock transactions in February 2024.

or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

562. Similarly, in the SOX Certifications under Section 906, Bisignano, Hau, and Lyons attested that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

563. By signing the SOX Certifications, Bisignano, Hau, and Lyons acknowledged that they had access to and reviewed Fiserv's financial information, including but not limited to the Company's organic revenue growth, contribution from hyperinflation in Argentina, and heightened customer attrition within the Financial Solutions segment, as well as the materially false and misleading statements set forth above. *See* Section VI, *supra*.

### I. The U.S. Government's Probe into Fiserv and Bisignano Supports Scienter

564. The timing and magnitude of Fiserv's October 29, 2025 financial reset prompted a government investigation into the management of Fiserv. As discussed above, on November 6, 2025, Senators Ron Wyden and Elizabeth Warren demanded information on "the details of [Bisignano's] financial projections for Fiserv's performance, which [Lyons] indicated in an investor call '**would have been objectively difficult to achieve even with the right investment and strong execution**.'" The senators also raised concerns that "Bisignano appears to have failed to manage Fiserv effectively," "**may have misled investors and the public about the company's financial status**," and "avoid[ed] about $300 million in losses" by divesting his interests before the stock dropped by "over 50%."

565. Similarly, on November 14, 2025, through a joint letter addressed to the Chairman of the SEC, Paul Atkins, Representatives John B. Larson and Jim Himes called for an SEC investigation into "the circumstances surrounding the financial reporting of Fiserv, Inc." during Bisignano's tenure "and the timing of his required stock divestiture." Again, this letter raised concerns that Bisignano may have "misled investors and the public, warranting an investigation."

566. The post-Class Period Congressional calls for scrutiny of Fiserv management for misleading investors, and of Bisignano's personal benefits and avoidance of substantial losses inflicted on public investors through his trading on material nonpublic information immediately before a corrective disclosure, also bolster the strong inference of scienter.

## IX. CLASS ACTION ALLEGATIONS

567. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Fiserv during the period from February 6, 2024 through October 28, 2025 inclusive. Excluded from the Class are: (i) Defendants; (ii) Individual Defendants' immediate family members; (iii) any officer, director, or control person of Fiserv during the Class Period, and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Fiserv's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

568. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fiserv's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or

thousands of members in the proposed Class. Millions of Fiserv shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Fiserv or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

569. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

570. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

571. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fiserv;

(c) Whether, and to what extent, the market price of Fiserv common stock was artificially inflated during the Class Period because of the alleged material misstatements;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants were controlling persons of Fiserv; and

(f) Whether the members of the Class have sustained damages because of the conduct complained of herein, and if so, the proper measure of damages.

572. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

573. To the extent that Plaintiffs allege affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations, or failed to disclose material facts required to render other statements non-misleading, during the Class Period;

(b) the misrepresentations were material;

(c) Fiserv common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Fiserv common stock;

(e) Plaintiffs and other members of the Class purchased Fiserv stock between the time of the misrepresentations and disclosure of the true facts, without knowledge of the misrepresented or omitted facts;

(f) Fiserv common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) According to the Company's SEC Form 10-Q filed on October 30, 2025, the Company had approximately 537,851,887 shares then outstanding, demonstrating a very active and broad market for Fiserv common stock;

(h) Fiserv filed periodic public reports with the SEC;

(i) Fiserv regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures;

(j) Fiserv was followed by securities analysts employed by major brokerage firms, including Goldman Sachs, Wells Fargo, Bernstein Research, and J.P. Morgan Research, which wrote reports distributed to the sales force and customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) Unexpected material news about Fiserv was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) There were market makers for Fiserv's shares during the Class Period.

574. As a result of the foregoing, the market for Fiserv common stock promptly digested current information about Fiserv from publicly available sources and reflected such information in its share price. Under these circumstances, all Class members suffered similar injuries through their purchases of Fiserv stock at artificially inflated prices and the presumption of reliance applies.

575. The material misrepresentations alleged herein would induce a reasonable investor to misjudge the value of Fiserv stock.

576. To the extent that Defendants improperly failed to disclose material facts about Fiserv's business and/or engaged in a fraudulent scheme and course of conduct, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

577. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

578. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the Company relied on various short-term initiatives to prop up a false appearance of revenue growth.

579. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded, Defendants are liable for the statements because at the time each was made, they had actual knowledge it was materially false or misleading, or the

statement was authorized or approved by an executive officer of Fiserv who knew the statement was false when made.

## XII. CONTROL PERSON ALLEGATIONS

580. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in its day-to-day operations at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements therein and of their materially false and misleading nature.

581. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Fiserv during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the alleged misrepresentations.

582. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Fiserv's business through access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly held meetings, as well as other management and Board of Directors meetings, and reports and other information provided to them in connection therewith.

583. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Fiserv's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Fiserv common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing violated these specific requirements and obligations.

584. The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Fiserv stock during the Class Period, which included, but was not limited to, the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) concerning the full extent to which the Company relied on and concealed Fiserv's reliance on certain short-term initiatives including (i) Clover's contributions to Merchant Solutions' revenue through adhesive, unwanted, and often unknown fees, including those from the forced Gateway Conversion; (ii) Fiserv's use of Argentina's hyperinflationary environment to boost GPV and revenue growth; and (iii) performance declines in Financial Solutions from severe cost-cutting and resulting client attrition.

585. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Fiserv, were acting on behalf of the Company in the regular course of business. Therefore, each statement made by the Individual Defendants during the Class Period is attributable to the Company.

## XIII. CAUSES OF ACTION

### COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) against Defendants Fiserv, Bisignano, Hau, and Lyons

586. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

587. The Count is asserted on behalf of all members of the Class against Fiserv, Bisignano, Hau, and Lyons for violations of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

588. As alleged, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially manipulate the price of Fiserv common stock; and (iii) cause Plaintiffs and members of the Class to purchase Fiserv common stock at artificially inflated prices.

589. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

590. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Fiserv common stock during the Class Period.

591. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Fiserv common stock, Plaintiffs and other members of the Class purchased Fiserv common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Fiserv common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the stock price declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

592. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against All Defendants**

593. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

594. The Count is asserted on behalf of all members of the Class against Fiserv, Bisignano, Lyons, Hau, and Gibbons for violations of § 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder.

595. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege nor prove that any Defendants made misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

596. As alleged herein, during the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the price of Fiserv common stock; and (iii) cause Plaintiffs to purchase Fiserv common stock at artificially inflated prices.

597. Defendants' fraudulent device, schemes, artifices, and deceptive acts, practice, and course of business included the knowing and/or reckless suppression and concealment of information regarding (i) Clover's success and the sources of that ostensible success; (ii) Fiserv's double-digit organic revenue growth and the contribution to that growth of economic conditions in Argentina; and (iii) the strength and stability of Fiserv's Financial Solutions business segment.

598. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Fiserv stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

599. Plaintiffs and the Class reasonably relied upon the integrity of the market in which Fiserv's stock traded.

600. During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of

conduct, they would not have purchased Fiserv stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

601. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Fiserv's common stock during the Class Period.

602. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Fiserv common stock during the Class Period.

## COUNT III

### For Violation of § 20(a) of the Exchange Act against the Individual Defendants

603. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

604. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

605. The Individual Defendants had control over Fiserv and made the materially false and misleading statements and omissions on behalf of Fiserv within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and culpable participation in the fraud, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs

to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

606. The Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Additionally, to the extent necessary, the Individual Defendants actually exercised control over Fiserv, including by, among other things, directing the Company to issue materially false and misleading statements to the investing public in group-published and other materials.

607. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with purchasing the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

Plaintiffs demand a trial by jury.

JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Dated: June 12, 2026

*/s/ Christopher F. Moriarty*

**MOTLEY RICE LLC**
Christopher F. Moriarty
(Admitted *pro hac vice*)
Susan Ranee Saunders
(Admitted *pro hac vice*)
Neli Traykova Hines
(Admitted *pro hac vice*)
Marie Celeste Anderson
(Admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
cmoriarty@motleyrice.com
rsaunders@motleyrice.com
ntraykova@motleyrice.com
mcanderson@motleyrice.com

Serena P. Hallowell
800 Third Avenue, Suite 2401
New York, NY 10022
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
shallowell@motleyrice.com

*Counsel for Lead Plaintiff ETHENEA Independent Investors S.A. and Lead Counsel for the Proposed Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Robert M. Rothman
(Notice of Appearance forthcoming)
Joseph Russello
(Notice of Appearance forthcoming)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173
rrothman@rgrdlaw.com
jrussello@rgrdlaw.com

*/s/ Michael H. Rogers*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty
Michael H. Rogers
Jacqueline R. Meyers
Stephen C. Boscolo
(Notice of Appearance forthcoming)
Kaicheng Yu
(Notice of Appearance forthcoming)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
jmeyers@labaton.com
sboscolo@labaton.com
nyu@labaton.com

*Counsel for Lead Plaintiffs Hollywood Police Officers' Retirement System and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
(*Pro Hac Vice* forthcoming)
FL Bar No. 244082
Stuart A. Kaufman
(*Pro Hac Vice* forthcoming)
FL Bar No. 979211
7080 NW 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiffs City of Hollywood Police Officers' Retirement System*

*Counsel for Plaintiff City of Pontiac Reestablished General Employees' Retirement System*

**ASHERKELLY**
Cynthia J. Billings-Dunn
25800 Northwestern Hwy, Suite 1100
Southfield, MI 48075
Telephone: (248) 746-2710
cbdunn@asherkellylaw.com

*Additional Counsel for Plaintiff City of Pontiac Reestablished General Employees' Retirement System*

*and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*